## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FROME WYE LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 22-mc-00249-CFC |
| HOSIE RICE LLP, SPENCER HOSIE, | ) | |
| AND DIANE RICE, | ) | |
| | ) | |
| Defendants. | ) | |


## DEFENDANTS' OPENING BRIEF IN SUPPORT OF MOTION TO
## <u>VACATE ARBITRATION AWARD</u>


OF COUNSEL:

Spencer Hosie
Diane Rice
Hosie Rice LLP
505 Sansome Street
Suite 1575
San Francisco, CA 94111

Dated: August 30, 2022

Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899-0951
(302) 984-6000
jchoa@potteranderson.com

*Attorneys for Defendants*

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.    INTRODUCTION AND SUMMARY.............................................................1

II.   THE LAW ...........................................................................................1

III.  STATEMENT OF FACTS ....................................................................4

IV.  ARGUMENT.......................................................................................18

      A.    The Panel Was to Resolve the Threshold Control Question to Narrow Discovery, Not End the Case ................................................18

      B.    The Law is the Law ..............................................................................20

V.   CONCLUSION...................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page**

*Ario v. Underwriting Members*,
   618 F.3d 277 (3d Cir. 2010) ........................................................................1

*Caputo v. Wells Fargo Advisors, LLC*,
   2022 WL 1449176 (3d Cir. May 9, 2022) ....................................................3

*CPR Management, S.A. v. Devon Park Bioventures, L.P.*,
   19 F. 4th 236 (3d Cir. 2021) ........................................................................3

*Dluhos v. Strasberg*,
   321 F.3d 365 (3d Cir. 2003) ........................................................................2

*E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*,
   531 U.S. 57, 121 S.Ct. 462, 148 L.Ed 2d 354 (2000) ..................................3

*Garda USA Inc. v. SPX Corp.*,
   2013 WL 2448912 (2011) ...........................................................................21

*Mansoory v. SC&A Construction, Inc.*,
   2009 WL 2140030 (2009) ...........................................................................21

*MarkDutchCo I B.V. v. Zeta Interactive Corp.*,
   411 F. Supp. 3d 316 (D. Del. 2019) .........................................................1, 2

*Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.*,
   409 F.3d 574 (3d Cir. 2005) ........................................................................3

*Online Healthnow, Inc. v. CIP OCL Investments*,
   C.A. No. 2020-0654-JRS (Del. Ch. Aug. 12, 2021) ...................................14

*Oxford Health Plans LLC v. Sutter*,
   569 564, 133 S. Ct. 2064, 186 L.Ed. 2d 113 (2013) ................................ 2-3

*Paul Green School Of Rock Music Franchising, LLC. v. Smith*,
   389 Fed. Appx. 172, 2010 WL 2993835 (3d Cir. 2010) ...............................2

*Ross Dress for Less, Inc. v. VIWY, L.P.*,
    2017 WL 4155087 (E.D. Pa. Sept. 19, 2017) ..................................................2

## **Statutes**

6 Del. Code section 2301(c)..................................................20

9 U.S.C. § 1 ..................................................1

9 U.S.C. § 10(a)(3)..................................................3

9 U.S.C. § 10(a)(4)..................................................2

## I.     <u>INTRODUCTION AND SUMMARY</u>.

Arbitrations are designed to be final.  Arbitrators are invested with significant discretion.   But an arbitration is not above the law, and arbitrators may not knowingly disregard the law.  Nor may an arbitration panel deprive a party of due process under the guise of arbitral "discretion."

In this arbitration, a Panel ruled against Spencer Hosie, Diane Rice, and their law firm, Hosie Rice LLP ("Firm").  The Panel did so without permitting **any** discovery: not a single document production request; not a single deposition. Instead, the Panel ruled against the Firm by disagreeing with the facts the Firm pled in an Amended Complaint, facts that Delaware law requires be accepted as true.  In a case turning on disputed facts, the parties are entitled to a **merits** hearing based on the evidence; this is fundamental.  Due process does not end when an arbitration begins.

## II.    <u>THE LAW</u>.

The Federal Arbitration Act (FAA), 9 U.S.C. §§1 *et seq.*, governs this Court's review of the JAMS arbitration panel's Final Award.  Even though Frome Wye Limited d/b/a ("Woodsford") is a foreign entity, the FAA applies here, as both the arbitration and enforcement took place here.  *See Ario v. Underwriting Members*, 618 F.3d 277, 292 (3d Cir. 2010).  *See also MarkDutchCo 1 B.V. v. Zeta Interactive Corp.,* 411 F. Supp. 3d 316, 327 (D. Del. 2019), The JAMS rules state that any

proceeding to "confirm, modify, or vacate an Award will be controlled by and conducted in conformity with the Federal Arbitration Act…." JAMS Rule 25.

There are two grounds for vacatur here. First, under Section 10(a)(4) of the FAA, a court may vacate an arbitration award "where the arbitrators exceeded their powers." 9 U.S.C. §10(a)(4). An arbitrator exceeds its powers when acting in "manifest disregard of the law." *Ross Dress for Less, Inc. v. VIWY, L.P.*, 2017 WL 4155087, at *3 (E.D. Pa. Sept. 19, 2017). Vacatur is available where "the arbitrator (1) knew of the relevant legal principles, (2) appreciated that this principle controlled the outcome of the disputed issue, and (3) nonetheless willfully flouted the governing law by refusing to apply it." *Paul Green School Of Rock Music Franchising, LLC. v. Smith*, 389 Fed. Appx. 172, 177, 2010 WL 2993835, at *4 (3d Cir. 2010). While the Third Circuit has yet to decide the issue, historically the Third Circuit has allowed a district court to vacate an arbitration award that evidences manifest disregard of the law. *See, e.g., Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003).

It is well settled "[a] court may only overturn an arbitrator's determination if 'the arbitrator acts outside the scope of his contractually delegated authority' by 'issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract.[.]'" *See MarkDutchCo* at 327 (*citing Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569, 133 S. Ct. 2064, 186 L.Ed.2d

113 (2013) (*quoting E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed 2d 354 (2000)).

Second, under 9 U.S.C. §10(a)(3), vacatur is proper where the arbitrators refuse "to hear evidence pertinent and material to the controversy." Vacatur is "warranted only where the arbitrators' refusal to hear proffered testimony so affects the rights of a party that it may be said that **he was deprived of a fair hearing**." *Caputo v. Wells Fargo Advisors, LLC*, 2022 WL 1449176 *4 (3d Cir. May 9, 2022) (*citation omitted*; emphasis added). "A 'fair hearing' is one where the parties have notice and opportunity to present evidence and arguments before an impartial arbitrator." *CPR Management, S.A. v. Devon Park Bioventures, L.P.,* 19 F. 4th 236, 245 (3d Cir. 2021) (citations omitted).

While great deference is due, there is a right to review for a **reason**: the reviewing court should not "rubber stamp" the arbitrator's decision. *See Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.*, 409 F.3d 574, 579 (3d Cir. 2005) ("However, we cautioned that '[e]ffusively deferential language notwithstanding, the courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions for arbitrators.'") (internal quotation marks omitted). Arbitrations sometimes run off the rails in a profound and unfair way. The right to be wrong is not equivalent to the right to ignore substantive rules of law, nor ignore the fundamental due process.

3

III.   **STATEMENT OF FACTS.**

After months of negotiation, and a detailed Term Sheet, the Firm entered into a Litigation Funding Agreement ("LFA") with Frome Wye Limited, a wholly owned subsidiary of Woodsford Litigation Funding Ltd. ("Woodsford").  Woodsford does business in this country as Woodsford, not Frome Wye.  *See, e.g.*, www.woodsford.com/litigation-funding.   Woodsford provides high-risk, high-reward non-recourse litigation funding.  It invests in contingency cases and recovers its investment plus a **very** substantial return from contingency recoveries, if any.

In early 2018, Woodsford proposed a contingency non-recourse funding arrangement to the Firm.  The Firm takes some pure contingency cases, but typically works on a "hybrid" fee basis, *i.e.*, the client pays monthly hourly fees at a reduced rate, and the Firm takes a reduced contingency interest in any recovery.  The reduced monthly fees are **not** contingent, but due "regardless of outcome," and must be paid monthly.

From the outset, it was explicit that Woodsford would have **no** interest in these non-contingent reduced hourly fees.  Instead, its interest would be limited to the contingency sums recovered, if any.  Woodsford's own Term Sheet is explicit on the point:

"**Repayment**: When contingent fee income is received."

4

"**Security**: **Contingent fee income** related to all existing cases on which the firm acts on a contingent fee [**or hybrid**] basis."

"**Basic case qualification criteria**: Hosie Rice's engagement letter with the plaintiff includes an element of contingent fee equivalent to at least 15% of gross case proceeds." *See* Term Sheet, Declaration Of Spencer Hosie ("Hosie Dec."), Ex. 5.

This Term Sheet so states that Woodsford's interest in hybrid cases was **limited** to the **contingent** component of these cases. The LFA included a schedule of cases subject to the financing: all were either fully contingent or hybrid.

Given the non-recourse contingent risk Woodsford assumed, it received an annual interest rate of 26%, **and** a mandatory first money out $250,000 interest "pre-payment."

The parties signed the LFA in early fall 2018. The Firm began to draw down monthly amounts in October 2018, and had used $550,000 by early December. In mid-December, the Firm settled one of the scheduled contingency cases, and forthwith (December 17, 2018) paid Woodsford $800,000, comprising the $550,000 in principal and the mandatory interest prepayment of $250,000. (The interest due for 2018 at 26% was just circa $16,000). The Firm began 2019 with nothing owed, **and** a $236,400 prepaid interest credit. These facts are undisputed.

In January through April 2019, the Firm drew down another $800,000. In early May 2019, Woodsford said it would not advance additional funds until it completed due diligence on several new contingency cases the Firm had accepted.

### *Space Data v. Google*

One of the hybrid scheduled cases was a patent and breach of NDA case pending in the Northern District of California (Hon. Beth Labson Freeman). The Firm's client was an Arizona company, Space Data Corporation ("SDC"); the defendant was Google, Inc. (now Alphabet). Jerry Knoblach was the SDC C.E.O.; his father Mark Knoblach was the principal SDC investor. Together, the Knoblachs had voting control, but about 40% of the equity was held by non-Knoblach minority investors, all owed a fiduciary duty by the Knoblach's.

This was a hybrid case, with the client required to pay reduced hourly fees and costs on a monthly basis due "regardless of outcome." *See* Hosie Dec., Ex. 6 (portions of Representation Agreement). The Firm also had an additional contingent interest, payable out of a recovery, if any. The **contingent** portion of this case was subject to the Woodsford financing; the hourly **non-contingent** fees were not.

In April 2018, the Court heard Google's Summary Judgment Motion, challenging the breach of the NDA claim, and arguing that Google did not practice one limitation of the asserted patents. At argument, it quicky became apparent that

the Court would grant the non-infringement summary judgment, but deny the motion on the NDA claim (and so it was).

Over 2019, the relationship between the Firm and the SDC C.E.O. Knoblach deteriorated.   The C.E.O. insisted that **he** was the client, not the Board (the Representation Agreement said the company was the client, not the C.E.O.; *see* Hosie Dec., Ex. 6 at 1).   Knoblach castigated the Firm for not being aggressive enough in settlement evaluation (*e.g.*, insisting that the Firm table a billion-dollar demand).  He insisted that the Firm not share any views on the litigation with which Knoblach personally disagreed.   The C.E.O. said that the lawyers were not "following the chain-of-command;" the lawyers felt that the Knoblachs were trying to prevent the Firm from speaking candidly to all equity stakeholders, a recipe for a malpractice suit.

In June 2019, two months before trial, Knoblach hired one of his oldest friends from college, a non-patent lawyer, to become SDC's outside General Counsel. Knoblach instructed the Firm **not** to communicate with the SDC Board, or with him, but communicate through the outside lawyer alone, who would (theoretically) forward the Firm's recommendations on settlement strategy and trial, etc. to the client, and then communicate the client's responses to the Firm.

On the eve of trial, the Firm settled the NDA claim at a **substantial** premium (close to 3X) over SDC's own expert's damages calculation for that claim.

Within days of this settlement, SDC fired the Firm.  The new lawyer appeared as counsel of record, and then SDC said it would not pay the accrued monthly fees due (a big number, given that SDC was often 12 to 20 plus months in arrears—here $5.2 million in arrears).

In August 2019, the Firm started a JAMS Streamlined Arbitration to recover fees due.  There were three components to the fee claim: (1) the due "regardless of outcome" past due monthly hourly fees (a contract claim); (2) the Firm's contingency interest in the paid NDA settlement amount (a contract claim); and, (3) a *quantum meruit* claim for a portion of any future recovery (under California law, an interest in a prospective contingency recovery cannot be brought as a contract claim, but only under a *quantum meruit* theory).

As clients sued for fees tend to do, SDC counterclaimed for malpractice and sought a declaration that it owed no fees at all—not the delinquent hourly fees, nor the contingency fees on the amount recovered, nor any interest in any future recovery.  SDC, instead, sought to clack-back the hourly fees paid in this massive and complex case over the many years prior.  It was, put mildly, a bitter dispute.[1]

The arbitration was heard by Hon. Sue Robinson (Ret.).  In a final Order dated August 20, 2020, Judge Robinson gave the firm $4 million of its $5.2 million accrued

---

[1] The new lawyer, not a patent lawyer, appealed the patent non-infringement ruling to the Federal Circuit, and lost a week after argument with a terse Rule 36 affirmance.

8

hourly fees, but denied the Firm any contingency recovery in the NDA settlement or on a prospective *quantum meruit* claim.  The Arbitrator also denied SDC's request to claw-back prior fees.

The Arbitrator's decision was entirely clear: the Firm received most of its hourly fees, but not all.  The Firm recovered **no** contingency fees whatsoever.

### ***The Woodsford Dispute***

When Woodsford saw the Order, and learned that the Firm had recovered only non-contingent hourly fees in the fee arbitration against its client, it suddenly took the position that it had an interest in the SDC hourly fees.  Without telling Mr. Hosie or Ms. Rice, Woodsford then tried to foreclose on their personal residence of over 30 years, which was security as both Hosie and Rice were co-borrowers under the LFA (an important point, as set out below).  Woodsford did not **disclose** this foreclosure effort, although the parties were in frequent contact, and it did **not** serve Hosie, Rice or the Firm (a tactic reprised in this case, as set forth below).  Hosie and Rice serendipitously learned of this effort, and filed an Emergency Relief Request per JAMS Rule 2.  Once the Firm received the Notice of Default ("NOD"), it was clear that Woodsford's NOD claimed a materially false (too high) amount; Woodsford failed to give the Firm any credit for the additional $236,400 interest prepayment.  Under California law, this is improper and tortious (*see* below), all as set forth in the Firm's very first pleading forward.

9

Under JAMS pleading rules, the Firm was required to give basic notice of the facts and claims germane to the case. The Firm did so in a lengthy Complaint filed with the Request for Emergency Relief. For example, on the contrast between what Woodsford said in negotiating the deal and its own Term Sheet, and its new litigation position, ¶ 29 of the Firm's first brief stated as follows:

> Woodsford, now, evidently, is trying to rewrite the contract to give it an interest in the Firm's **hourly, non-contingent** fee revenue. This position is directly contrary to the Woodsford Term Sheet, the Agreement, and every representation Woodsford made in the negotiation leading to the executed Agreement. Woodsford's new position, that its contract involved non-contingent hourly fee revenue, is made in bad faith and flat wrong on its face. And **Woodsford first made this allegation just days after it learned that the Firm did not recover any contingency fee in the Space Data case**.

Hosie Dec., Ex. 7, ¶ 29 (emphasis original). These allegations put Woodsford on notice that the Firm viewed Woodsford's new argument, if true, as proving false everything Woodsford had said prior.

JAMS appointed Arbitrator Otis McGee to handle this dispute. After significant briefing and argument, Mr. McGee ruled that the Firm was "likely to prevail," that Woodsford did not have an interest in hourly fees, and so enjoined the foreclosure. Woodsford then tried to seize the Firm's bank accounts all without **any** determination of liability; Mr. McGee enjoined these efforts as well.

10

In November 2020, the parties had agreed on a Panel of three arbitrators: Kenneth M. Kramer, Hon. Shirley W. Kornreich (Ret.), and Gregory P. Miller ("Panel"). On December 15, 2020, the Panel held an organizational call.

In that call, the Firm said that all parties would benefit from an early resolution of the contractual construction question: did Woodsford have an interest in the monthly fees due regardless of outcome or not? This threshold question materially shaped relevant issues and so prospective discovery. For example, Delaware usury law does **not** apply to a non-recourse financing; it **does** apply to a recourse financing. This usury issue was, therefore, dependent on how the Panel resolved the threshold contract question. The Firm's two letters to the Panel said that such an early ruling would "significantly streamline this dispute." Hosie Dec., Ex. 8 at January 4, 2021. Both parties also agreed that resolving this threshold question would narrow **but not moot discovery**:

> Finally, both parties agree that discovery should begin only **after** the parties file and this Panel decides the Summary Judgment questions outlined above. It is difficult to police fact discovery until one knows what basic issues remain in dispute. **Streamlining discovery is one important reason why both parties have proposed early motions on key contractual meaning issues.**

Hosie Dec., Ex. 9 (emphasis ours). "Streamlining" does not mean eliminating.

In Panel Order No. 2, the Panel ruled that early decision on the threshold contract question "will not serve the stated goals of efficiency and cost effectiveness

11

in fully resolving the claims and counterclaims in this arbitration, and therefore, the request to file such motions are denied." January 16, 2021 Pre-Hearing Order No. 2.

On February 16, 2021, the Panel changed its mind, and gave the parties leave to file motions on whether Woodsford had an interest in the hourly fees. The Panel stayed all discovery pending resolution of this threshold dispute. In short, both parties and the Panel agreed that the Panel would stay discovery, resolve the threshold control question, and then discovery and a hearing would proceed accordingly. **This is explicit in the record.**

### ***The Order on the Threshold Contractual Interpretation Question***

On July 3, 2021, the Panel ruled that the LFA, through several sentences in one paragraph, gave Woodsford a repayment right to hourly fees in hybrid cases. *See* Petition for Confirmation of Arbitration Award ("Petition"), Ex. 2. In this way, what was negotiated, drafted, and agreed to be a high-risk, high-return contingency financing, became a no-risk fully secured loan (at 26% a year!), as the record was clear that the Firm's hourly non-contingent fee income was sufficient to cover **any** Woodsford funds advanced.

On July 6, 2021, three days after this Order, the Firm asked leave to file an Amended Complaint, addressing issues necessarily arising given the Panel's construction, *e.g.*, usury under Delaware law. By agreement, these issues had been

12

**deferred** pending decision on the threshold contract issue.   The Panel's ruling changed what was negotiated and priced as a high-risk, high return no recourse financing into a fully secured loan, backed by all of the Firm's hourly fees in the hybrid cases.   These claims, *e.g.*, usury, fraud-in-the-inducement, became germane only once the Panel ruled on the threshold contract issue.

The Firm filed a detailed brief justifying the filing, including tying the claims in the proposed amendment to **facts** long since of-record.   For example, once the Panel accepted Woodsford's argument that the LFA gave it a repayment right in hourly fees in the hybrid cases, this meant that everything Woodsford said in negotiating the contract and its own Term Sheet was false.   As the motion for leave put it:

> [I]f Woodsford pre-execution understood the deal as it now claims (guaranteed by all non-contingent hourly fees and cost recoveries, and backed by equity), **every** representation Woodsford made to the Firm pre-execution was affirmatively misleading.   As alleged with 9(b) specificity, Woodsford explicitly described this financing as a "high-risk; high return" investment in contingent fee recovery.  It said this repeatedly in the parties' many phone calls.  It also said this in writing, pre-execution.  And it never stated to the contrary (until August 2020).  Given this history and numerous explicit representations, the proposed definitions did not put the Firm on notice to ask Woodsford if water remained wet.  If Woodsford changed the deal after months of oral and written representations through two LFA definitions, it should have so disclosed to the Firm.  It did not.

Hosie Dec., Ex. 10 at 2-3.  This reprises exactly what the Firm said in ¶ 29 of its first filing; **these were not new allegations**.

The attached Complaint was 27 pages long.  *See* Hosie Dec., Ex. 11.  It pled with 9(b) specificity, even though this is explicitly **not** required under JAMS' pleading rules (short statement providing notice).

### ***The Panel Denies Leave to Amend***

On October 18, 2021, in a decision centrally important here, the Panel denied the Firm leave to amend.  The **why** of this decision matters.  Put briefly:

- The Panel found the Amended Complaint did not plead fraud-in-the-inducement claims in adequate detail.  It did; the 27-page amended pleading fully complied with a 9(b) specificity standard.  But so be it: the larger point here is that **JAMS does not require 9(b) pleading specificity**; JAMS' pleading Rule 9 only requires a short statement providing basic notice.

- The Panel found that the LFA waived any claim for pre-execution misrepresentation.  But Delaware law is explicitly to the contrary: a party cannot contract away liability for fraud (for obvious reasons).  This ruling manifestly disregarded well-settled Delaware law.  *See Online Healthnow, Inc. v. CIP OCL Investments*, C.A. No. 2020-0654-JRS (Del. Ch. Aug. 12, 2021).

- The Amended Complaint pled a wrongful foreclosure count, specifically, that by proceeding with an NOD premised on a materially overstated

amount, Woodsford violated California law (which would apply to enforcement actions taken in California).  This claim alleged **exactly** the same facts set forth in the Firm's first filing: Woodsford went forward with an NOD based on an amount it knew to be wrong.  *Compare* September 10, 2020 Complaint for Emergency Relief, Hosie Dec., Ex. 7 at ¶¶ 26-27 (double-counting interest, so NOD amount overstated), with Proposed Amended Complaint, Hosie Dec., Ex. 11 at ¶ 111 (same). On this, the Panel ruled:

> Claimants also seek to add a breach of contract claim by alleging that the notice of default violated California law. There is no identification of the California law allegedly violated, nor any further effort to plead this purported violation. This vague and conclusory pleading does not meet any elements of a breach of contract claim. A defendant is entitled to notice of what a claim entails. The proposed pleading falls well short of giving Frome Wye notice of a claim.

*See* Petition, Ex. 3 at 3, fn 3.

> • The Amended Complaint set forth 12 affirmative defenses.  These defenses become germane **only** given the Panel's threshold ruling on the contract construction issue.  These defenses were factual, and turned on the detailed Statement of Facts in the proposed Amendment.

> • On usury, the Panel simply said that the Firm was the borrower, and that Rice and Hosie were not co-borrowers.  (The Panel cited no language in the LFA in support, and the LFA is explicitly to the contrary; *see* below).

15

### *The February 24, 2022 Hearing*

The Panel heard argument on "next steps" in the arbitration on February 24, 2022.  With notice to the Panel and Woodsford, the Firm had the hearing transcribed.  In this argument, Mr. Hosie reviewed the key points where Woodsford "led the Panel" into error.  *See* Hosie Dec., Ex. 12, Hearing Transcript at 3-10.  This matters, as arbitrators have the right to be wrong, even very wrong.  But they do not have the right to disregard clear rules of law **knowingly**.  By point:

***On Usury*:** Woodsford said that Hosie and Rice were "guarantors" under the LFA, not co-borrowers, and only co-borrowers could claim the Delaware usury protections (where a loan is more than $100,000, and is secured by the residence of "any borrower").  The LFA is exactly to the contrary: Hosie and Rice are co-borrowers, not guarantors; they are "primarily" liable.  The LFA says that they are **not** sureties, *i.e.*, guarantors.  *See* below, § IV.B.  *See* Hosie Dec., Ex. 12, Tr. at 3:10-4:12.

***On Deciding Disputed Factual Issues in a Pleading Motion*:** Under long-settled Delaware law, facts pled must be assumed to be true.  The proposed Complaint set forth many specific facts, all critical to the proposed claims and affirmative defenses.  Woodsford contested these facts.  The Panel's October 18, 2021 Order denying leave to amend expressly adopted Woodsford's **version** of

16

disputed facts, directly contrary to Delaware law.  *See* October 18, 2021 Order (Petition Ex. 3), Hearing Tr. at 10:5-25 (Hosie Dec., Ex. 12).

***On Due Process***:  On this record, Hosie, Rice, and the Firm were denied a substantive hearing on the merits.  They were permitted **no** discovery, not a single document production request, nor a single deposition, even though the entire process had been established to secure a ruling on the threshold contract question first, and then proceed with discovery as narrowed and germane.

***On the Pleading Standard***:  JAMS Rule 9 sets forth the pleading standard in JAMS arbitrations: a short and plain statement providing notice is all that is required. Tr. at 9.  Woodsford argued, and the Panel accepted, that the FRCP 9(b) fraud with specificity standard applied.  It did not.

### *The Final Award*

On May 31, 2022, over three months later, the Panel issued its Final Award. *See* Petition Ex. 4 ([sic] "Spenser Hosie," "Diane Hosie," "Woodford," not Woodsford).

The Final Award began by saying "Liability having been determined…."  It had not been: there was a threshold determination of contractual meaning, with discovery and a hearing held in abeyance pending this decision.

On usury, the Final Award simply asserted that Hosie and Rice were guarantors, not co-borrowers, citing no support for this conclusion.

On pleading fraud in the inducement with specificity, the Final Award stated that the Firm did not provide notice of the facts underlying this claim. (It did, in ¶ 29 of its very first filing).

On June 1, 2022, Woodsford filed to confirm the award. It did not serve the Firm or its partners until August 11, 2022, **ten weeks** after it filed. In the interim, Woodsford filed a series of motions seeking to seal the record. Its filings innocuously noted that Woodsford copied "all counsel of record." Having not being served, the Firm had no "counsel of record," and so knew nothing of these proceedings. These were all *ex-parte* filings.

## IV. <u>ARGUMENT</u>.

An arbitration decision will not be vacated because the arbitration panel was wrong, or even manifestly wrong. A Panel has the right to get it wrong. Here, the Panel decided the threshold contractual interpretation issue as it did, and so be it. But an arbitration award must be vacated where the Panel "manifestly disregarded" well-settled law, and did so willfully, or where the Panel refused to hear evidence. This is exactly what happened here.

### A. <u>The Panel Was to Resolve the Threshold Control Question to Narrow Discovery, Not End the Case</u>.

Here, all discovery and claims devolved from one threshold contractual question: did the LFA give Woodsford a repayment in the non-contingent hourly

fees paid monthly in hybrid cases?   After learning of Judge Robinson's Order, Woodsford said yes; the Firm disagreed.

This threshold issue would drive the disputes and claims following.   For example, if Woodsford indeed intended to claim a right to hourly fees, **all** of its prior representations, including in its Term Sheet, were false.   But this fraudulent inducement claim only arose **if** the Panel concurred with Woodsford.   Rather than pleading in a hall-of-mirrors alternative fashion, the parties, **and the Panel**, agreed that discovery would be stayed until the Panel ruled on this gating question.

The central point is this: the record is clear that discovery would **follow** this ruling, as shaped by this ruling.   No party, nor the Panel, ever said that the Firm had to plead multiple claims in the alternative prior to this ruling.   No party, nor the Panel, said that the ruling on the threshold ruling would **end** the case without further discovery on issues made central by that very ruling.   The entire process was to the contrary.

The Firm was denied a fair hearing on the merits.   The Panel accepted Woodsford's version of disputed facts, contrary to law.   The Panel refused to consider evidence, even though the agreed process was **designed** to tailor the issues and evidence given the Panel's ruling on the threshold question.

At the risk of being too blunt, the Firm was sandbagged.   In a very direct way, the Firm was deprived of a substantive merits hearing because the Firm, with

19

Woodsford and the Panel's full acknowledgement, tried to be efficient and take first issues first.  This is a profound due process violation.

**B.    <u>The Law is the Law</u>.**

Once the Panel ruled that Woodsford had a repayment interest in the non-contingent hourly fee component in the hybrid case, the financing became a fully secured loan, with full recourse.  Over many paragraphs, the Amended Complaint set forth the facts supporting this point, *i.e.*, the historical and then ongoing hourly fee revenue in the hybrid cases.  *See* Hosie Dec., Ex. 11 at ¶¶ 44; 51.

A non-recourse speculative investment is not subject to any interest cap under Delaware law.  But a secured, recourse loan is, where the amount loaned exceeds $100,000 and is secured by the personal residence of "any borrower," 6 *Del. Code* section 2301(c).  In both the October 18, 2021 Order denying leave to amend, and the Final Order, the Panel asserted, without citation, that Hosie and Rice were guarantors (not entitled to usury protection), not co-borrowers (entitled to such protection).

The LFA is explicitly otherwise.  The LFA says that the parties were "jointly and severally liable… for the payment **and performance** of all obligations…."  Petition, Ex. 1 at § 13.3.  Even more pointedly, the LFA said that the partners' obligations were "primary," and that Woodsford had no obligation to proceed against the Firm first, as would perforce be true more were the partners guarantors:

20

> Partners agree that any obligation of Firm under this Agreement arising after a material breach of this Agreement by Firm **may be enforced by Funder against a Partner or Partners without any requirement that Funder first exercise its rights against Firm. Each Partner's obligations under this Section 13.3 are primary, continuing, absolute and unconditional, and are not subject to any** counterclaim, setoff, deduction, diminution, abatement, recoupment, suspension, deferment or **suretyship defense.**

*Id.*, LFA § 13.3 (emphasis ours).  In saying that the parties were **not** sureties, the LFA made plain that they were not guarantors: **surety and guarantor are synonymous**.

The two partners were co-borrowers.  The amount exceeded $100,000 and was secured by the partners' personal residence.  It is impossible to say that they were "guarantors" under the LFA; indeed, the LFA specifically says that the partners were not sureties, *i.e.*, guarantors, but primarily responsible for performance and payment.

Where an arbitration panel ignores the plain text of an agreement, its decision should be vacated.  "Manifest disregard includes disregarding the plain language of the contract at issue.  *See, e.g.*, *Garda USA Inc. v. SPX Corp.*, 2013 WL 2448912 (2011); *Mansoory v. SC&A Construction, Inc.*, 2009 WL 2140030 (2009) ("[t]he court, however, may take appropriate steps if the arbitrator's actions are 'in direct contradiction to the express terms of the agreement of the parties' because, then 'he has exceeded his authority.'"

21

In characterizing Hosie and Rice as guarantors, a conclusion the plain text of the LFA explicitly disclaims, the Panel exceeded its powers, and the Final Award should be vacated.

## V.   **CONCLUSION.**

For the reasons set forth above, Defendants respectfully requests that the Court vacate the arbitration award.


POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Spencer Hosie                    By: */s/ Jonathan A. Choa*
Diane Rice                            Jonathan A. Choa (#5319)
Hosie Rice LLP                        Hercules Plaza
505 Sansome Street                    P.O. Box 951
Suite 1575                            Wilmington, Delaware 19899-0951
San Francisco, CA 94111               (302) 984-6000
                                      jchoa@potteranderson.com

Dated: August 30, 2022               *Attorneys for Defendants*

22

## <u>CERTIFICATE REGARDING WORD COUNT</u>

Pursuant to the Court's *Standing Order Regarding Briefing In All Cases,* undersigned counsel certifies that the text of Defendants' Opening Brief is in Times New Roman 14-point font and combined contain 4,975 words as counted Microsoft Word for Office 365 ProPlus.

*/s/ Jonathan A. Choa*