# EXHIBIT 5

WOODSFORD

LITIGATION FUNDING

## Proposal for Hosie Rice LLP

## Introduction

Hosie Rice LLP is a boutique litigation law firm, based in San Francisco, California. In addition to name partners Spencer Hosie and Diane Rice, the firm is made up of three other high-quality lawyers, and a paralegal. The firm employs contract attorneys on an *ad hoc* basis. The firm specialises in high-value and complex intellectual property litigation and structured transactional work.

Following discussions among Spencer Hosie and Woodsford's Steven Friel, Josh Meltzer, Mark Spiteri and Jonathan Dickie, we propose the following potential litigation finance options.

### $1m Revolving Facility, with potential to extend up to $2m

The firm's current preference is to handle litigation on a hybrid contingency fee basis. The client pays 50% of the firm's fees and all hard costs on an ongoing basis. In return for the 50% discount on its fees, the firm is entitled to a success fee of 17.5% of proceeds from each litigation.

This model works well for the firm, providing a high degree of cashflow certainty plus upside, and it works well for the firm's usual client base, private equity-backed ventures that are willing and able to pay fees and costs, but who like to see that their lawyers have some 'skin in the game'.

Woodsford proposes a $1m Revolving Facility, where repayment to Woodsford is contingent upon Hosie Rice's receipt of contingency fees from its current portfolio of cases, including Space Data. This facility would provide the firm with valuable cashflow, and could be used to help scale up the business, without burdening the firm or its partners with debt.

To provide Hosie Rice with maximum flexibility, our facility can grow in-line with the growth of the firm's portfolio of hybrid contingency fee cases. The $1m Revolving Facility can be extended by $250k for each future hybrid contingency fee case that meets certain basic criteria, as described further below.

Contingency Fee Support Facility

As an alternative, or potentially as an addition, to the $1m Revolving Facility, Hosie Rice may benefit from our Contingency Fee Support Facility. This is not a finance facility in the traditional sense, rather it is a commitment from Woodsford to offer funding for individual cases to be handled by Hosie Rice. As shown by our relationship with the law firm Lewis Baach Kaufmann Middlemiss (see **here**, **here**, **here**), such a facility can be very useful as marketing and business development tool.

The idea behind our proposal is as follows:

Hosie Rice does not currently offer full contingency fee arrangements. This is in part because the firm's business model does not accommodate the higher level of risk involved, including the demands on partnership cashflow.

While this limitation does not impact Hosie Rice's ability to generate new business from well-resourced PE-backed clients, it may mean that the firm loses out on high quality instructions for clients that seek a fully contingency arrangement, for example resource-constrained patent owner-inventors.

Woodsford therefore proposes a contingency-fee support facility that will allow Hosie Rice to offer clients fully contingent arrangements without the need for Hosie Rice to take on all of the associated additional risk. In essence, the firm continues to put 50% of its fees on good cases at risk. Liability for the other 50% and for the hard costs element is borne by Woodsford.

## Terms of the "$1m Revolving Facility"

| Item | Terms |
|---|---|
| Maximum Advance | $1,000,000 (excluding interest) |
| Drawdown | One drawdown each month of up to $200,000 per month |
| Security | Contingent fee income related to all existing cases on which the firm acts on a contingency fee (or hybrid) basis, including those where the plaintiffs are: Masterobjects, Space Data, Looksmart, Hagenbuch and Mariner Homes. Standard good behaviour clause. |
| Arrangement Fee | 1% |
| Interest Rate | 1.5% per month when paid or 2% per month when unpaid. At the end of each quarter Hosie Rice will have the opportunity to pay interest accrued in the last quarter. If not |

Registered in England & Wales • company no. 07327885 • registered office: 8 Bloomsbury Street, London, WC1B 3SR

|  | paid the accrued interest will be recalculated based on lower interest rate and rolled up. |
|---|---|
| Minimum Return | $250,000. At the end of the availability period or earlier if the facility is fully repaid all interest paid and accrued will be calculated. To the extent that this interest does not at least equal $250,000 a top up amount will be due until Woodsford has received at least $250,000. |
| Term length | 2.5 years |
| Repayment | When contingent fee income is received |
| Re-draw | If contingent fee income from any case (other than Space Data) is received during the first 2 years of the facility term resulting in a full or partial repayment of the facility a redraw of 50% of the repaid amount may be made.  E.g. if the outstanding balance is £750,000 and a case results in a contingent fee income of $500,000, some $250,000 may be re-drawn increasing the Maximum Advance to $1,250,000. |
| Space Data realisation | If the Space Data is resolved without a contingent payment to Hosie Rise (e.g. the case is lost), Woodsford has the option of terminating the facility.  If the case is resolved with a contingent payment to Hosie Rice (e.g. the case is won), Woodsford will review the overall facility to ensure that there is sufficient likely future contingent fee income to continue to provide the facility. |
| Term extension interest | Where the facility remains outstanding beyond its term length additional interest of 0.75% per month will accrue until the facility has been repaid. |
| Information requirement | Bank statements monthly, Management Accounts quarterly, annual tax returns |

## (1)   Extensions to the "$1m Revolving Facility"

When a new contingency fee (or hybrid) case is taken on by Hosie Rice that meets the defined minimum criteria, the Maximum Advance of the $1m Revolving Facility is increased by $250,000 for every new case that is engaged up to an aggregate extension of $1m.

| Item | Terms |
|------|-------|
| Maximum Advance | $250,000 per new case up to an additional $1,000,000 in aggregate |
| Security | The contingent fee income related to the new case is added to the security of the $1m Revolving Facility |
| Arrangement Fee | 0% |
| Interest Rate | Same as $1m Revolving Facility |
| Drawdown | Same as $1m Revolving Facility |
| Term length | Every new case added lengthens the term of the $1m Revolving Facility by 6 months up to a maximum of 24 months extension. |
| Repayment | When contingent fee income is received |
| Re-draw | No-redraw |
| Basic case qualification criteria | Hosie Rice's engagement letter with the plaintiff includes an element of contingent fee equivalent to at least 15% of gross case proceeds. |

## (2)   Contingency Fee Support Facility

Hoise Rice may have the opportunity to act on good cases, but where the client seeks a full contingency fee deal. Rather than lose out to competitor law firms that are willing and able to act on a full contingency fee basis, a Woodsford Contingency Fee Support Facility would allow Hosie Rice to onboard those cases.

Our Contingency Fee Support Facility effectively operates as an umbrella funding agreement, where the funding terms for individual cases are pre-agreed between Hosie Rice and Woodsford. The Facility would operate along the following lines:

1.  Hosie Rice identifies a suitable case opportunity, i.e. one that fulfils the following basic criteria:
    a.  Hosie Rice has the expertise and resource to handle the case.
    b.  Plaintiff is credible and has a good reason for seeking a contingency fee deal.
    c.  Defendant's financial position is sound.
    d.  The case is materially more likely than not to result in a positive outcome.
    e.  The level of damages in the case is sufficiently large to justify Hosie Rice's and Woodsford's investments.

2. Hosie Rice offers Client a fully contingent deal, covering all legal fees and costs to the realisation of the case.

3. Hosie Rise negotiates the best possible Success Fee e.g. 45% of gross proceeds.

4. Client is made aware that the deal with be made up of (i) a Retainer Agreement with Hosie Rice, and (ii) a Litigation Funding Agreement with Woodsford. Technically two separate agreements, however the commercial effect will be simple – Client gets a fully contingent deal in return for giving up the Contingent Percentage.

5. Hosie Rice prepares a budget for the hard costs (e.g. experts, travel) in the case ("***Costs Budget***").

6. Woodsford will commit to provide funding of up to 3x Costs Budget. For example, if the Costs Budget amounts to $1.5m, Woodsford's commitment will be up to $4.5m.

7. 33% of Woodsford's commitment (i.e. the Costs Budget) will be used for costs. These will be paid by Woodsford as and when they arise.

8. 67% of Woodsford's commitment will be used for Hosie Rice's fees.  In effect, Hosie Rice will be paid 50% of its fees on an ongoing basis, subject to a cap of 2x Costs Budget. In the example case where the Costs Budget is $1.5m, Woodsford would pay 50% of Hosie Rice's fees, up to $3m.

9. The Success Fee would be divided between Hosie Rice and Woodsford on a 40:60 basis (40% – Hosie Rice; 60% – Woodsford).

10. Woodsford's cash outlay would have priority in the waterfall.

**Woodsford Litigation Funding**

**London, 25 April 2018**

# EXHIBIT 6



ATTORNEYS AT LAW

Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
T: 415.247.6000  F: 415.247.6001

**REVISED**

January 28, 2019

Jerry Knoblach
C.E.O.
Space Data Corp.
2535 Fairview Street, Suite 100
Chandler, AZ  85224
jknoblach@spacedata.net

      Re:    *Representation Agreement*

Dear Jerry:

      This letter agreement ("Agreement") sets forth the terms and conditions on which Hosie Rice LLP ("Hosie Rice" or "Attorneys") will represent Space Data Corp. ("Client") in the matter described below.

      Hosie Rice believes that it is important that all parties understand the terms and conditions under which Hosie Rice will be providing legal representation to the Client. This Representation Agreement ("***Agreement***") is a formal and legally binding contract defining: (1) Hosie Rice's attorney-client relationship with the Client, (2) the scope of Hosie Rice's legal representation of the Client, (3) the terms and conditions under which Hosie Rice will represent the Client, and (4) the fees and costs for services concerning such legal representation. Therefore, it is important that the Client carefully review this Agreement before executing it.

      **1.**     **Scope of Services**. Attorneys will represent Client as to the matter captioned *Space Data v. Google* ("Litigation").

      The terms of this Agreement will apply to any services we perform for the Client unless Attorneys and the Client expressly agree to different terms in writing, or as otherwise expressly provided in this letter. It is our intent to serve as a trusted legal advisor and make available the full range of legal services of our firm, and we look forward to building this relationship with the Client. Hosie Rice's sole client is the Client, ***not*** the Client's founders, officers, directors, shareholders, agents, or employees, even though Attorneys will necessarily deal with such individuals in representing the Client. The Client agrees to make it clear to such individuals that Attorneys are representing the Client and that they should retain their own counsel if they have legal questions.

HOSIE | RICE LLP
ATTORNEYS AT LAW

Jerry Knoblach
January 28, 2019
Page 2

    **2.**    **Client's Duties.**  Client agrees to cooperate with Attorneys, to keep Attorneys informed of any information or developments which may come to Client's attention, to assist Attorneys by providing necessary information and documents, to abide by this Agreement, to pay Attorneys' bills when due, and to keep Attorneys advised of Clients' address, telephone number and whereabouts.  In order to represent the Client effectively, Hosie Rice needs the Client's full cooperation including, but not limited to: (1) providing all documents and information relating to Hosie Rice's representation of the Client in a timely manner, (2) advising Attorneys of any parties who are adverse to the Client in the representation undertaken for the Client, and (3) making personal appearances upon reasonable notice in furtherance of the representations undertaken.  By signing this Agreement, the Client agrees to provide full cooperation to Hosie Rice on all matters in which assistance is requested.

    **3.**    **Legal Fees and Billing Practices.**  This is a mixed, or hybrid, hourly-contingent representation agreement.  Client agrees to pay by the hour for Attorneys' services at the reduced client rate of $475 per hour for Spencer Hosie and Diane Rice, $450 per hour for Brandon Martin, $375 for Darrell Atkinson and $110 for paralegals.  Invoices will be delivered to Client monthly and are payable upon receipt unless otherwise provided herein, and we reserve the right to impose interest at the rate of 10% per annum on any invoices outstanding more than 30 days. In addition, hourly rates of personnel providing services to the Company under this Agreement will increase from time to time according to competitive market conditions and increased experience of attorneys and staff and Attorneys will provide Client with prior written notice of the same.  Billing rates and charges are usually revised annually but Hosie Rice reserves the right to adjust rates at other times during the course of Hosie Rice's representation.  In addition, as a partial contingency, Attorneys will be entitled to 17% of any net of costs cash (or cash equivalent) recovered.  For example, if plaintiffs recover $1.1 million, and if unpaid costs were $100,000, Attorneys would be entitled to 17% of the net recovery of $1 million, in addition to the discounted and unpaid hourly fees (which to date are outstanding in the amount of (approximately as of November 28, 2018) $2,506,120.30) as well as any costs advanced under ¶ 4.    Costs include such items as travel, photocopies, expert fees, deposition transcripts, as set forth in ¶ 5.  Attorneys' reduced hourly fees shall not be considered a cost.  "Cash equivalent" means any and all things of cash or otherwise, value received by Client, including stock, stock options, warrants, or any other form of non-cash payment received by Client through any claim, demand, negotiation, license, assignment, settlement, lawsuit, judgment or other agreement regarding Client's enforcement rights.  If a claim is settled in whole or in part by the Client's receipt of anything of value other than cash, then Attorneys will be paid-in-like-kind.  For example, if the non-cash consideration is in the form of a restricted stock or options, payments to Attorneys shall be made at the same time that Client is permitted to sell or exercise its options. The decision to settle and resolve the Litigation, in whole or in part, and the terms for such settlement and resolution, shall be and remain at the sole discretion of Client.

HOSIE | RICE LLP
ATTORNEYS AT LAW

Jerry Knoblach
January 28, 2019
Page 3

If Attorneys cease to be the Client's counsel in the Litigation, through no fault of the Attorneys, then Attorneys share in any contingent recovery will be governed by Attorneys' time spent on the matter over the total time spent on the matter by all counsel (the ratio of a "lodestar" ratio). If Attorneys' representation is terminated for cause, Attorneys will be entitled to no portion of any contingent recovery.

Upon resolution of the matter, if Attorneys' representation has not been terminated, all resolution funds will be paid by defendant(s) directly to Hosie Rice's Trust Account.

**4.      Attorney Provided Financing.** Hosie Rice will advance all costs and fees through the conclusion of the Litigation once Space Data has paid $4.5 million in costs and fees in connection with the Litigation. As of the date of this Agreement, Space Data has paid at least $4.5 million in costs and fees in connection with the Litigation. Hosie Rice represents and warrants that it has all the facilities in place necessary to fund the Litigation through its conclusion, with a $2 million revolver that can be increased, along with other fee income.

Attorneys agree to advance fees and costs incurred, subject to subsequent Client repayment, as follows:

A.      Once Attorneys begin to advance fees and costs, after the $4.5 million threshold is reached, the Attorneys' contingent interest on any recovery will increase 2% to 19%;

B.      If Attorneys are required to fund costs above $5.5 million, *i.e.*, advance more than an incremental $1 million, then the contingency fee will increase a second 2%, for a contingent interest of 21%; and

C.      Should Attorneys fund in an amount over $6.5 million, *i.e.* advance more than an incremental $2 million, then the contingency percentage increases another 1%, to a total contingency participation of 22%.

The parties understand that, in addition to receiving this increased percentage based on Attorney financing, the Attorney costs and fees advanced will also be paid within 90 days of the resolution of the matter, regardless of outcome. For example, if Attorneys invest $1 million above the $4.5 million threshold, for a total case expenditure of $5.5 million, Attorneys would recover the $1 million advanced within 90 days of the resolution of the matter, plus receive the contingency fee owed to Attorneys (if any).

The parties recognize that Space Data need not draw on this Attorney financing, unless Space Data, in its unilateral discretion, so elects. That is, Space Data retains the right to fund some or all of the Litigation fees and costs above $4.5 million, if Space Data so desires.

HOSIE | RICE LLP
ATTORNEYS AT LAW

Jerry Knoblach
January 28, 2019
Page 4

     **5.**     **Costs and Other Charges.**  Hosie Rice will incur various third party costs and expenses (*e.g.* travel, experts, photocopying) in performing legal services under this Agreement.  Client agrees to pay promptly, but no longer than 30 days, for all costs, disbursements and expenses unless otherwise provided in this paragraph or under ¶ 4.  Hosie Rice often advance costs that are reasonably incurred in the ordinary course of Hosie Rice's representation of its clients including filing fees, messenger fees, payments made to third parties, such as court reporters for transcripts of testimony, obtaining and/or copying documents, travel expenses (including mileage, transportation, business class air travel for any flights scheduled to be longer than eight hours, lodging and meals), and teleconference fees.  Should any costs exceed $2,000.00, Hosie Rice may require the Client to directly pay the costs rather than advance it.   The advanced costs, itemized in detail, and the voice and data charge will be included on Hosie Rice's monthly invoice.  Unless otherwise provided in this paragraph or under ¶ 4, the Client agrees to reimburse Hosie Rice for costs upon receipt of its monthly invoice.

     **6.**     **Communication Concerning Progress and Outcome.**  Hosie Rice will take reasonable steps to keep the Client informed of progress on matters and to respond to all inquiries.  Hosie Rice will furnish the Client with an updated litigation budget every three months, and more frequently if events occur in the Litigation that materially affect the budget. If the Client is uncertain about something related to Hosie Rice's representation, it is important for the Client to request further clarification, which Hosie Rice will provide to the extent possible.

     **7.**     **Conflicts of Interest.**  We have conducted a conflicts check based on information provided by the Client, and based on that information, we are not aware of any ethical conflicts of interest posed by Hosie Rice's proposed representation of the Client as described in this Agreement, including, but not limited to, conflicts related to the source of Hosie Rice's financing under ¶4   It is the Client's continuing duty to inform Attorneys of the identity of any person, firm, corporation or other entity adverse to the Client or that otherwise has any interest that may be in conflict with the Client's interests with respect to any legal matter as to which we are representing the Client.

     **8.**     **Disclaimer of Guarantee.**  Nothing in this Agreement and nothing in Hosie Rice's statements or writings to Client will be construed as a promise or guarantee about the outcome of the Litigation.  In the course of the representation, Hosie Rice may discuss with Client the status or potential outcome of matters or issues in which Hosie Rice is representing the Client.  Hosie Rice cannot promise or guarantee any particular outcome or result due to variables and uncertainties outside Hosie Rice's control.  Hosie Rice makes no such promise or guarantees.  Hosie Rice's comments about the outcome of the Litigation are expressions of opinion only.  Therefore, the Client should not construe any expressions or opinions on such matters or issues as assurances, promises or guarantees of the potential outcome of the Litigation. Hosie Rice has furnished the Client with a budget that reflects its best estimate of fees and costs to be incurred in the Litigation and may update the budget as circumstances in the Litigation dictate. Hosie Rice will implement its best efforts to adhere to the budget and promptly provide

HOSIE | RICE LLP
ATTORNEYS AT LAW

Jerry Knoblach
January 28, 2019
Page 5

Client with advance notice if it anticipates the budget will be exceeded. Notwithstanding, Client acknowledges that any estimate of fees given by Hosie Rice shall not be a guarantee. Actual fees may vary from estimates given.

9.    **Entire Agreement**.  This Agreement contains the entire agreement of the parties.  It replaces and supersedes any prior agreements or understandings, whether written or oral.  No other agreement, statement or promise made on or before the effective date of this Agreement will be binding on Hosie Rice and Client.  This Agreement may be modified only by an instrument in writing, executed by both Hosie Rice and Client.

10.    **Severability.**  If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

11.    **Effective Date.**  This Agreement will govern all legal services performed by Attorney on behalf of Client commencing with the date Attorney first performed services.

12.    **Insurance.**    Hosie Rice maintains errors and omissions insurance applicable to the services to be rendered pursuant to this Agreement.

13.    **Termination of Representation by Client.**  If at any time the Client is dissatisfied with Hosie Rice's services or wants to have other counsel represent it, the Client may terminate this Agreement by notifying Hosie Rice in writing of the Client's desire to end Hosie Rice's representation.  Similarly, Hosie Rice may withdraw at will representation of the Client and terminate this Agreement in writing.  If the Client's representation is terminated by the Client, then the Client is only responsible for payment of fees and costs that have been incurred up to the date on which Hosie Rice receives notice from the Client of its desire to terminate the representation, with the fee being calculated as set forth in ¶ 3 above.  The Client agrees that Hosie Rice may similarly elect to terminate the representation upon written notice.

Upon termination of the representation, the Client may request the return of the "Client File" (as defined below) related to the representation or may request that it be forwarded to another law firm.  The contents of the "***Client File***" will include all documents (in electronic, paper, or other format) provided by the Client and all recorded information (including but not limited to correspondence, pleadings, transcripts, exhibits, reports, completed but uncommunicated work product and other readily identifiable documents) that Hosie Rice retained as reasonably necessary to the Client's representation.  We do not consider our internal communications, notes, and drafts of documents as part of the Client File.  Hosie Rice reserves the right to copy the contents of the Client File at our expense and to reuse any work product (exclusive of confidential information) for other clients.  If the Client chooses not to request the return of the Client File, Hosie Rice will store it at our off-site storage facility pursuant to Attorneys' normal retention policy as required by law or regulation.  The Client will be notified

HOSIE | RICE LLP
ATTORNEYS AT LAW

Jerry Knoblach
January 28, 2019
Page 6

via email at the last email address provided to Hosie Rice when the retention period has ended and of Attorneys' intention to dispose of the Client File. The Client will have sixty (60) days from the email notification date to take possession of its Client File. If Hosie Rice does not take possession of it during this time, the Client agrees that it may be destroyed without further notice.

**14.    Termination of Representation by Hosie Rice.**  If material adverse facts are revealed through discovery, or otherwise, that were not disclosed by Client, Hosie Rice has the right to immediately withdraw in accordance with California Rules of Professional Conduct. Further, Hosie Rice may withdraw at will should Hosie Rice decide that Client is making it unreasonably difficult for Attorneys to carry out its engagement effectively.

**15.    Client's Acknowledgment.**  Client acknowledges that Client has been encouraged by Attorneys to consult independent counsel concerning the negotiation of this fee Agreement and its terms (including the following Section 17 on Dispute Resolution), that Client has made sufficient investigation and inquiry to determine that this Agreement is fair and reasonable to Client, and that this Agreement was the product of arm's length negotiation with Attorneys. Client acknowledges that Client has either consulted such independent counsel or, having had an adequate opportunity to seek such advice, has declined to follow Attorneys' advice to do so.

**16.    Client's Indemnity.**  Client agrees to indemnify and hold Attorneys harmless for any claims asserted by others to any portion of the claims covered by this Agreement.

**17.    Fee Not Set by Law.**  Client understands that the fees described in this Agreement are not set by law, but are negotiable, and were negotiated, between Attorneys and Client. Attorneys encourage Client to have this representation agreement reviewed by other Client counsel.

**18.    Dispute Resolution.**  Hosie Rice appreciates the opportunity to represent the Client and anticipates a productive and harmonious relationship. The Client is encouraged to bring to Hosie Rice's immediate attention any concerns with services performed or fees charged. Most problems can be resolved by communication and discussion. However, should a dispute arise which cannot be resolved by negotiation, Hosie Rice believes that attorney-client disputes are most satisfactorily resolved through binding, confidential arbitration rather than by litigation. Any dispute arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement—including any claim of legal malpractice (or similar claim) and any claim involving fees or expenses—shall be resolved by final, confidential and binding arbitration conducted in San Francisco, California, administered by a retired judge or justice and in accordance with the then existing JAMS Streamlined Arbitration Rules and Procedures, and any judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction to do so. If Hosie Rice and Client are unable to agree on a retired judge or

HOSIE | RICE LLP
ATTORNEYS AT LAW

Jerry Knoblach
January 28, 2019
Page 7

justice to conduct the arbitration, then each party will name one retired judge or justice and the two named persons will select a third retired judge or justice to act as the sole arbitrator. **Client further acknowledges that, by so agreeing, Client waives the right to a court or jury trial.** Client also acknowledges that arbitration provides only limited discovery and that courts will enforce an award in arbitration without reviewing it for errors of fact or law. The parties agree that the prevailing party in any such disputes shall be entitled to recover reasonable costs and attorney's fees.

In any such arbitration, both parties will be entitled to conduct discovery in accordance with the provisions of the California Code of Civil Procedure, but either party may request that the arbitrator limit the amount or scope of such discovery, and in determining whether to do so, the arbitrator shall balance the need for discovery against the parties' mutual desire to resolve disputes expeditiously and inexpensively.

Should there be a dispute concerning fees or costs, the Client may elect to submit that dispute to arbitration under the above provisions. If the Client does not make that election, then California law provides a client with the right to request arbitration of any fee dispute before an arbitrator or panel of arbitrators selected by a local bar association or the State Bar ("***Bar Fee Arbitration***"). By signing this Engagement Agreement, the Client agrees that if a Bar Fee Arbitration is conducted, that Bar Fee Arbitration shall determine only the issue of the properly chargeable amount of fees and costs, and that such Bar Fee Arbitration shall not affect the Client's agreement to arbitrate all other issues on the terms set forth above.

19.     **Attorney Lien.** Client acknowledges that the repayment of any deferred fees or costs, and, in the event of a successful resolution, any contingency due to Attorneys is enforceable by lien of property or any other means of collection under the law of the State of California

20.     **Choice of Law.** In any proceeding (whether in arbitration, in court, or in any other tribunal), all questions concerning the rights and obligations of Client and Hosie Rice under this Agreement that are determined to be governed by the law of a state shall be resolved in accordance with the then-prevailing law of the State of California, including the California Rules of Professional Conduct.

21.     **Conclusion.** If the terms set forth in this Engagement Agreement are satisfactory to the Client, please sign the original and return it to Attorneys in the enclosed envelope. Delivery of an executed counterpart of this Engagement Agreement by facsimile or other electronic imaging shall also be as effective as delivery of a manually executed counterpart of

HOSIE | RICE LLP
ATTORNEYS AT LAW

Jerry Knoblach
January 28, 2019
Page 8

this Engagement Agreement.  The Client should keep the fully executed copy of this engagement
agreement with its records.

Very Truly Yours,

HOSIE RICE LLP

Spencer Hosie, Senior Partner

AGREED TO AND ACCEPTED:

_____

Jerry Knoblach
Space Data Corp. (Client)

ACKNOWLEDGEMENT AND CONSENT:

_____

Paul Crawford
Managing Member
Space Data Investments LLC

HOSIE | RICE LLP
ATTORNEYS AT LAW

Jerry Knoblach
January 28, 2019
Page 8

this Engagement Agreement.  The Client should keep the fully executed copy of this engagement
agreement with its records.

Very Truly Yours,

HOSIE RICE LLP

Spencer Hosie, Senior Partner

AGREED TO AND ACCEPTED:

Gerald M
Knoblach:A01097C00000
16003D8BA4900015F3D

Digitally signed by Gerald M
Knoblach:A01097C00000016003D8BA4900015F3D
DN: c=US, o=U.S. Government, ou=ECA,
ou=IdenTrust, ou=SPACE DATA CORPORATION,
cn=Gerald M
Knoblach:A01097C00000016003D8BA4900015F3D
Date: 2019.02.02 20:29:57 -07'00'

Jerry Knoblach
Space Data Corp. (Client)

ACKNOWLEDGEMENT AND CONSENT:

Paul Crawford
Managing Member
Space Data Investments LLC

# EXHIBIT 7

SPENCER HOSIE (CA Bar No. 101777)                    **CONFIDENTIAL**
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Claimants*
*HOSIE RICE LLP, SPENCER HOSIE,*
*and, DIANE S. RICE*

JUDICIAL ARBITRATION AND MEDIATION SERVICES

| | |
|---|---|
| HOSIE RICE LLP, a California Limited Liability Partnership; SPENCER HOSIE, an Individual; and, DIANE S. RICE, an Individual,<br><br>Claimants,<br><br>vs.<br><br>FROME WYE LIMITED, INCORPORATED (dba "WOODSFORD"),<br><br>Respondent. | Case No.<br><br>**PLAINTIFF'S COMPLAINT IN ARBITRATION FOR: EMERGENCY RELIEF PER JAMS RULE 2; BREACH OF CONTRACT; DAMAGES; RESCISSION OF NOTICE OF DEFAULT; TEMPORARY RESTRAINING ORDER; PRELIMINARY INJUNCTION; AND PERMANENT INJUNCTION** |

## I.    **INTRODUCTION AND SUMMARY.**

1.    After months of negotiation, the Claimants in this case—the Hosie Rice LLP law firm ("Firm")—entered into a contingency case litigation funding agreement with Frome Wye Limited, Incorporated, which does business in this country as Woodsford Litigation Funding ("Woodsford"). The Agreement has a binding arbitration clause: "Any dispute, claim or controversy arising out of or relating to this Agreement shall be determined by final, binding arbitration" conducted in Delaware. *See* Ex. A, the executed "Agreement," attached, at page 25, paragraph 18.12.

2.    In the last several years, "litigation financing" agreements have become

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

1    increasingly common, particularly in contingent fee patent and IP cases.  In such a transaction, the

2    "funder" (Woodsford here) advances money on a contingency case or a portfolio of such cases in

3    return for an interest in any recovery in these cases.  The funds advanced are, typically, non-

4    recourse, *i.e.*, the funder recovers only if plaintiff prevails.  If the plaintiff loses a contingency

5    case, always a possibility, neither counsel nor the funder recover.  Given the pronounced risk in

6    such an arrangement, the funder's rate of return tends to be very high relative to other investments

7    (*e.g.*, Woodsford interest rate here was 26% per annum, plus a commitment fee, plus a guaranteed

8    "minimum return").

9           3.      Woodsford and the Firm negotiated a long-term, contingency case funding

10   agreement.  As reflected in the Term Sheet Woodsford drafted, *see* Ex. B, the funding had an

11   initial term of 2.5 years.  It included the "portfolio" of contingency cases the Firm had at the time,

12   *i.e.*, the Agreement was not one contingency case specific, but covered all of the contingency

13   cases the Firm had at the time.  These contingency cases were listed by name and caption on

14   Exhibit A to the Agreement.  The Woodsford Term Sheet explicitly and repeatedly limited

15   Woodsford repayment to the receipt of contingency fee revenue.  Prior to entering into the

16   Agreement, Woodsford did detailed due diligence whatsoever on these contingency cases, and

17   conducted no due diligence whatsoever on the Firm's hourly, non-contingent fee practice.

18          4.      The Funding Agreement had an initial amount of $1,000,000 USD, subject to

19   increase (in $250,000 USD increments) as the Firm added new contingency cases to its portfolio.

20   One purpose of the multi-year, multi-case Agreement was to give the Firm funding to expand its

21   practice and hire new lawyers.  This was explicit in the negotiations leading to the Agreement.

22          5.      As a profound and structural matter, the Agreement contemplated a long-term

23   agreement, where the parties shared risks and rewards over time.

24          6.      Under the Agreement, Woodsford's investment repayment was confined to the

25   Firm's contingency interest in contingent fee cases.  Woodsford had **no** interest in the Firm's

26   hourly fee revenue.  In a hybrid case, where the Firm received reduced but not contingent hourly

27   fees and a reduced contingency, Woodsford's investment, and the Firm's repayment obligation,

28   **lay in any contingency recovery,** not in the non-contingent hourly fees.  If there were no

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

---

*Plaintiff's Complaint in Arbitration*          - 2 -                    CONFIDENTIAL

1   contingency recovery, Woodsford did not recover.  This was explicit in the negotiation,

2   Woodsford's own Term Sheet, Ex. A, *see* below, and the Agreement (Ex. B).  In short,

3   Woodsford was making an investment on the outcome of full or partial contingency cases.

4          7.      Under the Agreement, the Firm agreed to a minimum interest payment of $250,000

5   over the life of the Agreement.  However, if the Firm had any early contingency settlement, it had

6   to repay the Woodsford money advanced, and immediately pay a Woodsford minimum return as

7   first money out.  To illustrate, if the Firm had drawn down $100,000 USD, and then settled a case

8   just several weeks later for $350,000, it had to pay Woodsford the $100,000 principal plus the

9   $250,000 life of the Agreement Woodsford "Funder's Minimum Return."  Woodsford received

10  this "Funder's Minimum Return" ($250,000) as the first money out.  The Firm agreed to this

11  prepaid interest provision given the portfolio-wide and multiyear nature of the Agreement.  At

12  any one point in time, one party might be ahead economically and the other behind.  But, given

13  the long-term duration of the Agreement, these transitory ups and downs would, presumably,

14  balance out.

15         8.      Hosie Rice drew down its first funds under the Agreement on October 18, 2018,

16  for $150,000.  It then drew down a second amount, $200,000, on November 8, 2018.  It then drew

17  down a third amount of $200,000 on December 9, 2018, to bring the total Firm draw on the line to

18  $550,000, as of December 9, 2018.

19         9.      In early December 2018, Hosie Rice settled one of the listed Exhibit A

20  contingency cases.  Per the terms of the Agreement, the Firm wired Woodsford $800,000 USD on

21  December 18, 2018.  Given that Woodsford had advanced only $550,000, with the last $200,000

22  USD coming just nine days before repayment, and the second $200,000 coming just a month

23  before payment, the minimum Woodsford return of $250,000 interest pre-payment represented an

24  enormous economic return to Woodsford.  Had Woodsford received just the agreed annual

25  interest rate, 26%, it would have received $563,391.94, comprising $550,000 in principal and just

26  $13,391.94 in interest.  Instead, it received the prepaid life of the contract "minimum return" of

27  $250,000 USD within several weeks of advancing the funds.

28         10.     The Firm understood that the 2018 minimum interest represented a huge windfall

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

1    to Woodsford, given the very short time that the Firm had the money.  But the Firm honored the

2    Agreement as negotiated and executed, given the anticipated long-term duration of the

3    Agreement.

4          11.    After this payment, including the $250,000 interest, the Firm began 2019 with the

5    line at zero, a $237,000 prepaid interest credit, and the full credit line available.  Or so it thought.

6          12.    Between January 2019 and the end of mid-April 2019, the Firm drew down

7    approximately $750,000.

8          13.    On April 11, 2019, the Firm had an important Summary Judgment argument in the

9    largest contingency cases listed in the Exhibit A cases, *Space Data Corp. v. Google, Inc.*  This

10   was a complex, high-stakes, high-reward patent and trade secrets case.  It was, by far, the largest

11   case in the Firm's contingency portfolio, and had, accordingly, been the detailed focus of

12   Woodsford's substantive prior due diligence for several months.  At the April 11 hearing, the

13   Court said that it would grant the defendant's Summary Judgment Motion for patent non-

14   infringement on one of the two patents asserted, while letting the trade secrets case proceed to

15   trial in that August of that year.

16         14.    The Firm informed Woodsford of this development promptly.  This kind of set-

17   back is **common** in complex cases; these patent cases tend to be marathons, not sprints.

18         15.    Without advance discussion, or notice, Woodsford then terminated its funding in

19   the first week of May in a curt email.  It did not discuss this decision with the Firm prior to

20   cutting funding.

21         16.    On information and belief, the Firm believes that Woodsford did so for two

22   reasons: (1) given the huge $250,000 interest payment the year prior, Woodsford realized—as did

23   the Firm—that Hosie Rice had effectively prepaid the interest for at least a year's use of

24   Woodsford funding in 2019.  That is, if Woodsford continued to provide financing in 2019, it

25   would only cost Woodsford money, as against finding a way to terminate funding and so lock in

26   its extraordinary 2018 return; and, (2) with the patent ruling, Woodsford understood that this one

27   significant and partially contingent case suddenly presented more risk and was likely to continue

28   for years.

---

*Plaintiff's Complaint in Arbitration*                    - 4 -                              CONFIDENTIAL

17.     In cutting off funding, Woodsford acted in bad faith, breached the implied covenant of good faith and fair dealing, and defeated the structure, nature, and intent of the Agreement.  It transformed what was intended to be a multiyear, multi-case portfolio agreement into a short-term one-time advance.

18.     In late July 2019, the Firm settled the trade secrets portion of the Space Data case (for a multiple of Space Data's expert report damages number for those trade secrets).  As of late July, the client was seriously delinquent in paying the Firm's reduced hourly fees and third-party costs, with the hourly amount and costs accrued and overdue exceeding $5.2 million, as evidenced by the Firm's monthly invoices and as acknowledged of-record by the client.  These reduced hourly fees in this "hybrid" fee agreement were **not** contingent: the client had to pay them "**regardless of outcome**," as the Representation Agreement stated explicitly.  The Firm **also** had a contingent fee claim on the settlement amount, and a significant ongoing contingent fee interest in the appeal of the patent non-infringement ruling.

19.     When the Firm asked the client to pay its bill, the client fired the Firm.  As per the attorney-client Representation Agreement, the Firm then filed a JAMS arbitration to: (1) recover the $5.2 million in reduced but not contingent hourly fees and expended third-party costs due "regardless of outcome"; (2) recover its contingency portion of the settlement; and, (3) for a Declaratory Judgment that the Firm had an ongoing lodestar contingency fee interest in the patent appeal.

20.     The client then counterclaimed for negligence, fraud, and breach of fiduciary duty.  It also sought "disgorgement" of all prior hourly fees paid.  That is, the client not only refused to pay its hourly fee bill then due "regardless of outcome," but also refused to pay any contingency fee, even on the settlement amount, much less on funds recovered on the appeal.  It, instead, demanded that the Firm "disgorge" all hourly fees paid prior.

21.     This led to a lengthy and contentious arbitration (JAMS).  The arbitration concluded with a Final Order on August 20, 2020.  Per the attorney-client fee agreement, this arbitration was confidential and privileged.  More, the details of the settlement were confidential per the Protective Order entered by the Federal Court, and by the terms of the settlement

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

1   agreement itself.

2   　　　22.　　Under the Agreement, the Firm was also prohibited from sharing this privileged

3   information with Woodsford.

4   　　　23.　　In an Interim Order, the arbitrator award the Firm most, but not all, of the accrued

5   hourly fees and costs.  Of the $5.2 million non-contingent hourly fees and costs owed, a sum the

6   client agreed was correct, the Firm ultimately collected $4 million of these accrued hourly fees

7   and costs (leaving $1.2 million in hourly costs and fees unpaid).  A significant portion of this $4

8   million reflected costs the Firm had paid to third parties, *e.g.* expert witnesses.  The Firm did **not**

9   recover any contingent fee in the Award.  This is **explicit** in the Interim Order, and confirmed in a

10  Final Order and Award entered on August 20, 2020.  This Final Order terminated the arbitration

11  (the parties had disputed portions of the Interim Award for months).

12  　　　24.　　As the Firm did not recover any contingent fee, it had and has no obligation to

13  repay Woodsford on the Space Data case.  Woodsford bet, as did the Firm, on a contingency

14  recovery.  That did not happen here.  Nor did the Firm recover a contingency fee on **any** of the

15  other scheduled contingency cases (except the case settled in late 2018, where Woodsford

16  received a return of $250,000, against what would have been approximately $13,500 at the 26%

17  contractual interest rate).  Under the explicit terms of the Agreement, the Firm's repayment

18  obligation only arises on a contingency recovery.  Woodsford has no claim for repayment.

19  Period.

20  　　　25.　　Woodsford made repeated demands for payment.  In its demands, it included over

21  $250,000 in accrued interest.  Even were a debt owed, and there was not given the absence of a

22  contingent fee recovery, Woodsford's interest calculation was wrong.  As the Firm had prepaid

23  the life of the contract "Funder's Minimum Return," the Firm had an interest credit of over

24  $237,000 USD as of January 2019.  In billing for additional interest, Woodsford ignored that the

25  Firm had prepaid interest, charged interest not due, and so breached the contract.

26  　　　26.　　Despite there being no contingency recovery, and hence no obligation to pay the

27  2019 Woodsford funds advanced, Woodsford secretly filed in mid-August 2020 a Notice of

28  Default ("NOD") to try to foreclose on Spencer Hosie's and Diane Rice's personal home.  It

HOSIE RICE LLP
Transamerica Pyramid, 34ᵗʰ Floor
600 Montgomery Street
San Francisco, California 94111

1   included in the amount due the doubly counted interest. Woodsford is so trying to enforce a debt

2   that it **knows** does not exist, including interest it **knows** is not due.

3        27.    This NOD is wrong on its face. First, Woodsford has no claim to the Firm's non-

4   contingent hourly revenue; this is explicit in any negotiation, the Woodsford Term Sheet, and the

5   Agreement. Second, the amount Woodsford claims due involves at least $237,000 of double-

6   counted interest. Third, even were Woodsford entitled to a portion of the Firm's hourly

7   revenue—and it is not—the $4,000,000 the Firm recovered included reimbursement for costs

8   expended.

9        28.    Spencer Hosie personally explained those facts to Woodsford's officers and

10   employees. Mr. Hosie also communicated these facts to Woodsford's local counsel. (Bernard

11   Greenfield in San Jose). The Firm sent counsel and Woodsford two draft complaints to show

12   Woodsford why and how it was wrong.

13        29.    Woodsford, now, evidently, is trying to rewrite the contract to give it an interest in

14   the Firm's **hourly**, **non-contingent** fee revenue. This position is directly contrary to the

15   Woodsford Term Sheet, the Agreement, and every representation Woodsford made in the

16   negotiation leading to the executed Agreement. Woodsford's new position, that its contract

17   involved non-contingent hourly fee revenue, is made in bad faith and flat wrong on its face. And

18   **Woodsford first made this allegation just days after it learned that the Firm did not recover**

19   **any contingency fee in the Space Data case**.

20        30.    Despite these communications, Woodsford persists in a foreclosure action it knows

21   is improper. This action is damaging to the Firm and its principals. This damage is substantial

22   and very real. Wrongful foreclosure is a tort that carries significant penalties.

23        31.    This Arbitration resulted. Per JAMS Rule 2, and as per the attached "Emergency

24   Application," the Firm seeks an immediate Order directing Woodsford and its agents to rescind

25   the improper "NOD," and related relief.

26   **II.**     **STATEMENT OF THE FACTS.**

27        **A.**     **The Parties.**

28        32.    Hosie Rice LLP is a San Francisco based law firm, specializing in technology

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

1    cases (patent; trade secrets; breach of NDA). It was founded by Spencer Hosie and Diane Rice.

2    It is a trial firm, with an active trial practice.

3         33.    Mr. Hosie began his career at the Heller, Ehrman, White & McAuliffe firm in 1982

4    (after a one-year clerkship). He left Heller Ehrman to open his own firm several years later. He

5    has run this firm, in various configurations, thereafter.

6         34.    Mr. Hosie has had several top ten and top 15 annual jury awards (largest awards by

7    dollar amount by year). He was named one of the top ten trial lawyers in the country, is a

8    member of the Top 100 "High Stakes Litigators" chapter, and has been a "Super Lawyer" for IP

9    and trial work since the inception of that program. He has been AV rated by Martindale for

10   decades.

11        35.    The other cofounder, Diane S. Rice, started her career at Brobeck, Phleger &

12   Harrison. She was a partner in the firm's product trial group and tried cases throughout the

13   country. Prior to leaving the Brobeck firm, she led Brobeck's national products liability trial

14   group. She, too, is a "Super Lawyer," a member of the "High Stakes" litigation group, and is AV

15   rated.

16        36.    Over the past decade, the Firm has successfully tried big IP cases to verdict, and

17   settled many others, often on the courthouse steps.

18        37.    The Firm's clients tend to be emerging technology companies, their founders, or

19   their venture or private equity investors. The Firm's cases tend to be against the largest

20   technology companies in the Silicon Valley and the world, including Google (multiple cases),

21   Microsoft (many cases), Intel, Apple, Cisco Systems, Facebook, Amazon.com, and the like.

22        38.    Woodsford is a firm founded to offer litigation financing, as defined above. In the

23   last five years, many companies have entered this business, including Citadel, Burford, Law

24   Finance Group, and others.

25        39.    These firms compete to offer financing to both law firms and clients. They look

26   for good cases where the would-be plaintiff lacks the resources to fund a meritorious case. On a

27   macro-level, these firms advance funds against an interest in any recovery. In a very real sense,

28   when these funders enter into an such agreement with a law firm, they become a (passive) partner

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

1   with the firm, with both entities (presumably) having the same economic interest: win the

2   contingent case and recover an award.

3       40.     There are several basic structures the litigation financing can take. One approach

4   involves the funder investing in just one contingency case. Funders tend not to prefer this single

5   case approach, as it concentrates risk and there is often a perception that law firms tend to seek

6   funding only on the riskier contingency cases.

7       41.     The other funding model, becoming more common now, is a contingency case

8   "portfolio" approach. With this structure, the law firm secures a multiyear general financing

9   commitment, akin to a revolving line of credit. The line of credit is covered by **all** of the firm's

10  contingency cases, not just one contingency case.

11      42.     This structure is advantageous to both the law firm and the funder. The firm

12  secures a multiyear, contingency case portfolio revolving line of credit. The funder has the

13  security of a portfolio of contingency cases, not just one contingency case, which mitigates risk

14  significantly. As the Firm draws the line down, the amount of credit available decreases; when it

15  repays the funds, the amount of available credit increases. This is how these "revolving" lines of

16  credit work.

17      43.     In such a multiyear, portfolio financing, one party may be differentially ahead or

18  behind at a particular time. But these arrangements are structured to last years, with the belief

19  that—over time—the economics will favor both funder and the law firm.

20      **B.**    **The Negotiation and Intent of the Agreement Between Woodsford and the Firm.**

21

22      44.     In January and February 2018, the Firm tried a prominent technology case to jury

23  verdict in the Northern District of California (San Jose Division). The Firm won, and the trial

24  generated significant publicity. The case settled a week after the jury verdict for a significant

25  eight figure sum.

26      45.     Shortly after this press coverage, Woodsford approached the Firm. (Woodsford

27  had sent prior emails to the Firm, as do most—if not all—litigation funders). Woodsford told

28  Hosie that Woodsford was very interested in providing a portfolio-wide, contingency case, multi-year funding facility for the Firm.

*HOSIE RICE LLP*
*Transamerica Pyramid, 34th Floor*
*600 Montgomery Street*
*San Francisco, California 94111*

---

*Plaintiff's Complaint in Arbitration*    - 9 -    CONFIDENTIAL

46.     This initial approach was followed by numerous calls and emails.  For example, the parties had a detailed call on February 6, 2018.  Six people attended for Woodsford, while Hosie and Rice spoke for the Firm.  In this call, as captured in Ms. Rice's contemporaneous notes, Woodsford emphasized that its interest and the Firm's repayment obligation exclusively involved contingency cases.  There was no ambiguity on this point.  There were many other calls, all documented by contemporaneous notes, and all confirming that Woodsford's fee participation would be limited to contingent case fee recovery alone.

47.     On May 14, 2018, Diane S. Rice met with the Woodsford principals in their London office.  At this meeting, Woodsford reiterated its desire to enter into a multi-year portfolio (all contingency cases) funding facility.

48.     Throughout the spring, Woodsford conducted detailed due diligence into the Firm and its contingency cases.  Under NDA, the Firm provided a detailed written summary of all of the Firm's contingency cases then pending, both full and partial contingency.  Woodsford did not conduct any due diligence into the Firm's hourly practice, as it had no interest in these fees.

49.     As part of these discussions, Woodsford explicitly stated that the revolving line would have an initial amount of $1,000,000 USD, but could be increased by the Firm to $2,000,000, if needed.  The parties explicitly discussed increasing the amount in increments of $250,000, per case, as the Firm added new cases.

50.     The Firm generally prefers to take its cases on a "hybrid" fee basis, *i.e.*, receiving one-half of its typical hourly fees and one-half its typical contingency.  The Firm explained this structure to Woodsford, and Woodsford understood and agreed that Woodsford's interest would be limited to the contingent aspect of any recovery (not the reduced hourly fees paid the Firm monthly).

51.     On April 25, 2018, after numerous conversations, Woodsford presented the Firm with a Formal Financing Proposal, a Term Sheet.  The Term Sheet stated that "repayment to Woodsford is contingent upon Hosie Rice receipt of **contingency** fees from its current portfolio of cases."  This was exactly what the parties had discussed.

52.     Here is what Woodsford's Term Sheet provided:

## TERMS OF THE "1M REVOLVING FACILITY"

| Item | Terms |
|------|-------|
| Maximum Advance | $1,000,000 (excluding interest) |
| Drawdown | One drawdown each month of up to $200,000 per month |
| Security | **Contingent fee income related to all existing cases on which the firm acts on a contingency fee (or hybrid) basis**, including those where the plaintiffs are: MasterObjects, Space Data, Looksmart, Hagenbuch and Mariner Homes.  Standard good behavior clause. |
| Arrangement Fee | 1% |
| Interest Rate | 1.5% per month when paid or 2% per month when unpaid.  At the end of each quarter Hosie Rice will have the opportunity to pay interest accrued in the last quarter. |
| Minimum Return | $250,000<br><br>At the end of the availability period or earlier if the facility is fully repaid all interest paid and accrued will be calculated. To the extent that this interest does not at least equal $250,0000 a top up amount will be due until Woodsford has received at least $250,000. |
| Term Length | 2.5 years |
| Repayment | **When contingent fee income is received** |
| Re-Draw | **If contingent fee income** from any case (other than Space Data) is received during the first 2 years of the facility term resulting in a full or partial repayment of the facility a redraw of 50% of the repaid amount may be made.  E.g. if the outstanding balance is $750,000 and a case results in a **contingent fee income** of $500,000, some $250,000 may be re-drawn increasing the Maximum Advance to $1,250,000. |
| Space Data realization | **If the Space Data is resolved without a contingent payment to Hosie Rice (e.g. the case is lost)**, Woodsford has the option of terminating the facility.  **If the case is resolved with a contingent payment to Hosie Rice** (e.g. the case is won), Woodsford will review the overall **facility to ensure that there is sufficient likely future contingent fee income to continue to provide the facility**. |
| Term extension interest | When the facility remains outstanding beyond its term length additional interest of 0.75% per month will accrue until the facility has been repaid. |
| Information requirement | Bank statements monthly, Management Accounts quarterly, annual tax returns. |
| Maximum Advance | $250,000 per new case up to an additional $1,000,000 in aggregate |
| Security | The **contingent fee income** related to the new case is added to the security of the $1m Revolving Facility |
| Arrangement Fee | 0% |
| Interest Rate | Same as $1m Revolving Facility |
| Drawdown | Same as $1m Revolving Facility |
| Term Length | Every new case added lengthens the term of the $1m Revolving Facility by 6 months up to a maximum of 24 months extension. |
| Repayment | **When contingent fee income is received** |
| Re-Draw | No-redraw |

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

| Basic case qualification criteria | Hosie Rice's engagement letter with the plaintiff includes **an element of contingent fee equivalent to at least 15% of gross case proceeds**. |
|---|---|

53.     This Woodsford Term Sheet explicitly and repeatedly stated that Woodsford was taking an interest only in the Firm's full or partial **contingency** cases, and just the **contingency** portion of the hybrid cases. *See, e.g.,* page 1 ("repayment to Woodsford is contingent upon Hosie Rice's receipt of **contingency** fees from its current portfolio of cases… "). There was no ambiguity about Woodsford's repayment being limited to contingent fee recovery, if any, as against claiming a portion of the Firm's hourly fee recovery. (Any such arrangement would be improper as fee sharing with a non-lawyer). This point was also explicit in the many calls and emails exchanged in negotiating the Agreement. No firm would pay 26% annual interest, plus a guaranteed $250,000 minimum return, for a loan secured by non-contingent hourly fee revenue, with the Woodsford "minimum return" coming immediately out of non-contingent hourly fee revenue. And this Firm did not.

**C.      The Terms of the Agreement.**

54.     The parties entered into the Agreement on August 6, 2018. Hosie and Rice executed the Agreement in San Francisco.

55.     The Agreement preamble states that the Funder (Woodsford) would advance funds to enable the Firm to pursue the "**contingency cases**." The Agreement then defines "**contingency cases**" as those matters set out in Ex. A and "any other matter in which Firm becomes engaged to act on a **contingency** basis… during the terms of this Agreement."

56.     The Agreement set forth the "Funder's Minimum Return," as $250,000 USD.

57.     The Agreement obligated the Firm to use its best efforts to assist the Funder in assessing "**the Contingency Cases**."

58.     The Agreement expressly prohibited the Firm from sharing any attorney-client privileged or other confidential information with Woodsford, Paragraph 3.3 states as follows:

> Firm shall not disclose to Funder or provide Funder with access to any (i) information where it would be in breach of a pre-existing and binding legal obligation (e.g. a protective court order, or client confidentiality) to do so or (ii) Privileged Materials.

59.     The initial amount was set at $1,000,000 USD, subject to increase.

60.     The Agreement sets forth a base annual interest rate of 24%, in addition to the minimum guaranteed return of no less than $250,000, over the life of the contract, as set forth above.

61.     The Agreement specifically disclaims any Funder right to control any contingency case, offer legal advice, or make any decisions.  These rights remained with the Firm exclusively.

62.     At Woodsford's insistence, the Agreement gave Woodsford a lien on the Hosie Rice personal residence, enforceable only upon the Firm breaching the Agreement, *e.g.*, not paying Woodsford what it was due on the receipt of a contingency fee recovery.

63.     The Agreement contains an arbitration clause.

64.     Exhibit A to the Agreement, captioned "Contingency Cases," lists the contingency cases subject to the Agreement.

65.     Exhibit B set forth detailed due diligence materials list for "each ongoing contingent fee case," and just those "contingent cases," and every previous "closed contingent fee case in the last three years."

66.     Woodsford conducted **no** due diligence into the Firm's hourly cases, as it had no interest in these fees.  Until mere weeks ago, Woodsford never made a claim for a portion of the Firm's hourly non-contingent fee revenue, nor even inquired into the Firm's hourly fee income.

67.     The Agreement cites and discusses contingency cases and contingency fee revenue numerous times.  *See* Ex. A and Preamble ("in the Contingency Cases"); 1.11; 1.12-1.16; 3.1; 8.7; 9.2.1; 9.3.3 (revenue expectations for "contingency cases" alone); 10.1.14 (listing cases subject to the Agreement, **all contingency cases**); Ex. A. (list of included cases – all contingency cases); Ex. C (due diligence into the Firm's current and prior contingency cases alone).

68.     The Agreement nowhere cites the Firm's hourly non-contingent fee revenue, beyond saying that Woodsford's interest was limited to the **contingency** position of hybrid cases.

**D.     2018 and the First Five Months of 2019: Woodsford Captures a Windfall.**

69.     As set forth above, the Firm began to draw down funds on the line in October 2018.  By December 7th, it had taken $550,000 out (with the last $200,000 coming on December 7, 2018).  The Firm settled one of the scheduled (Ex. A) contingency cases in early December.

As a contingency recovery, this was a Woodsford repayment event. Accordingly, the Firm wire transferred $800,000 USD to Woodsford on December 18, 2018. This comprised the $550,000 in principal, and Woodsford's "minimum return" life of the Agreement "minimum return" of $250,000 USD). By mid-December 2018, just months after entering into the Agreement, the Firm had prepaid the "Funder's Minimum Return," due over the remaining 2.5 years.

70.     Over the first four months of 2019, the Firm drew down approximately $800,000. The Firm was in the final stages of the largest scheduled (Ex. A) contingency cases.

71.     That case was a combined patent and trade secrets case against one of the largest tech companies in the world. It was pending before the Hon. Beth Labson Freeman in the San Jose Division of the Northern District of California.

72.     On April 11, 2019, the Trial Court heard argument on two distinct defense Summary Judgment arguments. The defendant argued that the plaintiff's trade secrets was legally and factually infirm and should be dismissed. The defendant also argued that Google did not infringe plaintiff's principal patent by failing to practice one limitation common to all claims.

73.     At the hearing, the Court stated that the Trade Secrets case had merit, even on the limited Summary Judgment record, and that part of the case would proceed to jury trial in August, just months away. The Court, however, said that it agreed with Google on non-infringement, but for a reason other than Google argued. The Court said from the Bench that it would grant Google's Summary Judgment Motion on this patent. (Another patent asserted requested equitable relief alone, and this patent claim was set for trial in May 2020).

74.     Hosie promptly informed Woodsford of what had happened. All counsel were shocked by the non-infringement ruling, and all thought it wrong, including Woodsford in-house counsel Zachery Krug. (Krug had previously read and commented, pre-filing, on the public portions of the Firm's Patent Opposition Brief). But Hosie emphasized that non-infringement Summary Judgment rulings were not rare in the NDCA, and that the Firm would appeal the ruling with considerable confidence. (The client later retained a retired Federal Circuit Judge to review the record and ruling. He concurred that the ruling was in error, and was even more confident of the Firm's chances on appeal. He sent this written opinion directly to the client).

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

HOSIE RICE LLP
Transamerica Pyramid, 34ᵗʰ Floor
600 Montgomery Street
San Francisco, California 94111

75.     After the ruling, the Firm worked hard to prepare for trial.  In late June, the defendant then initiated settlement discussions on the trade secrets claim.  At this point, the client's CEO retained one of his oldest friends, a non-patent, non-trial lawyer on the East Coast to advise the Board on settlement and communicate the Board's decisions to the Firm.  The Firm objected, but to no avail.  The CEO was very angry at the Firm, and Spencer Hosie in particular, for disagreeing with the CEO's settlement beliefs and doing so in writing.  The Firm thought the client's settlement expectations were **far** too high, and feared that the client was discounting risk.  The CEO then instructed the Firm not to copy the Board on any communications.  As the fee contract explicitly stated that the Firm did **not** just represent the CEO, but rather represented the company, the Firm declined to keep the Board ignorant of material events.  The CEO then had the Board instruct the Firm in writing not to communicate with the Board, but only work through the new outside counsel, the CEO's old friend.  There was, in short, considerable discord between the Firm and the client.  Given the imminent trial, however, the Firm could not withdraw.

76.     From June through July, this outside lawyer dealt with the Board and communicated the Board's decisions to the Firm.  By mid-July 2019, this lawyer gave the Firm written authority to close the settlement on specific financial terms.

77.     The Firm closed exactly such a settlement in very late July.  The cash settlement provided the client with close to a 3x multiple of its trade secret damages, as set forth in the client's own expert damages report.  The defendant also agreed that the Firm could continue to prosecute the patent appeal, despite the settlement.  That is, the defendant agreed to pay significant money, yet continue to be sued in the same case.  This is unusual, to say the least.

78.     Within days of the settlement, the CEO complained about one non-financial term, and asked the Firm to re-trade the deal.  As the settlement was approved and documented in writing, the Firm said it could not do so.

79.     Within a day of closing the settlement, the Firm received an email from the Board, evidently sent in error.  This email said that the Board was planning to fire the Firm in an effort not to pay any aspect of the Firm's fee, including the overdue accrued hourly fee due "regardless of outcome," nor the contingent fee due on the settlement, nor any prospective contingent fee on

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

1   any patent appeal.  This position was, in the Firm's view, driven by the CEO's personal animus to

2   the Firm (and Hosie in particular).  All-in, including its contingent percentage on the settlement

3   (but excluding any contingent fee on appeal), the Firm's fee then approximated $8 million.

4         80.     When the Firm asked to be paid as per the explicit terms of the Representation

5   Agreement, the client fired the Firm, saying it would pay nothing.  Both communications were in

6   writing.

7         81.     Under the Representation Agreement, the Firm had one avenue of recourse: filing

8   a JAMS arbitration to get paid.  It filed this arbitration on August 19, 2019.  By its explicit terms,

9   this arbitration was confidential.

10         82.     As clients sued for fees tend to do, the client then counterclaimed.  It alleged that

11   the Firm had committed malpractice, breached its fiduciary duty (by **not** talking to the Board after

12   being told not to do so), and committed fraud.  (The client withdrew its malpractice and fraud

13   claims before trial).

14         83.     The arbitration commenced in November, and the arbitrator issued an Interim

15   Award and decision in January.  This Interim Award gave the Firm some—but not all—of its

16   accrued hourly fees and costs, **but denied the Firm any contingency fee whatsoever**, even on

17   the beneficial settlement the Firm closed.  After the Interim Award, and the parties actively

18   continued to dispute matters through mid-August 2020.  There were many hearings and

19   submissions between February 2020 and August 20, 2020.

20         84.     On August 20, the arbitrator issued a Final and Binding Award, closing the case.

21         85.     Under these Orders, attached as Ex. C and D (redacted to preserve client privileged

22   information), **<u>the Firm did not receive any contingency fee whatsoever</u>**.  This is explicitly set

23   forth in both Orders.  That is what the arbitrator **said and ruled**.  Instead, the arbitrator essentially

24   split the baby, and gave the Firm about 80% of its accrued hourly costs and fees due, and nothing

25   more.  (While the Final Award was dated in February, the arbitrator did not issue the final award

26   until August 20, 2020, as is explicit in the attached Proof of Service).

27         86.     With no contingency recovery, there was no Woodsford repayment event.

28   Woodsford had no interest in the reduced hourly fee sum, any more than it had in the Firm's prior

1    full fee payments.

2         87.     The Firm lost money on this case. The reduced non-contingent fee amount did not

3    fully cover the Firm's costs, and the Firm was out-of-pocket for significant third-party costs.

4         88.     Over the spring and summer, Woodsford pressed Hosie for the details of the

5    arbitration. Given that the arbitration was as yet ongoing—and confidential and rife with

6    attorney-client privilege issues—Hosie told Woodsford what he could: that the client had fired the

7    Firm and was trying to award paying any fee at all.

8         **E.**     **Woodsford Files a Notice of Default.**

9         89.     In July and August, Hosie and Woodsford had many conversations about

10    Woodsford's alleged claim and several email exchanges. The Firm wanted to avoid litigation,

11    which would be bad for all. Hosie and Rice did not want to fight a wrongful foreclosure action.

12    The Firm understood that litigation would be damaging and embarrassing for both parties. The

13    Firm very strongly wanted this Woodsford claim resolved cooperatively.

14         90.     In these calls, specifically two with Woodsford CEO Steven Friel, Hosie told

15    Woodsford it had not received **any** contingency payment on **any** of the Ex. A scheduled cases,

16    except the one settled and paid in 2018 (as set forth above). This is flat-out empirically true.

17    Friel said he did not believe this.

18         91.     As Hosie Rice later learned, on August 24, 2020, Woodsford filed a Notice of

19    Default to foreclose on the Hosie Rice personal family home on a debt it knew was not owed.

20    Despite emails and calls following this filing, no Woodsford representative told Hosie of the

21    filing. Woodsford did not email a copy of the "NOD" filing to the Firm or its principals when

22    filed.

23         92.     The amount claimed in the "NOD" was wrong on its face. First, with no

24    contingency recovery, the Firm owed Woodsford nothing. Second, the amount claimed double

25    counted interest of at least $237,000 in interest.

26         93.     In prior emails and calls, Hosie said plainly that the parties were either on a

27    settlement or litigation track, but could not proceed on both fronts simultaneously.

28         94.     After his firm filed the "NOD," Friel sent Hosie an email proposing a Forbearance

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

1    Agreement.  The last line of Friel's email said that, absent agreement, Woodsford would

2    "**continue**" with its enforcement action.  Hosie immediately emailed Friel, asking "continue what

3    enforcement action?"  Friel ignored this email.

4         95.    Hosie also emailed Alex Lempiner, in-house Woodsford corporate counsel, asking

5    the same question.

6         96.    Two days later, Hosie and Friel spoke on the phone.  Friel said he was not

7    involved in any enforcement action, and could not provide details.

8         97.    Hosie then sent a formal mail demanding actual notice of any enforcement filing.

9         98.    The following week, Lempiner told the Firm that Woodsford had filed a Notice of

10   Default ("NOD").  Even though Woodsford **knew** that the Firm's San Francisco office had been

11   closed given Covid since March 2020, and even though Woodsford **knew** that Hosie and Rice

12   personally were in Idaho, not in Marin, (and had been for months), Woodsford sent notices to

13   both vacant addresses.  Woodsford did not prior disclose the "NOD" despite robust email

14   correspondence and calls with Hosie post-NOD filing.  No Woodsford employee or officer

15   forwarded to the Firm by email the filed Notice of Default until after Friel's inadvertent mail

16   disclosure.

17        99.    But for the last sentence in Friel's earlier email, it is likely that Hosie and Rice

18   might not have learned of Woodsford's action for many weeks, if not months.

19        100.   On information and belief, Woodsford acted as it did to try to conceal this filing

20   from the Firm.

21        101.   Before Woodsford filed the NOD, the Firm worked hard to reach a reasonable

22   resolution.  Litigation is expensive, and would be very bad for both parties here.  But, after

23   Woodsford filed the NOD, Hosie Rice approached the issue as a litigation matter.  Counsel

24   reviewed all of the correspondence leading up to the Agreement, the Term Sheet, and the dense

25   Agreement.  This review made plain that the Firm owed Woodsford nothing.  To the contrary,

26   Woodsford owes the Firm money.  If Woodsford wants to litigate, then the Firm will litigate.

27        102.   Woodsford evidently now seeks to rewrite the Agreement to include, for the first

28   time, hourly fee income.  It also seeks to use the Firm's efforts to resolve this issue without

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

litigation against the Firm.

103.     Woodsford first asserted an interest in the Firm's non-contingent fee income just days after the Final Arbitration Space Data case ruling, denying the Firm any contingent fee.  For the year plus prior, Woodsford did not inquire into the Firm's hourly fee revenue, just as it did no due diligence pre-Agreement into the Firm's hourly fee business.  Only within days of learning of the Arbitrator's final decision awarding no contingency fees, did Woodsford suddenly pivot and—for the first time—claim an interest in the Firm's non-contingent revenue.  In so doing, it profoundly rewrites its own Agreement.

104.     Woodsford's effort to foreclose is wrong, made in bad faith, and is entirely contrary to the parties' Agreement.

## CAUSES OF ACTION

105.     Under the JAMS Comprehensive Arbitration Rules, a claimant need not plead formal causes of action or claims for relief.  Instead, the claimant need only give reasonable notice of the claims.  *See* JAMS Rule 9.

106.     Incorporating the facts set forth above, the Firm and its principals seek the following relief:

a.     An immediate Order directing Woodsford and its agents to rescind the wrongful NOD until this dispute is resolved on its merits in arbitration, as the parties agreed. (The Firm files with this complaint a Motion for Emergency Relief per JAMS Rule 2).  Absent this relief, the Firm and its principals will suffer irreparable harm.

b.     Damages for breach of contract, as will be proven at the trial.

c.     For attorneys' fees and costs the Firm incurred in disputing Woodsford's wrongful claim.

d.     For any other relief that the arbitration panel deems just and proper.

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

1  Dated: September 10, 2020                        HOSIE RICE LLP

2

3                                                   By: _____
                                                        SPENCER HOSIE
4                                                       *Attorneys for Claimants*
                                                        *Hosie Rice LLP; Spencer Hosie; and,*
5                                                       *Diane S. Rice*

6

7

8

9

10

HOSIE RICE LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, California 94111

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 8



HOSIE | RICE LLP
ATTORNEYS AT LAW

Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
Tel.: 415.247.6000  F: 415.247.6001

January 4, 2021

<u>VIA Electronic Mail</u>

Kenneth M. Kramer
Gregory P. Miller
Hon. Shirley Kornreich (Ret.)
Judicial Arbitration and Mediation Services

Re:   *Hosie Rice LLP v. Frome Wye Ltd. dba Woodsford Litigation Funding*
      Ref. No. 1100109661

Dear Panel Members:

In this Panel's first Scheduling Conference, Hosie Rice LLP ("the Firm") said that it planned to file an early summary judgment motion. The Panel asked that the Firm submit a short letter outlining the bases for this motion, as well as explaining how the resolution of the proposed motion would serve efficiency and simplify the case. This is that letter.

This dispute is far narrower than Woodsford's heated allegations would have it. The dispute turns on two specific points of contractual meaning: (1) whether the Litigation Finance Agreement ("LFA") gives Woodsford an interest in the Firm's non-contingent hourly fee revenue, or instead limits Woodford's interest to the recovery of contingent fees, if any; and (2) whether the LFA's use of the term "Gross Revenue" gives Woodsford a right to recover if the Firm collects unpaid hourly fees and costs through a fee arbitration against the client.

Resolving both questions early would significantly streamline this dispute.

*<u>The LFA Covers Contingency Fees Alone</u>*

On its face, the LFA limits Woodsford's interest to contingent fee recoveries. This is stated explicitly and repeatedly in the LFA. The schedule of cases included, set out in Exhibit A, were all full or partial contingent fee cases. Woodsford's own Term Sheet limited Woodsford's interest to contingent fee recovery, if any.

The LFA was not a bank loan, secured by all of the Firm's hourly revenue. Instead, this was a contingency fee recovery litigation finance agreement. Woodsford took risk here, which is

HOSIE | RICE LLP
ATTORNEYS AT LAW

Kenneth M. Kramer
Gregory P. Miller
Hon. Shirley Kornreich (Ret.)
January 4, 2021
Page 2

why it received an annual interest rate of 26% plus a first-money-out minimum return of $250,000.

Under Delaware law, a contract must be ambiguous to warrant deviating from its terms. There is no patent or latent ambiguity here. The agreement manifestly limits Woodsford's interest to contingency fee recovery alone, just as the parties intended.

*Gross Revenue*

The LFA sets forth a series of defined terms, including "Gross Revenue" and "Revenue Event." Paragraph 1.16 of the LFA defines "Gross Revenue" as consideration recovered in resolving "Contingency Cases" or received in a "Revenue Event." Revenue Event is itself a defined term, in LFA section 1.31, and means the receipt of "Gross Revenue" through settling or resolving any of the "Claims." The LFA, in turn, defines "Claims" as cases brought by the Firm on behalf of its clients—defined as "Claimholders"—against third-party Defendants. *See* LFA at section 1.15, section 1.30.

In 2020, after a lengthy and bitter arbitration against a former client, the Firm recovered most but not all of the hourly fees and incurred costs the client owed the Firm. Woodsford apparently now reads the LFA as giving an interest in this hourly fee arbitration recovery as a "Gross Revenue" event.

It is not. Under the LFA's own defined terms, a Revenue Event is limited to the Firm's recovery against a third-party defendant on behalf of the Claimholders, the Firm's clients. Woodsford receives no greater fee participation rights under the LFA simply because the Firm had to pursue a recalcitrant client for hourly fees due.

*Resolving These Issues Now Would Simplify and Shorten the Dispute*

Both questions of contractual meaning are proper for resolution on summary judgment. Both are questions of law for the Panel, and neither turns on disputed facts. With these legal issues resolved, the dispute then reduces to one simple factual matter—whether the Firm in fact received any contingency fees other than as reported and paid to Woodsford.

HOSIE | RICE LLP
ATTORNEYS AT LAW

Kenneth M. Kramer
Gregory P. Miller
Hon. Shirley Kornreich (Ret.)
January 4, 2021
Page 3

It did not.

Very truly yours,

*/s/ Spencer Hosie*
Spencer Hosie

Cc:  Peter B. Ladig (Counsel for Frome Wye Ltd.)

# EXHIBIT 9



ATTORNEYS AT LAW

Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA  94111
Tel.: 415.247.6000   F: 415.247.6001

January 7, 2021

<u>VIA Electronic Mail</u>

Kenneth M. Kramer
Gregory P. Miller
Hon. Shirley Kornreich (Ret.)
Judicial Arbitration and Mediation Services

Re:   *Hosie Rice LLP v. Frome Wye Ltd. dba Woodsford Litigation Funding*
Ref. No. 1100109661

Dear Panel Members:

This letter responds to Woodsford's January 4, 2021 letter, outlining the basis for Woodsford's proposed Summary Judgment Motion.

Both parties believe the meaning and application of the LFA term "Gross Revenue" is suitable for determination on Summary Judgment.  By the same logic, the related question of whether the LFA reaches hourly, non-contingent fee revenue, as against contingency revenue, is likewise proper.  (This was the first issue raised in the Firm's letter, an issue that Woodsford did not address.  Prior to the January 4 crossing letters, the Firm confirmed with Woodsford that it continued to contest this issue).

Woodsford's second point turns on another issue of contractual interpretation, specifically whether Woodsford has a fee interest in new partial or full contingency cases the Firm accepted during the duration of the LFA, even if Woodsford elected not to add such new cases to the LFA and likewise declined to fund these new cases.  That is, in addition to the cases listed in Exhibit A, the Firm took on three new cases in 2020, as the Firm disclosed to Woodsford.  The Firm asked Woodsford if it wanted to add these cases to the LFA; Woodsford ignored this request.  The LFA has detailed provisions governing when Woodsford secures a fee interest in any such new cases, and the Firm agrees that this issue of contractual meaning—how new cases are handled under the LFA—is appropriate for summary adjudication.

Woodsford's final issue turns on an "audit."  It evidently wants this Panel to permit a parallel fact discovery proceeding, which it deems an audit.  But this dispute is, and has been, in litigation for months.  Discovery in a litigation (or arbitration) proceeds through the discovery processes set out in the rules, and as policed by the Judge or Arbitration Panel.

Hosie | Rice LLP
ATTORNEYS AT LAW

Kenneth M. Kramer
Gregory P. Miller
Hon. Shirley Kornreich (Ret.)
January 7, 2021
Page 2


       Finally, both parties agree that discovery should begin only **after** the parties file and this Panel decides the Summary Judgment questions outlined above.  It is difficult to police fact discovery until one knows what basic issues remain in dispute.  Streamlining discovery is one important reason why **both** parties have proposed early motions on key contractual meaning issues.

                    Very truly yours,


                    */s/ Spencer Hosie*
                    Spencer Hosie

Cc:  Peter B. Ladig (Counsel for Frome Wye Ltd.)

# EXHIBIT 10

1    SPENCER HOSIE (CA Bar No. 101777)                    **CONFIDENTIAL**
     shosie@hosielaw.com
2    DIANE S. RICE (CA Bar No. 118303)
3    drice@hosielaw.com
     HOSIE RICE LLP
4    600 Montgomery Street, 34th Floor
     San Francisco, CA 94111
5    (415) 247-6000 Tel.
     (415) 247-6001 Fax
6
7    *Attorneys for Claimants and Counter-Respondents*
     *HOSIE RICE LLP, SPENCER HOSIE*
8    *and DIANE S. RICE*

9
                **JUDICIAL ARBITRATION AND MEDIATION SERVICES**
10

11

12   HOSIE RICE LLP, a California Limited          JAMS Reference No. 1100109661
     Liability Partnership; SPENCER HOSIE, an
13   Individual; and DIANE S. RICE, an Individual,  **CLAIMANTS' MOTION FOR LEAVE
                                                     TO FILE THE ATTACHED AMENDED
14              Claimants and counter-               COMPLAINT AND RELATED
                respondents,                         DEFENSES TO COUNTER-
15                                                   CLAIMANT'S COUNTERCLAIMS**
          v.
16
     FROME WYE LIMITED, INCORPORATED,
17   (dba "WOODSFORD"),

18
                Respondent and counter-
19              claimant.

20

21

22

23

24

25

26

27

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION AND SUMMARY ................................................................. 1

II.   PROCEDURAL HISTORY ............................................................................. 3

III.  THE LAW ON LEAVE TO AMEND ............................................................... 5

IV.   ARGUMENT: LEAVE TO AMEND IS RIGHT, REASONABLE, AND JUSTIFIED
      HERE ....................................................................................................... 7

V.    LEAVE TO AMEND WOULD NOT BE FUTILE ............................................... 9

      A.   The Law ......................................................................................... 9

      B.   Woodsford's General Integration Clause Does Not Immunize It From Fraud .......... 9

      C.   The Facts Alleged Must Be Taken as True ...................................... 10

      D.   The Firm's Usury Defense (Offset) is Proper Under Delaware Law ...................... 10

1

## **TABLE OF AUTHORITIES**

2

**Cases**                                                                                                                    **Page**

3
4       *Aluminumsource, LLC v. LLFlex*,
          C.A. No. N18C-07-231 EMB CCLD (Sup. Ct. Del. May 19, 2021) .................................... 6

5       *Arnold Greenspan v. LADT, LLC*,
6          185 Cal.App.4th 1413 (2010) ............................................................................................ 6

7       *Dole v. Arco Chem. Co.*,
          921 F.2d 484 (3d Cir. 1990) .............................................................................................. 6
8
9       *Foman v. Davis*,
          371 U.S. 178, 83 S.Ct. 227 (1962) ................................................................................ 5-7

10
        *Harrison Beverage Co. v. Dribeck Importers, Inc.*,
11         133 F.R.D. 463 (D.N.J. 1990) ............................................................................................ 9

12      *In re NAHC Sec. Lit.*,
          306 F.3d 1314 (3d Cir. 2002) ............................................................................................ 9
13
14      *Malek v. Chef's Roll, Inc.*,
          No. 18-cv-03205-BRM-ESK (D.C. NJ. 2021) .................................................................. 6
15
16      *McDonalds Corp. v. Easterbrook*,
          No. 2020-0658-JRS (Court of Chancery of Delaware Feb. 2, 2021) ............................ 9-10

17      *Partner & Simons, Inc. v. Sandbox Acquisitions*,
18         C.A. No. 2020-0776-MTZ (Del. Court of Chancery, July 26, 2021) .............................. 10

19      *Sofregen Medical v. Allergen Sales*,
          C.A. N20C-03-319 EMD CCLD (Sup. Ct. Del. 2021) .................................................... 10
20
21      *Spady v. Keen*,
          No. 04C-11-185 MJB, 2006 WL 2559853 (Del. Super. Aug. 25, 2006) ............................ 7
22
23      *Tucker v. Reading Co.*,
          55 F.R.D. 327 (E.D. Pa. 1972) .......................................................................................... 6
24
        *United States v. Webb*,
25         655 F.2d 977 (9th Cir. 1981) .............................................................................................. 5

26      *United States v. Wood*,
          872 F.2d 453 (6th Cir. 1989) .............................................................................................. 5
27
28      *Venters v. City of Delphi*,
          123 F.3d 956 (7th Cir. 1997) .............................................................................................. 6

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1

2

*Winer Fam. Tr. v. Queen*,
    503 F.3d 319 (3d. Cir. 2007) ................................................................. 9

3

## Statutes

4

Del. R. Ch. Rule 15 ............................................................................................ 5
Fed. R. Civ. P. 15(c) ......................................................................................... 5

5

6

## Miscellaneous

7

Moore, 3-15 Moore's Federal Practice-Civil § 15.14 ...................................... 5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

CLAIMANTS' MOTION FOR LEAVE TO FILE THE ATTACHED AMENDED COMPLAINT
AND RELATED DEFENSES TO COUNTER-CLAIMANTS' COUNTERCLAIMS

- iii –

I.      **INTRODUCTION AND SUMMARY.**

Pursuant to Prehearing Order No. 7, Hosie Rice LLP, Spencer Hosie and Diane Rice (hereafter "Claimants") bring this motion for leave to amend and supplement "Plaintiff's Complaint In Arbitration For: Emergency Relief Per Jams Rule 2; Breach of Contract; Damages; Recission of Notice of Default; Temporary Restraining Order; Preliminary Injunction; and Permanent Injunction" (hereafter "Complaint for Emergency Relief") and Related Defenses to Counter-Claimants' Counterclaims.  In support of this Motion, Claimants submit the attached First Amended Complaint and Related Defenses.

Before discovery commenced, both parties asked that this Panel first consider a threshold question of contractual interpretation, specifically, whether the Litigation Finance Agreement ("LFA") gave Woodsford a claim to the fees Hosie Rice LLP ("Firm") recovered in its fee arbitration against its client, the Space Data Corporation ("SDC").  The Firm said no, believing that the LFA gave Woodsford an interest in contingency fee recoveries alone, as long discussed.  *See* attached Amended Complaint at § II, Statement of the Facts.  Woodsford disagreed, saying that it had the first right to any money coming from the cases set forth in LFA Schedule A, regardless of whether the funds represented cost reimbursements, guaranteed non-contingent hourly fees, or contingent fees proper.

On February 16, 2021, the Panel asked that both parties submit short letter briefs, explaining how taking up this threshold question first, and before discovery, would promote efficiency.  Both parties submitted letter briefs, arguing that resolving this threshold question first would narrow and focus discovery, and so focus the arbitration hearing.

In Pre-Hearing Order No. 3, the Panel directed the parties to brief two narrow but related questions of contractual meaning; the reach and meaning of the LFA definitions of "Gross Revenue" and "Revenue Event."

CLAIMANTS' MOTION FOR LEAVE TO FILE THE ATTACHED AMENDED COMPLAINT AND
RELATED DEFENSES TO COUNTER-CLAIMANTS' COUNTERCLAIMS

Case No.  1100109661

– 1 –

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

After substantive briefing and argument, the Panel issued its ruling on these two definitional terms on July 2, 2021.  The Panel found that these definitions were plain on their face, and gave Woodsford the right to take any money recovered in any of the scheduled cases, regardless of nature (costs reimbursed; hourly fees; contingent fees).  As the Panel found the language plain, it did not have to consider extrinsic evidence, and largely did not.  This ruling is now the law of the case.

The ruling, however, now gives rise to specific Hosie Rice claims and defenses.  For example, as read by the Panel, what Woodsford always described as a "high-risk; high return" investment in contingency fee recoveries became a no-risk loan.  This is so, as both parties understood, because the Firm's non-contingent hourly fees in the many Schedule A hybrid cases were more than sufficient to cover even the maximum amount that the Firm could draw down under the loan.  More, the repayment obligation was secured by the equity in the Hosie Rice family home.  Under the ruling, Woodsford took **no** risk on its investment, yet still got the extraordinarily high return it justified pre-contract by the substantial risk Woodsford said it took in investing in contingent fee recoveries alone.  As the LFA guaranteed Woodsford repayment and a return, even if the Firm lost every LFA Schedule A contingency case, the Firm received no consideration for Woodsford's extraordinary rate of return (all as alleged in detail in the attached pleading).

More, if Woodsford pre-execution understood the deal as it now claims (guaranteed by all non-contingent hourly fees and cost recoveries, and backed by equity), **every** representation Woodsford made to the Firm pre-execution was affirmatively misleading.  As alleged with 9(b) specificity, Woodsford explicitly described this financing as a "high-risk; high return" investment in contingent fee recovery.  It said this repeatedly in the parties' many phone calls.  It also said this in writing, pre-execution.  And it never stated to the contrary (until August 2020).  Given this history and numerous explicit representations, the proposed definitions did not put the Firm on

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

notice to ask Woodsford if water remained wet.  If Woodsford changed the deal after months of oral and written representations through two LFA definitions, it should have so disclosed to the Firm.  It did not.

More, post-execution, Woodsford not once asked that the hourly non-contingent fees and costs the Firm recovered on the scheduled hybrid cases be deposited in a "collateral account," as it now (and only now) contends was required.  It knew of these fees; the parties discussed them frequently.  Nor did it seek repayment from these non-contingent fees and costs until August of 2020, almost two years after the parties executed the LFA.  Had Woodsford done either in late 2018, when the Firm started drawing down the line, the Firm would have protested that Woodsford was changing the deal and would have terminated the LFA.

Finally, Delaware law on the right to amend tracks the federal law, FRCP 15.  Leave should be given freely, absent strategic delay and resulting prejudice.  We found no case—in court or arbitration—where leave to amend was denied before discovery even commenced or a trial (hearing) date set.  The Supreme Court has ruled that, while leave to grant or deny leave is always discretionary, it is an abuse of discretion to deny leave to amend in circumstances such as these.

## II.    <u>PROCEDURAL HISTORY</u>.

This Panel conducted its first scheduling conference on December 15.[1]  At this conference, the parties discussed whether an early decision on a threshold contract meaning question would be efficient, streamline discovery, and narrow the issues tried at the hearing (not yet scheduled).  At the Panel's request, both parties submitted letters requesting leave to file motions on the threshold contractual interpretation issue.

In its Pre-Hearing Order No. 2, the Panel denied the crossing requests, finding that

---

[1] During the conference, Woodsford asked the Panel if it could amend its Response to Complaint and for the first time, file counterclaims.  Hosie Rice took the high road and did not object.  On December 22, 2020, Woodsford filed its amended pleadings.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

"motions at this time will not serve the stated goals of efficiency and cost efficiencies in fully resolving the claims and counterclaims in this Arbitration."  (This was true, but the parties had said that an early decision would focus and narrow discovery and the hearing, not fully resolve the dispute).

After a scheduling conference, the Panel issued Pre-Hearing Order No. 3.  On reflection, the Panel decided that it would "be most efficient and cost effective to have the parties brief the issues of: (1) whether the meaning of provisions concerning 'Gross Revenue' and 'Revenue Event,' including the meaning of 'Claim' and 'Claimholder,' as set forth in the LFA are ambiguous; (2) whether there is any ambiguity in how such definitions to the receipt by Hosie Rice of $4 million in its fee arbitration against its client."

The parties then filed briefs addressing these precise questions of contractual meaning.

On July 3, 2021, the Panel ruled that these terms were plain on their face, and under these definitions, Woodsford was entitled to any money that came in on any scheduled case, pure contingency or hybrid, regardless of nature, *e.g.* cost recovery, non-contingent hourly fees (hybrid cases), or actual contingency fees.

In Pre-Hearing Order No. 6, the Panel asked that the parties submit a short statement of their positions on the remaining and next steps in this proceeding.

In its letter, Hosie Rice asked for leave to amend its pleadings to deal with issues now centrally relevant given the Panel's just prior ruling on contractual meaning.  Woodsford's letter essentially took the position that the matter was over, but that Woodsford wanted to go forward with work on damages discovery (as, of course, its damage amounts were just asserted, and as— alleged in the attached pleading—wrong on their face).

After the letters, the Panel set a short conference call.  In that call, the Panel asked that the Firm submit a formal Motion for Leave to Amend, attaching as an exhibit the proposed pleading.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   These are those documents.  *See* "Amended Complaint and Related Defenses to Counter-

2   Claimant's Counterclaims."

3   **III.      THE LAW ON LEAVE TO AMEND.**

4        JAMS' rules turn on notice and the lack of prejudice.  While formal pleadings are not

5   required, there can be no arbitration hearing by ambush.

6

7        Delaware law on leave to amend tracks federal law very closely.  F.R.C.P. 15(c).  *See* Del.

8   R. Ch. Rule 15, "Amended and Supplemented Pleadings" ("Leave shall freely be given when

9   justice so requires.").

10       There is a substantial body of federal caselaw on point.  Federal Rule of Civil Procedure

11  15(a) requires that leave to file an amended complaint be "freely give[n]… when justice so

12  requires."  In keeping with the flexibility of the Federal Rules, Rule 15 is generous.  The policy is

13  that by allowing the parties to "fix" or supplement their pleadings as they go along, the case will

14  more readily be resolved on the merits.  The United States Supreme Court, federal and state courts

15  held that leave to amend is to be granted with "extreme liberality."  *See, e.g. Foman v. Davis*, 371

16  U.S. 178, 182, 83 S.Ct. 227, 230 (1962) (leave to amend should be freely given); *United States v.*

17  *Webb*, 655 F.2d 977, 979 (9th Cir. 1981) (courts should be guided by policy favoring decisions on

18  the merits "rather than on the pleadings or technicalities"); *see also* Moore, 3-15 Moore's Federal

19  Practice-Civil § 15.14 ("A liberal, pro-amendment ethos dominates the intent and judicial

20  construction of Rule 15(a).").  Courts routinely allow amendment even after the expiration of

21  discovery and after the time for amended pleadings in the Scheduling Order.  *See, e.g. United*

22  *States v. Wood*, 872 F.2d 453, 456 (6th Cir. 1989) (allowing United States to add a claim fourteen

23  months after suit was filed, after discovery had closed, and three weeks before trial).

24       The parties' previous submissions, including pleadings, letters, briefs, exhibits, and Orders,

25  in both arbitration proceedings have put Woodsford on notice of the proposed claims and defenses.

26

27

28

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

CLAIMANTS' MOTION FOR LEAVE TO FILE THE ATTACHED AMENDED COMPLAINT AND
RELATED DEFENSES TO COUNTER-CLAIMANT'S COUNTERCLAIMS                    Case No.  1100109661

– 5 –

The amendments rise out of the conduct, transaction, or occurrence set forth in the original Complaint.  As one court noted in finding that an original complaint put a party on notice that it was jointly and severally liable, that "[t]he parties' submissions, including their arbitration briefs and the Hold Funds Agreement, also raised the issue of LADT's liability for breach of contract." *Arnold Greenspan v. LADT, LLC*, 185 Cal.App.4th 1413, 1449 (2010).  The court noted that "'[t]he essence of arbitration is its freedom from the formality of ordinary judicial procedure (citations omitted).'"  "'[W]hen [the parties] have adopted [arbitration], they must be content with informalities.'"  *Id.*

Prejudice matters.  Leave to amend should be granted absent a showing of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc."  *Foman* at 182.

Similarly, 15(a) allows a party to amend to assert omitted affirmative defenses in federal actions.  *See Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir. 1997).  If an affirmative defense becomes apparent only after discovery has begun, a defendant should seek leave to amend.  Federal courts have also held that an amendment to an answer should be liberally allowed even if it adds an entirely new claim to an action.  *See Tucker v. Reading Co.*, 55 F.R.D. 327 (E.D. PA 1972).

Third Circuit and Delaware Courts decisions accord: a "particular claim will be decided on the merits rather than on technicalities."  *Dole v. Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990).  *Malek v. Chef's Roll, Inc.*, No. 18-cv-03205-BRM-ESK (D.C. NJ 2021) (finding neither the proposed fraudulent inducement or fraudulent concealment claim futile).  For example, in *Aluminumsource, LLC v. LLFlex*, C.A. No. N18C-07-231 EMB CCLD (Sup. Ct. Del. May 19, 2021), the court granted Plaintiff's motion to amend its complaint even after the court had granted summary judgment on a fraudulent inducement claim.  Thereafter, the court scheduled a status

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

CLAIMANTS' MOTION FOR LEAVE TO FILE THE ATTACHED AMENDED COMPLAINT AND
RELATED DEFENSES TO COUNTER-CLAIMANT'S COUNTERCLAIMS

Case No.  1100109661

– 6 –

conference with the parties to address why the fraudulent inducement claim could not be amended to conform to the facts developed and to allow further discovery.

Delaware Courts also consider the proposed amendment's impact on a scheduled trial date. *See, e.g. Spady v. Keen*, No. 04C-11-185 MJB, 2006 WL 2559853, at *3 (Del. Super. Aug. 25, 2006).

We found no case denying leave to amend before discovery had even commenced, nor a trial and hearing date set.  The Supreme Court has explained the circumstances under which denial of leave to amend is appropriate:

> If the underlying facts or circumstances relied upon by plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.  In the absence of any apparent or declared reason— such  as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sough should, as the rules require, be "freely given."  Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

## IV.    ARGUMENT: LEAVE TO AMEND IS RIGHT, REASONABLE, AND JUSTIFIED HERE.

Discovery has not yet commenced in this case.  No hearing date has been set.

By design, the parties asked for the Panel's ruling on the contractual issues to focus the issues remaining.  **No** party ever proposed or thought that the ruling would resolve the case, as this Panel itself observed in Pre-Hearing Order No. 2.

Parties are routinely given leave to amend following an important ruling, especially at the outset of a case, where that ruling significantly changes the nature and identity of remaining issues. This Panel's ruling did that exactly.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1   To cite one example, and as set forth with 9(b) specificity in the attached pleading, the

2   ruling held that Woodsford had first claim to any and all money that came in in any of the hybrid

3   cases, including hourly fees and costs.  Coupled with Woodsford's security interest in the house,

4   this meant that Woodsford took **no** risk in this deal whatsoever.  From 2018 forward, Woodsford

5   knew, as alleged, that the Firm's non-contingent revenues in the hybrid cases (of which SDC was

6   just one) were more than sufficient to cover the maximum amount available under the line.  This is

7   simply and empirically true.  With the equity in the home, and its founder's minimum return,

8   Woodsford was absolutely guaranteed at least an 8% annual return, even if the Firm **lost** every

9   single scheduled hybrid case.  As constructed, this became a risk-free loan, but one carrying an

10   extremely high rate of return.

11   As so read, the Firm received no consideration for this extremely high return. The LFA also

12   gave Woodsford the right to advance money and then claw it back mere days or weeks later (as

13   hourly fees and cost reimbursements came in).  No consideration again.

14   More, if Woodsford then understood the LFA as it now claims, everything Woodsford

15   represented to the Firm pre-closing was misleading.  This is alleged with 9(b) specificity in the

16   attached proposed Complaint.

17   As another example, as a loan, Woodford's was **not** a high-risk speculative investment in

18   potential contingency fee recoveries.  With the claim to every dollar in the many scheduled cases,

19   and the security in the home, there was no speculative investment at all.  As such, and as relevant

20   now, this agreement is subject to Delaware usury law, which generally permits any interest rate

21   **except** where the loan "or use of money" is secured by the borrower's personal residence, as

22   Woodsford's line is here.

23   There is no surprise to Woodsford here in the proposed amendment; the factual story has

24   been set forth many times.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

1    Nor is there any prejudice: discovery has not even begun.  While Woodsford would simply

2    like to proclaim victory, and wish away remaining factual and legal issues, it cannot—that would

3    be a substantial due process violation.

**V.    LEAVE TO AMEND WOULD NOT BE FUTILE.**

4

5    Woodsford might contend that Leave to Amend would be futile as the Firm can properly

6    state no claims nor defenses under Delaware law.  It can, and has in the attached pleading.[2]

7

8    **A.    The Law.**

9    Courts determine futility "by taking all pleaded allegations as true and viewing them in a

10   light most favorable to the plaintiff."  *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 330-31 (3d. Cir.

11   2007) ("[A]n amendment would be futile when ʹthe complaint, as amended, would fail to state a

12   claim upon which relief could be granted.'"  *See In re NAHC Sec. Lit.*, 306 F.3d 1314, 1332 (3d

13   Cir. 2002).  "If a proposed amendment is not clearly futile, then denial of leave to amend is

14   improper."  *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990).

15

16   **B.    Woodsford's General Integration Clause Does Not Immunize It From Fraud.**

17   Numerous Delaware courts have considered whether a standard "integration clause" will

18   immunize a party from its pre-contract misrepresentations.  For example, in *McDonalds Corp. v.*

19   *Easterbrook*, No. 2020-0658-JRS (Court of Chancery of Delaware Feb. 2, 2021), the Court first

20   noted the general policy: "As a matter of public policy, Delaware is 'intolerant of fraud….'"  It

21   therefore concluded that "[a] standard integration clause, without more, is insufficient to disclaim

22   all reliance on extra-contractual statements."  The court then found that the integration clause

23   before it did not preclude the fraud claims, citing numerous other Delaware cases to the same

24

25   effect.

26

27

28   [2] As matters stand, Hosie Rice has to anticipate Woodsford's futility arguments, if any.  Hosie Rice
     would request a brief reply to the extent futility arguments raise questions for the Panel.

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

The integration clause central to the *McDonalds* case is substantially identical to the integration clause in the LFA.  To compare, here are the two clauses:

> The clause in the McDonalds case:

>> This Agreement… constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, inducements or conditions, oral or written, express or implied.

> The LFA integration clause:

>> This Agreement, together with all exhibits hereto, sets forth the entire understanding between the parties and supersedes all previous understandings, agreements and communications and representations whether written or oral concerning the subject matter to which this Agreement relates.

This LFA integration language is exactly the language that numerous Delaware courts have held does **not** bar fraud claims.  *See, e.g. Sofregen Medical v. Allergen Sales*, C.A. N20C-03-319 EMD CCLD (Sup. Ct. Del. 2021) (Delaware law will not bar reliance on ex-contractual statements under an integration clause, "unless that contracting party unambiguously disclaims reliance on such statements… [T]he disclaimer must come from the point of view of the aggrieved party…'").  More, an integration clause must "identify the specific information on which a party has relied and which foreclose reliance on other information (citation omitted)." *Partner & Simons, Inc. v. Sandbox Acquisitions*, C.A. No. 2020-0776-MTZ (Del. Court of Chancery, July 26, 2021).  ("To be effective against fraud claims, a disclaimer must unambiguously 'ensure the preclusion of fraud claims for extra-contractual statements.'").

**C.      The Facts Alleged Must Be Taken as True.**

It is axiomatic that the allegations must be taken as true.  As alleged, the Firm has set forth competent and proper claims and defenses.  Woodsford may not contend otherwise by arguing the facts.

**D.      The Firm's Usury Defense (Offset) is Proper Under Delaware Law.**

In its recent six-page letter brief, Woodsford argued that the usury statute did not apply here.  It cited two cases, neither on point (*e.g.* a loan secured by the borrower's personal residence.  The usury claim is specific to Mr. Hosie and Ms. Rice.  It arises under clear Delaware law, and the set-off defense so arising is entirely proper).

For these reasons, Hosie Rice respectfully asks leave from the Panel to file the attached proposed pleading.

Dated: August 6, 2021

*/s/ Spencer Hosie*
Spencer Hosie
HOSIE RICE LLP

*Attorneys for Claimants and Counter-Respondents HOSIE RICE LLP, SPENCER HOSIE and DIANE S. RICE*

Hosie Rice LLP
600 Montgomery Street, 34th Floor
San Francisco, CA  94111

CLAIMANTS' MOTION FOR LEAVE TO FILE THE ATTACHED AMENDED COMPLAINT AND
RELATED DEFENSES TO COUNTER-CLAIMANT'S COUNTERCLAIMS

Case No.  1100109661

– 11 –

# EXHIBIT 11

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Claimants and Counter-Respondents*
*HOSIE RICE LLP, SPENCER HOSIE*
*and DIANE S. RICE*

CONFIDENTIAL

## JUDICIAL ARBITRATION AND MEDIATION SERVICES

| | |
|---|---|
| HOSIE RICE LLP, a California Limited Liability Partnership; SPENCER HOSIE, an Individual; and DIANE S. RICE, an Individual, <br><br> Claimants and counter-respondents, <br><br> v. <br><br> FROME WYE LIMITED, INCORPORATED, (dba "WOODSFORD"), <br><br> Respondent and counter-claimant. | JAMS Reference No. 1100109661 <br><br> **CLAIMANTS' [PROPOSED] AMENDED COMPLAINT AND AMENDED RESPONSE TO FROME WYE'S AMENDED RESPONSE TO DEMAND FOR ARBITRATION AND COUNTERCLAIMS** |

## I.   INTRODUCTION AND SUMMARY.

1.      Hosie Rice LLP is a San Francisco based law firm ("the Firm").  It largely pursues complex intellectual property (Patent; Trade Secret Theft; Breach of NDA) claims, often against some of the largest tech companies in the world.  Spencer Hosie is one of the two co-founders.  He began his career at the Heller, Ehrman, White & McAuliffe firm, and then established his own firm in 1986.  Diane Rice is the other co-founder.  For 12 years, she was a partner at the Brobeck, Phleger & Harrison firm, and ran its Products Liability and Life Sciences trial practice from 2001 to 2003 when the Brobeck firm dissolved.  She joined Mr. Hosie in the now joint practice.  Hosie Rice LLP, Mr. Hosie and Ms. Rice personally are the claimants and counter-respondents in this

- 1 -

arbitration

2.     Frome Wye Limited ("Woodsford") is a "litigation finance" firm, now one of many such firms.  It has its principal place of business in London, England.

3.     Woodsford's public website has long described its basic business model and approach to litigation financing.  Woodsford there states that it offers non-recourse capital to finance contingency fee lawsuits in return for a share of any contingency fee recovered by counsel. Woodsford explains that it so takes significant risk, as contingency cases are inherently risky, and that this risk justifies a significant Woodsford return, *e.g.*, four times or greater than the interest rate under a traditional, revolving bank line of credit.

4.     On its website, Woodsford asked the question "What is Litigation Financing?"  It then answered its question as follows:

> In return for taking a significant financial risk, Woodsford receives a percentage of the damages recovered or a multiple of the costs financed. If the proceedings fail, we recover nothing and may even face liability for the other side's costs.

5.     Woodsford's website also contains a video describing its business model and how it makes its investment decisions.  This video sets forth the six "factors" Woodsford considers.  Each "factor" describes Woodsford making a high-risk; high return investment in a law firm's recovery of contingent fees, if the agreement is with counsel.

6.     After over a year of discussions, many dozens of emails, a large number of calls, contemporaneous notes, and a formal April 2018 Woodsford "Term Sheet," as set forth below, the parties closed a Litigation Finance Agreement ("LFA").  Woodsford's own underwriting documents say that the Woodsford "Term Sheet" is designed to capture the parties' agreement on the commercial terms.  *See* below.  The Firm agreed with the provisions in Woodsford's Term Sheet.

7.     In every single conversation preceding the LFA, Woodsford invariably described its proposed interest to be cabined to the Firm's contingency fee recoveries, exactly as its website

Claimants' [Proposed] Amended Complaint in Arbitration           CONFIDENTIAL

explained.  Woodsford never once said that it contemplated what was essentially a risk-free bank loan, fully secured with no risk to Woodsford, as alleged in detail below, but nonetheless still providing an extremely high Woodsford return.  To the contrary, Woodsford justified its high return, 26% per annum plus a guaranteed $250,000 minimum return, by underscoring that Woodsford was making a risky investment in uncertain contingent fee recoveries, and that this risk warranted its very high return.

8.      In its many written communications to the Firm, Woodsford always so described the proposed financing to the Firm, as set forth below.

9.      Just weeks after Woodsford circulated its Term Sheet, Woodsford sent the Firm a draft LFA.

10.     This draft contained language defining two terms, "Gross Revenue" and "Revenue Event."  Given the many conversations, numerous emails, explicit negotiations, and Woodsford's Term Sheet, the Firm did **not** read these definitions as profoundly changing the nature of the deal, *i.e.*, changing it from a speculative high-risk, high-return investment in contingency case fee recoveries, into a secured bank loan with no risk to Woodsford, as alleged in detail below.  In short, Woodsford retained the very high return, while avoiding any of the risk that it long said justified that return.

11.     Following execution of the LFA, from October 2018 until August 2020, Woodsford not once asked that the Firm deposit the hourly guaranteed non-contingent fees received in the scheduled hybrid cases in the "Collateral Account," as Woodsford now says was required.  Woodsford before and post-execution knew of these hybrid hourly fees in the many scheduled hybrid cases, not just SDC.  Woodsford saw the Firm's financials for prior years, and these hourly fees were frequently discussed in pre- and post-execution calls and in emails.  See below.

12.     In August of 2020, after a settlement in the *Space Data v. Google* case, Woodsford

- 3 -

first demanded a share of the Firm's non-contingent fees.  Late in the month, and without giving

notice to the Firm or its principals, Woodsford then filed a "Notice of Default" to try to foreclose on

the Hosie Rice family home, given Woodsford's claimed but not adjudicated breach. On its face,

Woodsford's NOD set forth an incorrect amount owed, as it continued to double count interest, as

set forth below.

13.     When the Firm and its principals discovered this NOD, they filed a JAMS arbitration

and sought emergency relief under JAMS Order No. 2.  After substantive briefing and argument,

the Emergency Arbitrator ruled that the Firm was more likely right than wrong on its LFA

interpretation.  He so ruled twice.

14.     After this Panel was appointed, both parties said that the case could be simplified and

streamlined by resolving a threshold legal issue: whether Woodsford had an interest in the hourly

fees the Firm recovered in the fee arbitration against Space Data.

15.     In written submissions to the Panel, both parties said that an early ruling on this

threshold issue would streamline discovery, which had not yet commenced, and narrow the

subsequent hearing.  No party said that there would be no further discovery nor a hearing.  *See*

below.

16.     On July 2, 2021, this Panel ruled that the LFA gave Woodsford the right to collect

any and all money of any sort received by the Firm in any of the Schedule A listed contingency

cases or hybrid cases.  For example, if the Weissensee plaintiff sent the Firm a $10,000 cost

reimbursement check, this went to Woodsford.

17.     This recent ruling now makes relevant several narrow and specific issues.  For

example, as read by the Panel, this Agreement posed no risk to Woodsford at all.  The Hosie Firm

so received no consideration for paying an extraordinarily high interest rate.  More, if Woodsford

truly understood in 2017 and 2018 the LFA as it says it does now, every representation it made to

the Firm prior to closing the deal was affirmatively misleading.  *See* § II below (paragraphs in Statement of Facts all pled with 9(b) detail).  More, under Delaware law, Woodsford's integration clause does not immunize Woodsford from fraud.

18.     Although the JAMS rules require notice, not formal pleadings, an Amended Complaint clearly stating and making of-record now germane Claims and Affirmative Defenses is in the interest of all.  This motion thus seeks leave to file an Amended Complaint and Response with Affirmative Defenses (attached as one document for convenience).

## II.     THE FACTS.

19.     Over time, here is what happened, as confirmed by the contemporaneous written record.

20.     In early 2017, Woodsford contacted Spencer Hosie to introduce its firm and describe its business model, *i.e.*, high-risk, non-recourse, high return litigation financing.  In this brief call, Mr. Hosie thanked Woodsford for calling, said that neither the Firm nor any Firm client needed litigation financing, but that he would call Woodsford should that change.  (At the time, litigation financing was becoming popular and the Firm often received unsolicited litigation finance overtures).

21.     In April 2017, a former and prospective Firm client, Implicit Networks, emailed Spencer Hosie, asking for recommendations on potential litigation finance companies (Implicit later becomes important here, as described below).  Hosie referred Implicit to Woodsford, and sent an introductory email to the Implicit C.E.O. and Woodsford's Josh Meltzer.  In an immediately subsequent email, Mr. Meltzer emailed Mr. Hosie, saying "Spencer, I'm familiar with your firm and would appreciate the chance to meet you and learn more."

22.     Woodsford and Implicit did not then close a deal (for reasons unknown to the Firm).  Mr. Meltzer, however, emailed Mr. Hosie again saying, "I would appreciate the chance to speak

Claimants' [Proposed] Amended Complaint in Arbitration                    CONFIDENTIAL

with you about the pro's and con's of a law firm portfolio financing facility.  Are you open on a call on this this?  I don't think it would be a waste of your time."

23.     Mr. Meltzer and Mr. Hosie spoke over the phone shortly thereafter.  In this call, Mr. Meltzer described Woodsford's business model as providing non-recourse financing secured by an interest in the Firm's contingent fee recoveries, if any.  Mr. Meltzer said that Woodsford very much wanted to fund a "portfolio" of contingency cases, as against just one such case.  He explained that this approach mitigated risk, as any one case might well go south, and that Woodsford was always concerned that law firms might keep the best contingency cases for themselves, while seeking financing on cases less strong.

24.     As this was underway, Mr. Hosie emailed Mr. Meltzer on August 18, 2018, saying "we have a client looking for litigation financing asking; may I introduce you?"  Meltzer said yes, and Hosie sent an email the same day introducing Woodsford to the Space Data Corporation ("SDC") C.E.O. (Knoblach) and C.F.O. (Ritchie).

25.     Mr. Meltzer, in fact, had earlier talked with Ritchie in 2017.  SDC evidently independently approached Woodsford for contingent funding in 2017.

26.     Mr. Meltzer and Mr. Hosie continued to discuss a possible Hosie Rice firm litigation financing arrangement with Woodsford.

27.     On September 10, 2017, Mr. Meltzer emailed Mr. Hosie, confirming a call on Monday, September 10, 2017.  Mr. Meltzer attached to his mail an article he authored describing Woodsford's business model.  This article repeated what Woodsford described on its website, *e.g.*, that Woodsford would be "a financial partner… with the expertise to **underwrite an illiquid but valuable contingency litigation portfolio**…."  This echoed exactly what Mr. Meltzer had told Mr. Hosie in earlier telephone calls.

28.     In September, Mr. Hosie told Mr. Meltzer that the Firm, then, had no interest in

- 6 -

litigation financing.

29.     Matters so rested until February 1, 2018.  Mr. Hosie then emailed Mr. Meltzer, saying that he would like to discuss litigation financing further with Woodsford.  Mr. Hosie said that the Firm was "growing quickly," but "turning away good cases."   By definition, these **were** contingency cases; hourly cases pay for themselves and generate a stable and monthly revenue stream.  Mr. Meltzer responded promptly, saying "I have followed your firm closely and have always been impressed with its focus and sophistication in plaintiff matters."

30.     In early February, Mr. Meltzer sent Hosie the Woodsford's standard NDA to enable the parties to discuss the Firm's practice with NDA protection.  The NDA was generic and fair, and the Firm executed it on February 2, 2018.

31.     Woodsford then set a conference call for February 6, 2018.  Mr. Meltzer had expanded the Woodsford team to include: Jonathan Dickie (lawyer), Zachary Krug (same), corporate in-house counsel Alex Lempiner, and Mark Spiteri.  Mr. Meltzer set forth the agenda for the call as follows, "Introduction and roles; description of Woodsford's portfolio funding facility; and process and next steps."

32.     The parties had the call on February 6.  In that call, Woodsford described its litigation funding offer exactly as it had earlier described its proposal to Mr. Hosie: Woodsford made high-risk, no recourse investments in contingency fee recoveries, with the inherent risk justifying Woodsford's high returns.  At **no** point in this call did Woodsford mention that the Firm's hourly non-contingent revenue would be included in the financing.  (In a hybrid case, the client paid reduced monthly hourly fees, due regardless of outcome, and the Firm took a reduced contingent interest in any ultimate recovery, typically 15% to 17% of any recovery).

33.     Immediately following the call, Mr. Dickie sent to the Firm a detailed Woodsford "Information Request," essentially a Due Diligence document request.

34.     This Due Diligence request asked for comprehensive information about the Firm's current contingency cases, including the contingency portions of hybrid cases.  For example, Category C1 required that the Firm provide  the following information for current contingency cases (and only contingent cases):

> For each ongoing contingent fee cases, please include:
> - Case name
> - Description of each case
> - Filing status update (i.e. has case been filed?  If not, when?)
> - Key milestones (e.g. Markman, IPR, Trial dates)
> - Retainer agreement clearly showing how the firm is remunerated
> - Case budget showing expected case disbursements
> - Identification of claimant(s)
> - Identification of defendant(s)
> - Jurisdiction (if filed)
> - Details of any co-counsel on the claim and their renumeration
> - Details of any parties that have an interest in the claim (economic and/or lien)

35.     Woodsford then asked for nearly equally detailed information concerning closed contingent cases:

> For each underlined closed contingent fee case in the last 3 years, please include:
> - Description of each case
> - File case number (if filed)
> - Case type (e.g. patent, class action etc)
> - Key dates for each case
> - Claim size / damages – please explain if claim size materially changed from initial estimate
> - Timeline – please explain if timeline materially changed from initial estimate
> - Jurisdiction
> - Outcome of each case including financial settlement value
> - Fee earned (if any) by the firm
>
> Note: if any risk of confidentiality breaches, then cases may be anonymized

Woodsford's Due Diligence request did not inquire at all into the Firm's non-contingent hourly fee revenue, including in the hybrid cases.

36.     The Firm sent Woodsford the information requested, including the Firm's P&L

1   statements and comprehensive case information.

2       37.   Throughout March 2018, the Firm continued to send detailed and confidential

3   information to Woodsford, including the Firm's bank statements and the Firm's balance sheet.

4       38.   In mid-March, Woodsford asked the Firm to provide additional case detail on three

5   large earlier contingency cases.  The Firm did so for three significant cases: (1) *FiTeq v. Venture*

6   *Corp.* (NDA and IP case, tried to jury in Hon. Beth Labson Freeman's Court in early 2018; jury

7

8   found for the plaintiff on all verdict counts, and the defendant settled the next week for a significant

9   eight-figure amount plus the return of nine million of plaintiff FiTeq's shares); (2) *Backflip v. Cisco*,

10  another IP case filed in Santa Clara Superior Court; the defendant settled the day before trial for a

11  very significant eight-figure amount; and (3) *Britto v. Ripple et al.* (Britto, the Firm client, was a co-

12  founder of Ripple, a cryptocurrency company.  He personally wrote most of the code.  This, too,

13  was a hybrid case, with the Firm receiving guaranteed monthly hourly fees, plus a share of the

14  Ripple cryptocurrency recovered, known as "XRP's.").

15

16      39.   On March 28, 2018, after Woodsford received these detailed due diligence materials,

17  the Woodsford C.E.O. emailed Mr. Hosie to arrange a call.  The call was set for the following

18  Wednesday.  At no point in this call did the C.E.O., Steven Friel, suggest that Woodsford

19  contemplated taking an interest in the Firm's non-contingent hourly income.  If he had done so, the

20  Firm would have ended the discussions then and there.

21

22      40.   On Wednesday, April 25, 2018, Woodsford sent a formal written "Funding

23  Proposal" to the Firm.  **This was a Term Sheet.**  In material part, the proposal stated as follows:

24          $1m Revolving Facility, with potential to extend up to $2m

25          The firm's current preference is to handle litigation on a hybrid
26          contingency fee basis. The client pays 50% of the firm's fees and all hard
            costs on an ongoing basis.  In return for the 50% discount on its fees, the
27          firm is entitled to a success fee of 17.5% or proceeds from each litigation.

28          This model works well for the firm, providing a high degree of cashflow

- 9 -

certainty plus upside, and it works well for the firm's usual client base, private equity-backed ventures that are willing and able to pay fees and costs, but who like to see that their lawyers have some "skin in the game."

Woodsford proposes a $1m Revolving Facility, **where repayment in Woodsford is contingent upon Hosie Rice's receipt of contingency fees** from its current portfolio of cases, including Space Data.  This facility would provide the firm with valuable cashflow, and could be used to help scale up the business, without burdening the firm or its partners with debt.

41.     Woodsford's own underwriting documents describe the significance of Woodsford's Term Sheet as follows: "**Term Sheet Issued (Woodsford and Claimant agree on indicative commercial terms for the case.)**."  That is, Woodsford's own underwriting documents say that the Woodsford Term Sheet was designed to confirm agreement on the commercial terms of the financing.  This is exactly what the Firm thought the Term Sheet did.  The Firm accepted the terms set out in the Term Sheet.

42.     The Firm's partners Hosie and Rice had planned a trip to London in May 2018.  Mr. Hosie was unable to make that trip.  Ms. Rice went and met with the Woodsford principals in the Woodsford London offices.  It was a cordial meeting.  Woodsford said nothing about taking an interest in the Firm's non-contingent hourly fees; indeed, its April 25 "Proposal" was explicitly to the contrary.

43.     Following this meeting, and on May 22, Woodsford's Zachary Krug asked this question, "if there are any other larger contingency cases besides those 4 [discussed at the in-person meeting] then it would be good to know about those.  (I know you have some smaller matters, no need to pull those…)."  Just prior to Mr. Krug's email, Ms. Rice had sent to Mr. Krug an additional email on two other hybrid cases, *Weissensee v. Oznowicz* (a real estate development dispute that went to trial in 2013), and *Hagenbuch v. Steel et al.*

44.     In response to Mr. Krug's email, Mr. Hosie once more explained the Firm's hybrid fee structure, and why the Firm preferred this structure:

- 10 -

These are hybrid cases, which we really prefer. Hourly component keep clients rational and provides operating plus a profit. Will forward information.

Hosie to Krug, May 22, 2018.

45. From the documents Woodsford earlier received, Woodsford knew that the Firm's contingency recovery in the Backflip, Britto, and FiTeq matters dwarfed the non-contingent monthly reduced hourly rates paid over the life of these cases.

46. As part of its continuing due diligence, Woodsford asked that the Firm provide its 2009 profit and loss statement. The Firm did by email on August 23, 2018. The profit and loss showed gross revenue of $3.8 plus million ,which reflected significant hourly fees, and a net profit of $1.33 million.

47. Following the many discussions, and Woodsford's formal Term Sheet, Woodsford forwarded the first draft of the LFA. The cover email noted, "Attached please find the Funding Agreement for the proposed law firm facility that **we have been discussing with you**." This draft contained Definitions for "Gross Revenue" and "Revenue Event." Given the explicit negotiation history, Woodsford's many written representations, and its own explicit Term Sheet, there was nothing in these definitions that fairly put the Firm on notice that Woodsford intended to materially rewrite the deal through two definitional terms, and so transmute a high-risk—high return investment in contingency fee recovery into a high return, **no** risk bank loan, secured by all the Firm's hourly fees in the scheduled cases. The transmittal email said nothing of the sort, and Woodsford never so stated (until August 2020).

48. The Firm, being in the last heated months of trial preparation, did not immediately respond to this first draft LFA. On June 12, 2018, Lempiner emailed Hosie and Rice, asking if they had had the time to review the draft LFA. Ms. Rice responded that, given trial preparation, neither had.

49.     Matters then remained static until July 17, 2018.  On that day, Mr. Krug emailed Ms. Rice, asking for additional due diligence materials on two hybrid cases.  Ms. Rice responded the same day, saying the Firm would forward the requested information.  Mr. Hosie then joined the email chain, informing Mr. Krug that the Firm had a new contingency case which would be part of the proposed funding, *MasterObjects v. Yahoo!*, (N.D. Cal., before Judge Jeffrey White).

50.     On July 18, 2018, Mr. Lempiner forwarded a revised LFA draft.  This draft changed the "allocation between Overhead Costs and Case Contingency Costs…."  Woodsford said nothing in this email about changing the basic structure of the financing, as long discussed and documented by Woodsford.

51.     Also, on July 18, Ms. Rice forwarded key rulings in three pending contingency cases, as Woodsford requested.  She also noted in her transmittal email that the Firm "routinely takes on smaller cases to generate cash flow.  As an example, the Oz case [*Weissensee v. Oznowicz*—a real estate development dispute] generated $250,000 last year."  These were hourly fees in just one small hybrid case.  Woodsford knew that the Firm's hourly fees in the Schedule A hybrid cases would more than cover the maximum amount available under the Woodsford line.

52.     The parties next spoke in a conference call on July 24.  Woodsford asked follow-up questions on the Firm's pending contingency cases.

53.     On August 1, Mr. Krug emailed Hosie and Rice, setting up yet another due diligence call.  In his email, Mr. Krug asked that Hosie and Rice "confirm whether current HR attorneys are compensated on salary basis or do they have some potential interest in HR's contingency fee?"  The Firm told Woodsford that all associates were on a salary, and that none had any interest in contingency fee recoveries.

54.     On August 6, 2018, Mr. Lempiner emailed what he described as the execution copy of the LFA.  His email said nothing to contradict Woodsford's many discussions with the Firm, or

- 12 -

formal Term Sheet, which all confirmed that Woodsford intended to make a high-risk, high-return

investment in the Firm's contingency fee recoveries, as against a high return, no-risk fully secured

loan.

55.    Three days later, a crisis emerged.  Mr. Lempiner forwarded a New York Bar

opinion, addressing the legality of a Litigation Funding Agreement, where the funder invested in,

and was repaid, from the receipt of **contingent** fee income.  *See* "Formal Opinion 2018-5 **Litigation**

**Funders Contingent Interest in Legal Fees**."  This opinion specifically addressed a contingency

fee investment, not a bank loan fully secured by all receivables (which had been common in the

business for decades).  Mr. Lempiner asked if this opinion might be soon reflected in California

rules prohibiting a proposed contingency investment.  Mr. Hosie responded: "Well, this will upend

some business models.  Q: is the Calif rule identical?  If so, I have an idea.  We cannot get

crosswise with the bar.  Period."

56.    In its due diligence process, Woodsford asked that the Firm partners give Woodsford

collateral security in their family home.  They first declined to do so.  On August 31, 2018, Mr.

Hosie sent the following email to Mr. Lempiner:

> On reflection, I am not comfortable liening our home with our last kid out.
> We do not need a 5 bedroom plus 7 million home and may want to sell
> and downsize.
>
> We agree to pledge [as collateral] all hourly fee revenue.  If that doesn't
> work for you, I understand and will move on.

57.    Mr. Lempiner then called Mr. Hosie.  He said that the home was just security in case

the Firm breached.  Mr. Hosie understood this to mean that, by breached, the Firm did not pay

Woodsford its share of a contingency recovery.  By offering to "pledge" hourly fees as additional

security, Mr. Hosie made explicit that he did **not** believe these fees were already covered by the

LFA.  Mr. Lempiner did not say otherwise in this call.  *See* Lempiner to Hosie, August 21, 2018

("We would like to take you up on your offer to include in the collateral security, the Firm's interest

- 13 -

in its discounted deferred fees in the Space Data case…").

58.     During this negotiation process, the parties discussed the prior tax liens on the Hosie residence.  These liens were explicitly disclosed and discussed.  On August 23, 2018, Mr. Hosie forwarded to Mr. Lempiner a complete series of "lien releases," filed and of-record.  *See* Hosie to Lempiner, August 23, 2018 ("Lien Releases").  *See also* Hosie to Lempiner, August 28, 2018 ("FTB release").  Far from being hidden from Woodsford, these liens were disclosed, discussed, and complete lien releases sent to Woodsford.

59.     Woodsford forwarded a revised LFA on August 28, adding the now "pledged" deferred hourly fees as additional collateral.

60.     On October 2, 2018, Woodsford asked for the Hosie Rice personal tax returns going back years.  Mr. Hosie replied as follows:

> You ask for personal tax returns below.  This is just too intrusive.  We
> have already produced the Firm's tax returns.  And your schedule of DD
> [due diligence] docs only called for the firm's returns.

61.     Mr. Hosie then said that the Firm would "step back," stop the many months of negotiations, and that the parties might revisit the litigation financing in the next year.

62.     Alex Lempiner set a conference call for Thursday, October 4, agreed with Mr. Hosie, and this issue was so resolved.  Over many months, Woodsford so aggressively pursued the Firm to close the litigation financing, as against the converse.

63.     On October 4, Mr. Hosie emailed Mr. Krug asking if the two could talk the next day for a "substantive case update."  Contrary to Woodsford's allegations, the Firm kept Woodsford fully informed, through both calls and quarterly written updates.

64.     By mid-October, 2018, Woodsford was ready to close.  As a pre-condition, it required the Firm to wire $10,000 to Woodsford to pay an "Arrangement Fee."  The Firm did so.

65.     In every conversation preceding the LFA, Woodsford invariably described its

- 14 -

1   proposed investment to be in the Firm's contingent fee receivables, and secured only by

2   contingency fee recourse, exactly as its Term Sheet stated.  Woodsford never said that it

3   contemplated an essentially risk-free bank loan, fully secured by all listed case hourly fees and cost

4   reimbursement, as alleged in detail below.  During these calls, Ms. Rice often took notes, which

5   reflected that Woodsford only discussed a high-risk contingency fee financing.

6       66.     The Firm first accessed the line on October 18, 2018 for $150,000.

7       67.     On November 8, 2018, with just $150,000 drown down, the Firm advised Woodsford

8   that a scheduled contingency case, *MasterObjects v. eBay* was likely going to settle, and that

9   Woodsford should assume "payment in December."

10      68.     On November 9, 2018, the Firm drew down an additional $200,000 on the

11  Woodsford facility.  This brought the amount then advanced to $350,000.  On December 7, the

12  Firm drew another $200,000, bringing its total draw to $550,000, in three tranches in the last three

13  months of 2018.

14      69.     On December 4, 2018, Mr. Hosie emailed Woodsford saying that it had closed the

15  eBay settlement, and was drafting final documents.  The next day, Hosie emailed Mr. Lempiner that

16  the eBay settlement might "fund as early as next week," and that the Firm would forthwith wire

17  Woodsford $800,000; the repayment of the $550,000 drawn down in three tranches in the prior

18  three months, plus Woodsford's first money out $250,000 "minimum funder's return."  The Firm

19  sent this $800,000 wire the following week, thereby pre-paying $234,000 in Woodsford's

20  prospective interest.  That is, the interest on the amount drawn down at the contractual 26% rate

21  approximated just $16,000, as against the $250,000 the Firm paid, leaving the Firm with a $234,000

22  pre-aid interest credit.

23      70.     From October 2018 forward, Woodsford not once asked the Firm about its hourly

24  receivables.  It not once asked that the Firm deposit those fees in the "collateral account," as it now

- 15 -

contends the LFA required.  It not once asked for repayment from these hourly fees.  Had it done any of these things, the Firm would have protested that Woodsford was changing the Agreement, and never drawn down another dime if Woodsford persisted.

71.    As a consequence of the eBay payment, the Firm started 2019 with zero drawn down on the Woodsford facility, and an interest pre-payment of $234,000.  It also had substantial hourly fee income that would come in in 2019 in the scheduled hybrid cases.

72.    In January 2020, the Firm asked Woodsford if it would be interested in "factoring," *e.g.*, buying, the Firm's SDC hourly receivables, at discount to face.  At that point, the Firm had millions of dollars of such receivables.  This request would have been nonsensical if the parties then believed that Woodsford already owned these fees.

73.    On January 8, Mr. Meltzer emailed Mr. Hosie to discuss the possibility of Woodsford factoring the deferred hourly Space Data fees.  Mr. Meltzer also asked Mr. Hosie about the numerous Implicit Networks cases pending in Texas that Mr. Hosie had accepted:

> I would like to take the next step regarding the [Implicit] opportunity….
> Attached is our Schedule 1 of case questions [Woodsford contingency
> case due diligence].  Can you complete this or let us understand the
> proposed (hybrid) retainer agreement and anticipated budget?

(Woodsford later added these Implicit cases to its portfolio, as set forth below).

74.    On January 18, 2018, Woodsford sent to the Firm a written proposal to factor the outstanding Space Data receivable.  Mr. Hosie responded that this was a change ("addendum") to the existing LFA.  No party in these negotiations thought or suggested that Woodsford already had claim to these hourly, non-contingent fees under the LFA.

75.    On January 17, the Firm told Woodsford that it signed the hybrid Implicit Representation Agreement.  Woodsford responded, "when can you let us know the focus/scope of the case and the associated budget?"

76.    On January 18, 2019, Woodsford sent to the Firm a formal proposal to add hourly

Claimants' [Proposed] Amended Complaint in Arbitration                                    CONFIDENTIAL

deferred fees to the LFA.  This Woodsford proposal first stated the parties' intent: to add hourly fee income from Space Data to the existing contingency fee LFA:

> Advance of $1,000,000 against the Law Firm's current and future contingent fee income receivables **and non-contingent receivables from the case**.

(Emphasis ours).  The language regarding non-contingent receivables was new, as known by both parties.

77.     The Woodsford proposal then set forth a detailed series of conditions precedent to close this new agreement giving Woodsford an interest in the Firm's Space Data hourly and non-contingent fees.

78.     All of these Woodsford protections were new.  If Woodsford had prior understood that these hourly fees were captive under the original LFA, why did Woodsford not earlier do any due diligence into the Firm hourly fee revenue?

79.     Woodsford's proposal also added a Woodsford priority as to these hourly fees. *See* Proposal at 2.  ("Funder will receive a first priority security interest…").  If these non-contingent hourly fees were already covered under the 2018 LFA, Woodsford **already** had this security interest.  If so, why did Woodsford now ask for the security protection in January 2019?

80.     As a further condition, Woodsford demanded the right to review the Firm's Space Data representation contract and ensure that the Firm indeed had the right to recover hourly fees regardless of outcome:

> Funding offer is contingent upon Funder's review of Law Firm's engagement letter with Space Data Corporation, invoices, and satisfactory confirmation of Law Firm's rights/ability to provide lender with [hourly fees].

Mr. Hosie sent Mr. Lempiner that agreement on January 22, 2019.

81.     On Implicit and Space Data, Mr. Hosie emailed Mr. Meltzer the following on January 21, 2019:

- 17 -

J: two things:
On implicit, after many client calls and draft claims charts, we have agreed
to file four cases immediately.  The biggest will be edny against AMZ.
We have a NY bar member in the firm and so will not require local
counsel.  Second, we will file three cases in Waco (Austin presence):
riverbed, juniper, and barracuda.  We will jt venture these cases with Bo
Davis (Davis firm Ed Tex; he is judge Leonard Davis' son).  I am working
on the budgets today.  Client has committed 5 m.
Second, we did not agree to one term in the proposed factoring term sheet
(we accepted the economics and structure).  With our monthly bill
clipping along at 400 k a month, the AR number will be between 5 to 6 M
by the time we talk to the jury.  I want to use part of this now to hire two
lawyers and grow the firm.  So, pls let me know where we stand.

82.     On January 28, 2019, Mr. Lempiner sent back suggested redlines to the Firm's SDC

Representation Agreement.  Mr. Lempiner specifically added provisions making more clear that the

Firm would be paid its reduced hourly fees regardless of outcome.  Woodsford added a line to the

agreement asking that the client confirm the hourly fees due the Firm as of the date of the proposed

redline.  Woodsford also added language to the paragraph describing the Firm's right to discounted

non-contingent hourly fees, saying that these fees would be paid "within 90 days of the resolution

of the matter regardless of outcome."

83.     The Firm forwarded the Representation Agreement, with Mr. Lempiner's suggested

edits, to the client.  The client then executed the slightly revised agreement.

84.     Throughout this period, the Firm kept Woodsford fully informed on case progress.

Mr. Krug and Mr. Hosie spoke frequently.  Mr. Hosie forwarded detailed quarterly updates.  He

also forwarded draft pleadings.  Indeed, Krug and in-house counsel Robin Davis had a conference

call to discuss the best way to brief the Space Data Summary Judgment Opposition.

85.     On February 12, 2019, Mr. Lempiner sent to Mr. Hosie a new draft LFA, now

including the Space Data non-contingent hourly fees.  The revisions were substantial, and all made

explicit that neither party prior believed that these non-contingent hourly fees were covered under

the original LFA.

- 18 -

86.     Indeed, the draft added a new obligation for the Firm: a covenant that the Firm would pursue an enforcement action against its client if the client did not pay the hourly fees due "regardless of outcome…."

87.     To ensure that the Firm was still keeping Woodsford fully informed, on Friday, March 1, 2019, Mr. Hosie emailed Mr. Krug, asking "Do you need a case update and review or have the ceaseless emails sufficed?"  Krug responded that he did enjoy the emails, but a formal report that he "could circulate to others would be useful."  Mr. Hosie forwarded that detailed report on March 4, 2019.  This report included a detailed account of the new Implicit Networks cases.

88.     On Implicit, Woodsford had largely completed its due diligence preparatory to adding these cases to the LFA.  On March 4, after receiving the formal report, including a long section on Implicit, Mr. Meltzer emailed Mr. Hosie saying that Woodsford was "ready for next step re Edward [Implicit C.E.O.] when you are."

89.     The next day, Mr. Hosie sent to Mr. Meltzer proposed economics covering the Implicit cases.

90.     In late March, Mr. Meltzer told Mr. Hosie that Woodsford wanted to "move ahead" with adding the Implicit cases to the LFA.  To that end, Mr. Krug wrote Mr. Hosie in April, saying that he needed "to update our facility review and valuation to include those [Implicit] cases."  Mr. Krug knew that these were hybrid cases, yet only spoke of the Firm's "contingency" interest in these new cases.

91.     Mr. Hosie sent his next quarterly review memo on May 6, 2019.  This memo included the Implicit cases.

92.     In early May 2019, the Court in the Space Data case, ruled on Google's Summary Judgment Motion.  The Court denied Space Data's motion on trade secret claims, but—to the surprise of all, even Google's lawyers—granted the motion as to the Space Data '193 patent.  The

Claimants' [Proposed] Amended Complaint in Arbitration                                        CONFIDENTIAL

Court did so on an argument that Google had not even made.  Mr. Hosie promptly so informed Mr. Krug.

93.     After the Summary Judgment hearing in early May, Woodsford cut-off funding to the Firm.  It said that the Firm had hit the line limit.  This was wrong, as that line had increased under the LFA by $250,000 given the added Implicit cases.  Shortly thereafter, Mr. Hosie asked Mr. Lempiner to provide an accounting reflecting what Woodsford viewed as owed.  In his written response, Mr. Lempiner included over $90,000 in interest for the first five months of 2019 alone.  This charge overlooked, however, that the Firm began the year with a $234,000 interest pre-payment **credit**.

94.     In late July, the Firm closed a Google settlement, recovering **more** than the face value of the Space Data trade secrets case as set forth in Space Data's own expert's damages report, and even while preserving the right to appeal the adverse '193 ruling.  That is, the Firm persuaded Google to both settle, pay Space Data, yet agree to let Space Data continue to sue Google.

95.     As set forth in the Firm's first Complaint, which allegations are hereby incorporated by reference as fully set forth here, the Space Data attorney-client relation broke down beginning in January 2019.  By early summer, Mr. Knoblach had retained an old college friend to serve as Space Data's in-house counsel.  Mr. Knoblach had huge settlement expectations, *e.g.* over a billion dollars for a Google technology that had not generated a dollar in revenue.  The Firm strongly disagreed with this view, and said so in writing.  Mr. Knoblach evidently then believed and said (in emails not shared with counsel) that, in disagreeing with Mr. Knoblach, the Firm was being "insubordinate" and not following the "chain of command."  The Firm also told its client that there was a very real chance that Google technology would **not** work and that Google would shut down its Google Loon project in full.  (Google did so in early 2021).

96.     After closing this settlement, the Firm had a contract claim for the hourly fees not

- 20 -

paid but then due ($5.2 million), a contract claim for its contingency fee on the settlement amount itself, and a prospective fee interest in the coming '193 appeal (under California law, this kind of prospective contingent fee is only a *quantum meruit* claim, not a contractual interest, as the recovery pre-condition has not yet occurred).

97.     In late July, Space Data fired the Firm and refused to pay the Firm any of the fees due.  As set forth in the Firm's original Complaint and extensive briefing, this led to a bitter fee arbitration with the client.  Under the arbitration rules, this arbitration was confidential and not to be disclosed publicly.

98.     The arbitration was finally resolved on August 20, 2020.  As set forth in the Firm's original Complaint, the Firm ultimately got paid just a portion of its hourly fees due ($4 million of the $5.2 million due).  The Arbitrator denied the Firm its contingent fee on the settlement amount. This is explicit in the Arbitrator's ruling.

99.     In March 2020, Mr. Hosie was diagnosed with metastatic stage four renal cell carcinoma that had spread through his lungs.  At that time, this cancer was considered invariably fatal. and Mr. Hosie's first two sets of oncologists (UCSF; Cedars Sinai) told him there was nothing to be done.  At the time, though, companies were developing novel monoclonal antibodies that might well be effective against metastatic RCC.  In April, Mr. Hosie found an oncologist at Stanford willing to try these therapies "off label," as not over fully approved by the FDA. Thereafter, Mr. Hosie went six months of extraordinarily toxic infusion therapy.  He also had two separate lung surgeries in the spring of 2020 and into 2021 where the doctors removed diseased sections from lobes in both lungs.  Mr. Hosie shared this information with Woodsford, though in less graphic detail.

100.     Over this period, Mr. Hosie desperately wanted to avoid litigation with Woodsford. He was desperately ill.  He feared that Woodsford might seek to foreclose on the family home

- 21 -

(despite any adjudication of breach).  He told Woodsford in writing several times that he did not want to fight about the issue with Woodsford, but would if Woodsford forced him to do so.

101.    In late August, Woodsford filed a Notice of Default ("NOD") to try to foreclose on the Hosie Rice home.  Despite being in constant email and phone contact with the Firm prior to this filing, Woodsford did not disclose this filing to the Firm.  The Firm learned of it later when Mr. Friel made an elliptical comment about Woodsford's enforcement action.  After several sharp letters, Woodsford then disclosed what it had done.

102.    The Firm then filed a JAMS arbitration and sought emergency relief to stay the NOD under JAMS Rule 2.  After substantial briefing and argument, the Emergency Arbitrator twice ruled that the Firm's view of the contract was more likely right than wrong.

103.    As set forth in the Motion for Leave to Amend, this led to the parties' mutual request that the Panel first address a threshold legal question: what the LFA meant and covered.  In their submissions, both said that such an early decision on the contract question would narrow and focus the following discovery and hearing.

104.    On July 2, 2021, this Panel issued its Order.  The Panel found that the "Gross Revenue" and "Revenue Event" definitions were plain on their face.  The Panel ruled that these definitions gave Woodsford the right to take any money recovered in a scheduled case.  As it found the definitions plain, the Panel so did not weigh extrinsic evidence, *e.g.* the detailed negotiation history alleged above, or Woodsford's conduct over nearly two years.

105.    This ruling is now the law of the case.  This ruling, however, now gives rise to Hosie Rice Affirmative Defenses and Claims, as set forth below.  Under JAMS rules, and basic due process, the Firm is entitled to focused discovery and a hearing on these new claims and defenses.

106.    Under the JAMS Comprehensive Arbitration Rules, a claimant need not plead formal causes of action or claims for relief.  Instead, the claimant need only give reasonable notice of the

1  claims.  *See* JAMS Rule 9.

2  **CLAIMS FOR RELIEF**

3  107.    Under the JAMS Comprehensive Arbitration Rules, a claimant need not plead formal

4  causes of action or claims for relief.  Instead, the claimant need only give reasonable notice of the

5  claims.  *See* JAMS Rule 9.  Hosie Rice hereby incorporates and asks to amend the Original

6  Complaint for Emergency Relief to provide further supplementation of the claims against

7  Woodsford following the Arbitration Panel's Prehearing Order No. 7 and July 3, 2021 Order on the

8  Summary Disposition Motions on the meaning of "Gross Revenue" and a "Revenue Event."

9  **CLAIM I**

10  **FRAUD-IN THE INDUCEMENT**

11  108.    Claimants incorporate and re-allege, as though fully set forth herein, the allegations

12  contained in paragraphs 1 through 107 above. Woodsford made false representations to Hosie Rice

13  and concealed material facts to persuade Hosie Rice to enter into the LFA.  As noted above,

14  Woodsford knowingly made false representations of material fact, intending that the Firm rely on

15  these misrepresentations.  The Firm did reasonably rely on these misrepresentations, and was

16  injured thereby.  Woodsford's misrepresentations were a substantial factor in causing the Firm

17  injury.  Hosie Rice has been injured by relying on Woodsford's misrepresentations, and this

18  deception was a substantial factor in causing injury.

19  **CLAIM II**

20  **FRAUD IN PERFORMANCE**

21  109.    Claimants incorporate as though set forth here the allegations contained in

22  paragraphs 1-107 above.  Post-execution, Woodsford did not ask that the Firm deposit any hourly

23  fees in the hybrid cases into the collateral account, as it now claims the LFA required.  It never

24  asked to be repaid from those hourly fees for almost two years, as it now says was its due.  Its

- 23 -

failure to do these things, if it then believed what it now asserts the LFA required, continued to mislead the Firm into believing that Woodsford's interest was cabined to contingency fee recoveries alone.  Woodsford, through its conduct over a protracted period, induced the Firm to so believe. Through these false acts and omissions, Woodsford intended to mislead the Firm, and did mislead the Firm.  The Firm reasonably relied on Woodsford's acts and statements, including things not said, and suffered damage thereby.

## CLAIM III

## BREACH OF CONTRACT

110.    Claimants incorporate the fact allegations set forth above in paragraphs 1 through 107 above, as though fully set forth here.

111.    Woodsford breached the contract by not adding to the Firm's available credit the $250,000 called for by the LFA given Woodsford adding the Implicit cases to its portfolio. Woodsford further breached the contract by serving an improper NOD, with the claimed amount materially false on its face.  This NOD also violated California law.

## PRAYER FOR RELIEF

112.    Incorporating the facts set forth above, Hosie Rice seeks a hearing on the merits and further requests that this Panel grant Hosie Rice the following relief:

        a.      Judgment in Hosie Rice's favor on all claims alleged against Woodsford;

        b.      Damages in an amount to be further proven at the hearing on the merits;

        c.      Damages for Woodsford's fraudulent inducement of Hosie Rice to enter into the LFA in an amount to be proven on the merits;

        d.      Damages for the fraud and deceptions and omissions, as will be proven on the merits;

        e.      Damages for breach of contract in an amount to be proven on the merits;

f.     That Woodsford be ordered to disgorge, restore and/or make restitution to Hosie Rice for all sums constituting unjust enrichment, if Woodsford is not compelled to set off the usurious interest and double-counted interest, as allowed by law according to proof;

g.     Any further damages as this Panel determines are proper.

## **AFFIRMATIVE DEFENSES**

113.   On December 22, 2020, Woodsford filed an Amended Answer.  On January 12, 2021, the Firm responded to this pleading, setting forth detailed facts and generally denied the allegations.  *See* Hosie Rice LLP's Reply to Frome Wye Ltd.'s Amended Response to Demand for Arbitration and Response to Counterclaims as Per JAMS' Rule 9(a).  Given the recent ruling, Hosie Rice moves for leave to supplement its pleading to state additional Affirmative Defenses.

114.   Subject to the responses above, Hosie Rice and counter-respondents allege and assert the following defenses in response to the allegations contained in Woodsford's counterclaims. Hosie Rice does not undertake the burden of proof as to any defense listed herein, regardless of how a defense is labeled, unless it is required to do so by law. Hosie Rice incorporates herein the allegations in its Amended Complaint and Amended Reply as though fully set forth herein.  As further separate and affirmative defenses, and in light of the Arbitration Panel's July 3, 2021 Order, Hosie Rice alleges as follows to each and every claim:

## **FIRST AFFIRMATIVE DEFENSE**
### **(Invalidity of the Contract)**

Woodford obtained Hosie Rice's consent to the contract through fraud, fraud in the inducement, deceit, and/or misrepresentation.  As a result, the contract is invalid.

## **SECOND AFFIRMATIVE FEDENSE**
### **(Fraud/ Fraud in the Inducement)**

Woodsford's counterclaims are barred because Woodsford's fraudulent inducement excused Hosie Rice from further performance.  Woodsford deceived Hosie Rice into entering into a contract

Claimants' [Proposed] Amended Complaint in Arbitration                                                    CONFIDENTIAL

in which Hosie Rice would have not otherwise have entered.  Woodsford continued that deceit throughout the life of the contract.

### THIRD AFFIRMATIVE DEFENSE
### (Unclean Hands)

Woodsford is barred from recovery for damages, if any, by the doctrine of unclean hands.

### FOURTH AFFIRMATIVE DEFENSE
### (Modification of Contract through Conduct)

Woodsford is barred from recovery of damages, if any, by modification of contract through conduct, as alleged in detail above.

### FIFTH AFFIRMATIVE DEFENSE
### (Lack of Consideration)

Woodsford is barred from the recovery of damages, if any, by the lack of consideration received by Hosie Rice.

### SIXTH AFFIRMATIVE DEFENSE
### (Unconscionability)

Woodsford is barred from recovery of damages, if any, by unconscionability.

### SEVENTH AFFIRMATIVE DEFENSE
### (Usury-Usurious Interest Rate Exceeds Lawful Rate Under Delaware Law)

Spencer Hosie and Diane Rice personally allege that the LFA is subject to Delaware law, and that Woodsford seeks an interest rate higher than permitted under Delaware law (*see Del. Code Title 6, §2301 et. seq*).  Woodsford is therefore not entitled to recover interest in the amount it seeks under the Counterclaim.

### EIGHTH AFFIRMATIVE DEFENSE
### (Frustration of Purpose)

Woodsford is barred from recovery of damages, if any, by the doctrine of frustration of purpose.

### TENTH AFFIRMATIVE DEFENSE
### (Estoppel/Promissory Estoppel/ Equitable Estoppel)

1
2
3

Woodsford is estopped by its acts, omissions, representations, and course of conduct, by which Hosie Rice was led to rely on to its detriment from asserting the claims listed in the Demand.

4
5

### ELEVENTH AFFIRMATIVE DEFENSE
**(Waiver, acquiescence, ratification, and/or accord and satisfaction)**

6
7

By reason of its acts, conduct, and omissions, Woodsford's claims are barred in whole or in part by the doctrines of waiver, acquiescence, ratification, and/or accord and satisfaction.

8
9

### TWELFTH AFFIRMATIVE DEFENSE
**(Failure to Mitigate)**

10
11
12
13
14

Woodsford never asked that the Firm deposit the hourly fees received in the hybrid cases in the collateral account, as it now claims the LFA required.  It never asked in late 2018 that the Firm repay Woodsford on those fees, as it could have done, as it now claims.  Had it done what it now says the LFA required, the Firm would not have drawn down another dime.  For failure to do as required, Woodsford so failed to mitigate its damages.

15
16

### THIRTEENTH AFFIRMATIVE DEFENSE
**(Additional Defenses)**

17
18

Hosie Rice reserves the right to raise additional defenses at law or equity, which may now exist or in the future be available upon the completion of further discovery and investigation.

19
20

Dated: August 6, 2021

    _/s/ Spencer Hosie_
Spencer Hosie
HOSIE RICE LLP

21
22
23

*Attorneys for Claimants and Counter-
Respondents HOSIE RICE LLP, SPENCER
HOSIE and DIANE S. RICE*

24
25
26
27
28

- 27 -

Claimants' [Proposed] Amended Complaint in Arbitration      CONFIDENTIAL

# EXHIBIT 12

1          JUDICIAL ARBITRATION AND MEDIATION SERVICES

2

3

   HOSIE RICE LLP, a                )
4  California Limited               )
   Liability Partnership;           )
5  SPENCER HOSIE, an                )
   Individual; and DIANE S.         ) JAMS Reference
6  RICE, an Individual,             ) No. 1100109661
                                    )
7          Claimants and            )
           counter-respondents,     )
8                                   )
           vs                       )
9                                   )
   FROME WYE LIMITED,               )
10 INCORPORATED, (dba               )
   "WOODSFORD"),                    )
11                                  )
           Respondent and           )
12         counter-claimant.        )

13              The Zoom arbitration proceedings of the

14 above-entitled cause on the 24th day of February,

15 A.D., 2022, commencing at 10:33 o'clock a.m.

16

17

18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2        HOSIE RICE, LLP
          BY:  MR. SPENCER HOSIE
 3             MS. DIANE RICE
          505 Sansome Street
 4        Suite 1575
          San Francisco, California 94111
 5        (415) 247-6000
          shosie@hosielaw.com
 6        drice@hosielaw.com

 7             Appeared on behalf of the Claimants and
               counter-respondents;
 8
          BAYARD
 9        BY:  MR. PETER B. LADIG
          600 North King Street
10        Suite 400
          Wilmington, Delaware 19899
11        (302) 655-5000
          pladig@bayardlaw.com
12
               Appeared on behalf of the Respondent
13             and counter-claimant.

14

15   REPORTED BY:

16        Steven J. Brickey, CSR, RMR, CRR
          CSR License No. 084-004675
17

18

19

20

21

22

23

24

25
```

Transcript of Arbitration 2.24.2022                                    Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

Page 3

1    ARBITRATOR KRAMER:  Good afternoon,
2  everybody.  I think you can safely assume that the
3  arbitrators have read the filings and we'll let
4  Mr. Hoise speak first.
5    MR. HOISE:  Thank you, sir.  Again,
6  for the record, Spencer Hosie.  We appreciate the
7  panel's time and attention as always.  I won't
8  repeat our briefing, but I'd like to hit some high
9  points and make our record.
10    First, we do believe that
11  Woodsford led the panel into error in terms of
12  substantive Delaware usury law.  Woodsford told
13  the panel in its July 21st, 2021 letter, which is
14  only supposed to address procedural next steps,
15  that the partners were, in fact, guarantors, not
16  co-borrowers.  They made that explicit affirmation
17  of fact.
18    That is, in fact, contrary to
19  the explicit language of the LFA.  Under Section
20  13.3, we, as individuals, are co-borrowers.  In
21  fact, we're designated as primarily liable
22  borrowers and that provision gives Woodsford the
23  right to proceed against us first and foremost
24  without doing anything prior and that is the very
25  antithesis of a guarantor relationship.

Page 4

1    We are parties to the agreement
2  and we signed it in our individual capacity.
3  Woodsford says we're not borrowers, but if we're
4  not borrowers why did they try to take our house?
5  We are borrowers.  We're identified as borrowers.
6    The statute -- the Delaware
7  statute says that if a loan exceeds $100,000 or
8  the use of money, which is clearly true here, and
9  is secured by the principal residence of, open
10  quote, any borrower, close quote, then the usury
11  rate applies and that plus the thorough rate of
12  interest comes to from memory about $126,000.
13    So we think that there was a
14  substantive error of law in terms of how Woodsford
15  explained the LFA to this panel and that's
16  reflected directly in this panel's decision on
17  denying us motion for leave to file the proposed
18  amended complaint.  The very last page of that
19  order pretty much reprises the very arguments that
20  Woodsford made, including citing three of the four
21  cases that Woodsford cited to the panel.
22    I understand that Woodsford will
23  say this is a disguised motion for
24  reconsideration, but it is computational because
25  what is more important to the computation of

Page 5

1  interest than the proper interest rate?
2    Finally, Woodsford on this
3  point -- Woodsford says that we waive this
4  argument because we didn't raise it in response to
5  their 7/21/2021 letter brief that was sent
6  pursuant to panel order number six.
7    Panel order number six said
8  please give us a short, simple statement of what
9  you perceived to be the next steps.  We did and it
10  was a simultaneous exchange and they made a
11  six-page substantive argument.  We had no
12  opportunity to respond to that until we filed our
13  motion for leave to amend.
14    ARBITRATOR KRAMER:  Let me ask you
15  this question, Mr. Hoise.  Was there a mortgage
16  signed and recorded in connection with the placing
17  of collateral?
18    MR. HOISE:  Yes.  It's not a
19  mortgage.  They placed -- I'm not sure what you
20  mean by a mortgage.  They placed an affirmative
21  lien.
22    ARBITRATOR KRAMER:  The statute
23  calls -- refers to a mortgage and I just was
24  curious whether there was a mortgage in your view.
25    MR. HOISE:  Yes.  Substantially,

Page 6

1  this is a mortgage.  They lent us money secured by
2  the interest in the real estate.  That is
3  absolutely; otherwise -- otherwise, form trumps
4  substance and you can walk away from usury just by
5  saying "Oh, this isn't a mortgage" even though
6  we're loaning money and it's guaranteed by the
7  security in your house.
8    ARBITRATOR KRAMER:  One more issue.
9  I'm not sure if this is an issue or not.  Is the
10  property that was pledged as collateral the
11  principal residence or a personal residence?
12    MR. HOISE:  It was both, Mr. Kramer,
13  and it is today and that was specifically pled in
14  the proposed amended complaint, from memory,
15  paragraph 56.  It's the family's principal home.
16    We live in -- we live in
17  California.  That's why California taxes have been
18  all over these pleadings from the get-go.  We
19  don't live in a lower tax state and somehow elect
20  to pay the much higher California tax rate.  That
21  is where we live.  It is our family home, our
22  personal residence.
23    ARBITRATOR KRAMER:  Thank you.
24    MR. HOISE:  Okay.  So that
25  substantive error is what we think led the panel

Page 7

1 into error on usury.
2          Second, we think they led the
3 panel into using the wrong procedural law in terms
4 of assessing the appropriateness of our proposed
5 amended complaint.
6          This is a JAMS arbitration.
7 JAMS Rule 9 applies.  It calls for a simple, short
8 notice pleading.  It doesn't call for a specific
9 factual pleading.  It doesn't certainly call for
10 any sort of heightened standard 9B pleading and
11 Woodsford acknowledges that in a footnote, but
12 then they hold us to a -- a 9B plead fraud with
13 specificity standard.  That's not appropriate
14 procedurally under the JAMS rules.
15          And even though Woodsford
16 acknowledges that, the JAMS procedural rule
17 applies, Rule 9, it then goes ahead and argues
18 substantive Delaware law on pleading fraud with
19 great specificity and that error, too, is
20 reflected in the panel's decision denying us leave
21 to amend because the panel analyzed our proposed
22 amended complaint under a heightened standard
23 equivalent to 9B and said "You didn't plead with
24 sufficient specificity."  Well, wrong law.  JAMS
25 doesn't require that.

Page 8

1          ARBITRATOR KORNREICH:  Can I ask you
2 something?
3          MR. HOISE:  Of course.
4          ARBITRATOR KORNREICH:  Is that
5 really a procedural issue or is this to some
6 degree substantive?
7          MR. HOISE:  You know, your Honor,
8 it's a good question and sometimes it's hard to
9 draw the line, but I'm not sure it is here because
10 this is -- the JAMS rules say "Here is how the
11 process will work.  Here is what you have to
12 allege.  Here is the level of detail."
13          That's very process and
14 procedure oriented.  It doesn't say, oh, the
15 underlying state procedural law and pleading
16 standards apply and if that were true it would --
17 it would really vitiate the advantage of most
18 arbitrations because one of the advantages of
19 arbitrations is the procedures and the pleadings
20 are supposed to be far more simple and straight
21 forward.  It's a basic notice standard, not a --
22          ARBITRATOR KORNREICH:  But it is
23 noticed.  You have to give notice of all of the
24 elements of the claim.
25          MR. HOISE:  Not elements of the

Page 9

1 claim.  You have to give notice of the underlying
2 facts and events that are germane to the claims.
3          ARBITRATOR KORNREICH:  Right.
4          MR. HOISE:  You don't have to plead
5 the claims.  So let me digress a little bit.  Let
6 me give you an example.  One of Woodsford's
7 arguments is that they had no notice of our fraud
8 claim set forth in the proposed amended complaint.
9          Now, as we think about it, of
10 course, those fraud claims didn't become germane
11 until this panel construed the LFA the way it did,
12 but in terms of the underlying facts of the fraud
13 claim, they were explicitly pled in the very first
14 filing in this case forward and that would be our
15 initial petition for emergency relief from memory.
16 It's paragraph 29 in that pleading.
17          We set forth the facts that they
18 said.  They said these things to us again, again
19 and again and if they are now saying something
20 different, these things weren't right.  That is
21 the essence of what we pled in the proposed
22 amended complaint.  So there was absolutely notice
23 here, even -- even under a standard more rigorous
24 than JAMS.
25          So we think to summarize this

Page 10

1 point the -- Woodsford led the panel into error in
2 terms of the wrong procedural standard to apply
3 and we were held to a standard that wasn't what's
4 set forth in JAMS Rule 9.
5          Third point and this is -- this
6 is a mix of both process and substance.  We -- we
7 proposed a very detailed proposed amended
8 complaint.  From memory, it's many, many, many,
9 many pages long with many, many specific detailed
10 allegations.  Under Delaware substantive law, the
11 allegations in the proposed amended complaint had
12 to be accepted as true.  Woodsford acknowledges
13 that in a footnote, but then it goes on to dispute
14 the facts.
15          We believe on this record that
16 Woodsford led the panel into error in deciding
17 disputed factual issues that were clearly pled in
18 our complaint and deciding them against us without
19 a hearing and forgive me for being blunt, but we
20 think that is a profound deprivation of due
21 process.
22          On a pleading motion, our facts
23 have to be assumed as true and they can't be
24 decided based on conflicting evidence, yet that's
25 what happened here.  There was, in essence, a

Page 11

1 substantive hearing with no testimony, no
2 documents, no witnesses and no hearing and we do
3 think that's a deprivation of due process which --
4        ARBITRATOR KORNREICH:  So are you
5 now arguing -- sort of arguing for reargument of
6 your motion to amend, is that what you're doing
7 now?
8        MR. HOISE:  In terms of the relief
9 we're requesting, absolutely.  We have been giving
10 these errors that the panel should revisit its --
11 its decision and give us a short evidentiary
12 hearing with evidence to decide these underlying
13 and important factual issues and let me give you
14 an example to why it really matters.  I -- I
15 can -- I can see you shaking your head, your
16 Honor.
17        ARBITRATOR KORNREICH:  No, the only
18 thing I guess I didn't understand that you were
19 making a motion for reargument and it looks -- I
20 didn't understand in reading the briefs.  I
21 thought I had read them all, but I didn't see
22 where you were arguing to be permitted to amend
23 your statement of claims.
24        MR. HOISE:  We're not asking to
25 amend the statement of claims.  We're asking that

Page 12

1 we get the substantive due process here and I
2 think the law entitles us to on the motion for
3 leave to amend and really we haven't had the
4 opportunity to do that.
5        The brief was restricted to
6 computational damage errors, but, your Honor,
7 frankly this is our opportunity to make our record
8 which is why we have a court reporter here.  You
9 know, this matters and you, know, I'm always
10 hesitant to disagree with a judge or panel.
11        ARBITRATOR KORNREICH:  No.  No.  No.
12 I mean, feel free to say whatever you want to say.
13        MR. HOISE:  Thank you.  Frankly, at
14 this point, you know, it has to be said and I
15 think that the process and the panel itself
16 deserve bluntness and candor and that's what
17 you're going to hear from us today.  Let me give
18 you an example.
19        ARBITRATOR MILLER:  How do you deal
20 with 10, JAMS Rule 10?
21        MR. HOISE:  JAMS Rule 10.  Let me
22 pull that up.  Is that the reconsideration rule?
23        ARBITRATOR MILLER:  That's --
24 that's -- basically, that says that, you know, you
25 can't amend your claim without the consent of the

Page 13

1 arbitrator.  So isn't it really a discretionary
2 decision for us to allow you to amend your claim
3 under Rule 10?
4        MR. HOISE:  Yes.
5        ARBITRATOR MILLER:  Totally
6 discretionary.
7        MR. HOISE:  I have Rule 10 up.
8 Well, respectfully no.  No.  It's summation of
9 law.  Delaware law applies in terms of if you
10 want -- if you want to look at Delaware
11 substantive law and then JAMS procedural law
12 applies.
13        If this case had been before a
14 Federal District Court in Delaware, the refusal --
15 again, I'll be blunt.  The refusal to give us
16 leave to amend would have been reversed as an
17 abuse of discretion on these facts.  There had
18 been no discovery, not a single deposition.  No
19 documents exchanged.
20        The motion to amend was filed
21 promptly after the court's decision on the
22 contract and that decision is what made these
23 amended claims germane.  So on this record, we do
24 not think that under substantive law or procedural
25 law the panel could simply say "We're going to

Page 14

1 decide the disputed factual issues ourselves and
2 because we think the other side's version of facts
3 are more persuasive, we're going to say no to
4 you."  That's what happened.  A substantive --
5        ARBITRATOR MILLER:  I understand
6 your argument.  I guess what I'm saying is we're
7 in district court.  We're in arbitration.  And by
8 virtue of that, different procedural rules apply
9 and the procedures established by JAMS require an
10 initial pleading that gives notice of claims that
11 has to be filed before the appointment of
12 arbitrators and then after the appointment of
13 arbitrators it can only be amended with the
14 consent of the arbitrators at that point in time
15 and -- and doesn't that just give us procedural
16 discretion whether to grant your claim just as a
17 matter of --
18        MR. HOISE:  Your Honor --
19        ARBITRATOR MILLER:  -- under the
20 JAMS rules?
21        MR. HOISE:  No.  Respectfully, not
22 at the cost of due process.  If -- if a panel made
23 a decision for a capricious and arbitrary reason,
24 it wouldn't --
25        ARBITRATOR MILLER:  Of course.

Transcript of Arbitration 2.24.2022                    Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

Page 15

1  MR. HOISE:  Excuse me.
2  ARBITRATOR MILLER:  But I think the
3  idea is -- the expectation in JAMS is that you're
4  going to take time and file your claim under Rule
5  9 and you're going to -- because the rule is
6  general and there isn't, you know, very specific
7  pleading requirements that you have a broad
8  opportunity to set forth your claims and if you
9  fail to do that, you know, it's -- that's really
10 on you.  That's not on the process.
11         You had an opportunity to submit
12 the claim.  The first claim you submitted was in
13 connection with the foreclosure procedure.  And
14 I'm just wondering -- you know, I understand what
15 you're saying, but aren't we entitled to rely and
16 shouldn't we rely on the JAMS rules because that's
17 what the parties agree to negotiate?  It was part
18 of the contract.
19         MR. HOISE:  Well, first -- I'm
20 sorry.  Please.
21         ARBITRATOR MILLER:  No, that's it.
22         MR. HOISE:  First, we did provide
23 notice in our initial pleading, paragraph 27.
24 That paragraph reprises the underlying facts that
25 are set forth in greater detail in our proposed

Page 16

1  amended complaint.
2         So the factual notice of the
3  underlying facts are set forth and JAMS doesn't
4  even require that you set forth formal causes of
5  action.
6         Second, I don't think that any
7  arbitration panel has unbridled discretion to
8  ignore the substantive and procedural rules.  It
9  is -- we are -- it's a nation of laws and we're
10 still bound by these rules and I do not believe
11 that the panel had the right to say "You know
12 what, you've pled these facts.  We're supposed to
13 accept them as true.  We decline to accept them as
14 true and we -- we're going to adopt the other
15 side's version of those facts."
16         I don't think a panel has the
17 ability to create a due process violation and then
18 say "Look, this is proper under JAMS Rule 10."
19         ARBITRATOR KORNREICH:  Can I ask you
20 a question?  Just assume -- and I'm not focusing
21 totally on these facts.  Assume that a panel looks
22 at the amended pleadings and the prior pleadings
23 or statement of claim, whatever you want to call
24 it, and says, you know, there is no -- this
25 doesn't make out, these claims.  It doesn't give

Page 17

1  the other side notice, due process, notice of what
2  is alleged against -- against it.
3         Would that be okay for the panel
4  then to say you have -- you know, you can't amend?
5         MR. HOISE:  If the pleading itself
6  does competently set forth facts, if it pleads
7  facts, that it's taken as true, sustained causes
8  of action, I think that the substantive law
9  requires that the facts be accepted as true in the
10 matter before us.
11         ARBITRATOR KORNREICH:  Absolutely.
12 But if it does not, then the opposite would be the
13 case, am I correct?
14         MR. HOISE:  Right, your Honor.  And
15 I think the fulcrum point here is that panel
16 doesn't get to weigh the facts and decide disputed
17 factual issues in making that decision.
18         ARBITRATOR KORNREICH:  Yeah, okay.
19         MR. HOISE:  That's the point and
20 that's what happened here.  This was a hearing
21 without a hearing, we think, and if you -- if you
22 look at the panel's -- I think it's an eight-page
23 order denying us leave to amend it does rest on
24 factual findings and I will give you one example.
25         One of the core issues in this

Page 18

1  case is after this panel's construction that
2  included all hybrid fee revenue, cash fee revenue,
3  not only from the scheduled case, but according to
4  Woodsford from any subsequent case, there was no
5  risk here and that's very carefully and
6  repetitively pled throughout our proposed amended
7  complaint and, in fact, has been in the case from
8  the very first pleadings forward.
9         So there was notice of that.
10 And the decision says we -- no, we do think
11 there's risk here.  That's a factual issue that
12 was disputed.  Given the numbers as alleged, there
13 was no risk here anymore that -- let me -- there
14 is always metaphysical risk.
15         I mean, Citibank could extend a
16 line to Cravath and Cravath might get hit by, you
17 know, a bomb attack and go out of business.  That
18 doesn't mean that's a risky loan that allows the
19 usury law not to apply and we have pled facts
20 that, if taken as true, shows there was no risk
21 here.
22         And so it is a loan secured with
23 no risk, not a speculative equity investment and
24 that conclusion, your Honor, comes as a
25 consequence of this panel's construction of the

Page 19

1  contract.  It made those claims relevant.  So, in
2  short, we gave them factual notice of everything
3  germane to the proposed amended complaint from the
4  very beginning in detail.
5         This -- these weren't cursory,
6  cavalier two-page filings.  And then promptly
7  after the panel's decision that made these issues
8  relevant, we filed a complaint saying given this
9  decision which is a change in the case, a change
10 in the law of the case if you will, here are these
11 offenses and claims are suddenly -- suddenly
12 valid.
13         I don't think there is any
14 obligation on a JAMS plaintiff in arbitration to
15 think through every possible prospective branch in
16 the case.  You know, this might happen, this might
17 happen, this might happen like a ball trickling
18 through a pachinko machine and then plead
19 endlessly for permutations.  People do routinely
20 amend in litigation, especially before discovery
21 is done.
22         ARBITRATOR KORNREICH:  You moved to
23 amend for -- if I recall, it was -- the usury was
24 one of the affirmative defenses, but it was two --
25 two fraud actions.

Page 20

1         One was fraud in the inducement
2  and one was regular fraud and are you addressing
3  those two claims now or are you just talking
4  about -- are you talking about the usury?  I'm not
5  clear.
6         MR. HOISE:  I start with usury, but,
7  no, we do think those other claims were properly
8  pled.  For instance, the panel's decision against
9  us said that, look, you waived -- you waived any
10 fraud claim under the LFA.  Delaware substantive
11 law says you can't waive a fraud claim with
12 language in a contract and let me provide a cite,
13 if I may.
14         ARBITRATOR KORNREICH:  Well, I
15 understand, but there was -- that was not the only
16 reason for that.  I know what you're talking
17 about.  You're talking about the waiver clause,
18 but there were other reasons set forth like santer
19 and all this other stuff.
20         So, yes, but what I'm trying to
21 find out is your arguments about findings of fact,
22 is that -- is that directed at the two fraud
23 claims that you tried to put forth or is it only
24 directed at the usury claim?
25         MR. HOISE:  Thank you, your Honor,

Page 21

1  for the question.  It does go to the fraud claims
2  because the panel said these claims are futile.
3  They're not pled with any specificity.  I think
4  the word boilerplate was used once.
5         And just for the record the case
6  that I would like to cite, it's a new case, it's
7  Online HealthNow v. Bertelsmann, the German
8  publishing company, it's chancery -- and I'll slow
9  down for this, chancery number 2020 0654 it's
10 August 12th, 2021 and the Court very clearly says
11 that a party does not have the right to immunize
12 itself from fraud by contractual language and for
13 obvious policy reasons.
14         So we -- we think that, again,
15 Woodsford led the panel into error in saying we
16 can -- we can immunize ourself from fraud with
17 this language in the contract.  Well, under
18 Delaware law, you cannot and that's -- you know,
19 that's important.
20         So -- and I've run through sort
21 of the high level themes.  I don't want to repeat
22 our brief in any greater detail, but fundamentally
23 we were deprived due process by the panel setting
24 factual disputed issues that were properly pled
25 and citing the facts against us without giving us

Page 22

1  a hearing.
2         And I understand the panel has a
3  lot of jurisdictional flexibility.  I understand
4  arbitration panels have a lot -- there's a great
5  deference given to them, but arbitration panels
6  are appealed all the time and if there's a
7  significant procedural or substantive error of
8  law, if due process has been violated, that --
9  that can be a problem and we do believe that we
10 were denied due process here.
11         ARBITRATOR MILLER:  So it's been a
12 while, and I apologize if I misstate something,
13 but it was always my understanding that the
14 threshold issue was one of contract interpretation
15 and -- and we -- I think we concluded that the
16 contract was not ambiguous and we concluded what
17 we thought the contract meant and there were no
18 factual -- and because it was not ambiguous, you
19 know, we didn't consider any facts, we looked at
20 the language of the agreement and -- and I don't
21 see anything improper about any of that.
22         MR. HOISE:  Nor do I.  Nor do I.
23 This -- we -- we -- we actually were the ones that
24 asked for this ruling what we called the
25 preliminary contractual issue.  We said in our

Transcript of Arbitration 2.24.2022                                    Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

Page 23

1  letter requesting leave to file this that it would
2  streamline the case in discovery going forward.
3            The panel initially disagreed
4  with that twice and then in the third order said
5  "On reflection, maybe we think that's right and it
6  will streamline the issue."
7            So, no, you know, we -- we
8  thought we were right on the contract. We
9  understand we lost that issue. We're not asking
10 the panel to reconsider that. That's a done deal.
11 The panel said what it thought the contract meant.
12 The panel said that since there's no allegation of
13 facial ambiguity we do not consider extrinsic
14 evidence, although it did note in a footnote
15 certain e-mails that I sent trying to avoid this
16 very -- very debacle. So, no, there is nothing
17 improper. The question is what then happens next?
18 What was --
19           ARBITRATOR MILLER: Yeah, I think
20 that's where the issue is. The issue is, okay,
21 we've interpreted the contract and then you
22 decide, well, based on that interpretation I now
23 want to amend my demand, correct?
24           MR. HOISE: Not demand. The
25 interpretation made issues not previously -- legal

Page 24

1  issues and claims not previously germane,
2  centrally relevant, like usury because under the
3  panel's construction this wasn't a speculative
4  contingency fee financing warranting a 26 plus
5  two-fifty return. It was a fully secured bank
6  loan. There was no risk of no repayment as
7  alleged in great detail going back to the very
8  beginning of the case.
9            So that decision made these
10 legal issues germane. They weren't germane until
11 the panel had decided what we all characterized,
12 including, forgive me, the panel as a preliminary
13 question of contractual interpretation.
14           So what -- that was supposed to
15 streamline, but it wasn't supposed to end the case
16 without any sort of procedural hearing and given
17 that it did change the law of the case as you will
18 and it did give rise to these new legal theories,
19 we think we absolutely had a substantive
20 procedural right to amend with the facts properly
21 pled assumed to be true and that -- that did not
22 happen.
23           ARBITRATOR MILLER: And your
24 argument is there is something there that you
25 learned as a result of the decision -- the

Page 25

1  preliminary decision that -- that brought to your
2  attention claims that you would not have known of
3  prior to that decision?
4            MR. HOISE: Your Honor -- I'm never
5  sure whether to call an arbitrator your Honor or
6  not, but I'm just going to default and call you
7  your Honor.
8            ARBITRATOR MILLER: Don't call me
9  your Honor. Arbitrator. Anything you want to
10 call me. I don't care.
11           In fairness to the other side,
12 and I'm trying to do my best because I litigated a
13 lot in district court and I had a lot of these
14 arguments in front of district court judges and
15 they were pretty tough on you as a -- as a
16 claimant in saying -- like, you know, when you
17 show up in federal court, you need to have all
18 your claims amply pled and if you try at some
19 midpoint during the trial to add claims, you run
20 into tremendous resistance in federal court and I
21 know you know this.
22           Okay. So I'm just trying to
23 find out this is different than the example you
24 gave me where you're six months into litigation,
25 you come up with some new claims and you try to

Page 26

1  amend your claim at that point and you have, you
2  know, very interesting arguments about why you
3  should be allowed to do that, but I was never able
4  to do that in federal court, okay, ever.
5            MR. HOISE: You know what, you're
6  right. We -- as you, we have had these fights for
7  too many decades now in federal court, but I
8  would -- I would put your statement of the issue
9  slightly different, if I might.
10           This isn't a situation where
11 we -- we missed claims in the initial filing or we
12 changed our theories or we got more creative.
13 What happens once this panel ruled as it did on
14 the meaning of the LFA certain other issues then
15 became germane for the first time; e.g. usury.
16           Under our view of the contract,
17 this was a high-risk investment secured by an
18 uncertain contingency fee recovery alone, not
19 subject to usury. The panel said "No, it's
20 covered by all of your hourly fee revenue" and not
21 just in the scheduled cases, but according to
22 Woodsford any other case and it's secured by your
23 home.
24           There is zero risk in that
25 detail as set forth in factual detail in the

Page 27

record and then pled in great deal in the proposed
amended claim.  So it's not where we changed our
views, it's not where we got more creative, not
where we changed our theory of the case.  It's
that legal issues became germane for the first
time once the panel ruled it did; e.g. usury,
e.g., fraud in the inducement.
        ARBITRATOR MILLER:  Let's take that
one, fraud in the inducement.  That strikes me as
a claim that is unrelated to our -- our
contractual determination.  I mean, if there was
fraud in the inducement, there was fraud in the
inducement at the time you filed the initial claim
with -- with JAMS.
        MR. HOISE:  Respectfully, no, and
here is why.  Because we believe, and we believe
the record supported us, that this was a
contingency deal, just as they said in their term
sheet and in their many, many representations to
us.  Once the --
        ARBITRATOR MILLER:  They put you --
they put you on notice that they had a different
view of the agreement than you earlier.  They gave
notice.
        MR. HOISE:  Yes, and we anticipated

Page 28

that in terms of notice in paragraph 27 of our
very first filing in this case, the emergency
complaint.  We said "And if, in fact, they
intended to be secured by hourly fee revenue,
everything they told us was not factual."  So it's
that issue --
        ARBITRATOR MILLER:  You could have
made that allegation in your first pleading.
        MR. HOISE:  We did.
        ARBITRATOR MILLER:  You didn't
allege fraud in the inducement in your first
pleading.
        MR. HOISE:  We didn't allege fraud
in the inducement.  We pled the facts saying "If
this is what they really say they intended, then
they mislead us."
        ARBITRATOR MILLER:  I --
        ARBITRATOR KRAMER:  With respect
to --
        ARBITRATOR MILLER:  I don't want to
belabor the point.  I hear you.  I appreciate your
argument and I appreciate the -- the delicacy of
raising the argument and you're doing a good job.
        MR. HOISE:  Thank you.
        ARBITRATOR MILLER:  We are not

Page 29

offended.  We are not offended in the least bit,
but I think I'm not doing my job if I'm not
pushing back a little bit.  Okay?
        MR. HOISE:  I appreciate that.
        ARBITRATOR KRAMER:  With respect to
usury, the initial claim by Woodsford was for an
amount that had -- they claim was owed plus
interest.
        MR. HOISE:  Yes.
        ARBITRATOR KRAMER:  And the interest
they claimed then was, according to you, usurious.
Why wasn't that -- why wasn't that defense pled in
the initial response?
        MR. HOISE:  Because if this contract
were, in fact, a high-risk contingency recovery,
speculative deal, it wasn't usurious because it
wasn't a secured loan.
        The usury claim becomes valid
only once this panel said "You know what, their
recovery is covered by your guaranteed hourly fees
in these cases and in any other cases" and on the
facts that pled that the hourly fees were far more
than sufficient to cover even the maximum amount
in debts.
        Once this panel said this is not

Page 30

a contingency fee deal with a lot of risk, then
the usury defense became appropriate.  So it's
the -- it's a consequence -- it's a legal
consequence of the panel's interpretation of a
disputed contract in what everybody characterized
as a preliminary issue to be decided to streamline
what happened thereafter and instead it became --
it became a substance -- for substantive hearing
on the merits on issues that weren't legally
germane prior to that decision.
        Again, I do not believe a
litigant in federal court has an obligation to
think through every possible branching development
in the two or three years of litigation and plead
dozens of alternatives.  You plead your claim and
then if something changes -- you know, especially
if it's early and before discovery, you have a
right to amend.
        ARBITRATOR KRAMER:  Anything further
right now, Mr. Hoise?
        MR. HOISE:  One last point.  On the
fee issue, the other -- the other issue here is of
course the Woodsford claim that the language from
memory 136 -- 31.6 of the LFA that says they can
recover as contributions some spent to protect the

Transcript of Arbitration 2.24.2022                    Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

Page 31

1 collateral, they have transmuted that,
2 transmogrified that, if you will, to use a
3 stronger word into a general fee shifting clause.
4 It's not what it is. It's not what it says.
5         There's a whole elaborate series
6 of provisions dealing with dispute resolution. If
7 there were a prevailing party fee shifting clause,
8 that's where it would have been. The question for
9 the panel is if Woodsford is right that this
10 entire merits dispute is protecting collateral,
11 then what case wouldn't allow them to recover fees
12 and wouldn't that read into this contract a
13 prevailing party fee shifting clause, which
14 Delaware law says can't be implied. It has to be
15 set forth plainly and explicitly and it simply
16 isn't there.
17         So we -- we do not think they
18 are correct under the LFA in saying every penny
19 they spent on fees in this merits dispute, which
20 hopefully will continue with a short hearing, is
21 about protecting their collateral.
22         That can't be right because that
23 means there is -- that Woodsford is writing into
24 this clause a prevailing party fee shifting clause
25 and they could have put it in and they clearly

Page 32

1 elected not to do so. That's -- that's all I
2 have. Thank you. Thank you very much for
3 listening with such patience and grace.
4         ARBITRATOR KRAMER: Thank you.
5 Mr. Ladig, are you going to speak on behalf of the
6 respondents?
7         MR. LADIG: Yes, I am. Thank you.
8 I have to say that this appears to be a very
9 different kind of motion than I was anticipating
10 that we were going to be resolving today because
11 now Mr. Hoise has just gone out and said, yes,
12 this is a motion for reargument when you know
13 there hasn't been one filed.
14         But I think what I want to do is
15 I want to go through what I had initially planned
16 on saying. I think it does cover a lot of what
17 Mr. Hoise was saying and then we can see if I can
18 fill in the gaps as well.
19         As an initial matter, I would
20 like to ask that this transcript be marked
21 confidential so that it has that protection. This
22 arbitration has been going on for almost 17 months
23 now and it's time for it to end.
24         As Mr. Miller noted, the panel
25 decided the key legal issue and found that the

Page 33

1 receipt of the Space Data funds triggered Hoise
2 Rice's obligation to repay the amounts that had
3 been advanced to it under the LFA. There is no
4 objection from Hoise Rice on the calculation of
5 how much money was actually advanced and really as
6 we understood the panel's last order, there are
7 only two discreet issues here and that is the
8 appropriate interest rate and whether fees and
9 expenses incurred by Frome Wye in this action
10 should be considered contributions in their 13.3
11 of the LFA.
12         Now, on the first issue, you
13 know, this addresses, I think, some of the motion
14 for reargument point. This was already addressed
15 and decided and I think it's important to remember
16 the sequence of events here. As the panel has
17 gone over before, it's not mentioned in the
18 initial claim.
19         It's also not asserted as a
20 defense in the response to Hoise -- to Frome Wye's
21 counterclaim. So the first time that it is raised
22 is after the claimants lost on the merits and then
23 it was sort of as an offhand, you know, assertion
24 in a letter to the panel.
25         Now, prehearing order number six

Page 34

1 asked the parties for letters on what was supposed
2 to be done next. Now, in Frome Wye's letter, we
3 laid out the arguments why the usury defense was
4 meritless and why the panel shouldn't even allow
5 Hoise Rice to try to amend its claim. The panel
6 allowed the claimants to file that motion and
7 importantly the -- the order in which the panel
8 allowed Hoise Rice to file its motion to amend
9 also noted that the parties agreed it could be
10 resolved on the papers without a hearing and so
11 when Hoise Rice was preparing this proposed
12 amended complaint, it had all of Frome Wye's
13 arguments in its hand when it was drafting the
14 proposed amendment to its complaint or its claim.
15         So it knew what Frome Wye --
16 Frome Wye's position was and it had the
17 opportunity to try to plead -- to well plead the
18 facts necessary in order to avoid the
19 application -- or to avoid the statutory
20 limitations on the usury defense and despite
21 having this preview the panel's October 18, 2021,
22 order denied that motion to amend and rejected the
23 attempt to interpose the defense of usury.
24         I would submit there is nothing
25 in that October 18, 2021, order that indicates

Page 35

1 that the panel had applied a heightened pleading
2 standard or had decided facts.
3       It -- it -- the plain language
4 of the panel's order there shows that it was doing
5 what it was intended to do, which is to see
6 whether there were plain facts being pleaded by
7 Hoise Rice that would allow them to continue this
8 case beyond the resolution of the core legal issue
9 and now under the guise of a computational
10 challenge the claimants are asking for another
11 bite at the apple to raise all of the same
12 arguments that they already -- the panel already
13 considered and rejected and the panel should, I
14 think, reject this improper attempt at reargument
15 without actually making a motion for reargument
16 and doing so at such a late date.
17       But in all events, it's Frome
18 Wye's position that there is nothing they could
19 have pleaded to avoid this result because the
20 usury defense is not available as a matter of law.
21 Hoise Rice was the borrower under any accepted
22 definition.  Hoise Rice was the only one that
23 could ask for funds to be forwarded and receive
24 the money.
25       It was secured not by a

Page 36

1 mortgage, but by a deed of trust and that's
2 because the individuals are not the borrowers, the
3 primary borrowers.  Now, businesses I think it is
4 clear from the statute do not get to take
5 advantage of the usury statute.  Delaware law is
6 clear that if you're a business and you're
7 borrowing money, then you -- you negotiate the
8 rate that you get and you're not going to be saved
9 by the statute and what Hoise Rice is suggesting
10 here is that just because they agreed to be
11 jointly and severally liable that somehow they get
12 back in, but the core point of this -- of this
13 relationship was that Hoise Rice was borrowing the
14 money to pay its business expenses and to do
15 things for its business.
16       Because the entity was the
17 borrower, the usury laws don't apply.  And there
18 is -- there is no support for the proposition that
19 the usury law would not apply simply because the
20 individuals agree to be jointly and severally
21 liable for their obligations.
22       ARBITRATOR KORNREICH:  Isn't the
23 case in most business loans, at least when I was
24 on the bench, in the commercial part, I saw a lot
25 of them, that the lender can go against the

Page 37

1 guarantor without ever going against the borrower?
2       MR. LADIG:  Those are -- those
3 are -- Justice Kornreich, those are all matters
4 for negotiation in each --
5       ARBITRATOR KORNREICH:  But it
6 happens many times.
7       MR. LADIG:  Yes, it happens and it's
8 simply what the parties can negotiate.  Now,
9 Mr. Hoise didn't touch on the calculations, the
10 actual calculations, but I think -- I don't think
11 the panel is particularly interested in that
12 and -- but I think our papers set that out well
13 enough.
14       So on this second issue of the
15 amounts spent to protect collateral, now in their
16 papers and even today the claimants have spent a
17 lot of time trying to argue this is a prevailing
18 party provision and it's not in the right place in
19 the agreement, but really this language that is in
20 13.6 is typical language in secured obligation
21 documents where the borrower has to pay for
22 whatever expenses that the lender incurs in
23 protecting the collateral and now this litigation
24 is protecting collateral in that same sense
25 because let's look at it in context.

Page 38

1       The panel found that the receipt
2 of the Space Data fees triggered the obligation to
3 repay.  Hoise Rice didn't repay which is a breach.
4 Frome Wye moved to protect its collateral by
5 commencing the foreclosure pleading in California.
6 The claimant --
7       ARBITRATOR KORNREICH:  I have a
8 question about that.  Is foreclosure the same
9 thing as protecting collateral?
10       MR. LADIG:  Yes.  Because that --
11 that was the collateral and that was --
12       ARBITRATOR KORNREICH:  But is that
13 how -- is that how you protect it?  What does
14 protect mean?
15       MR. LADIG:  I think in this instance
16 protecting the collateral would mean protecting it
17 from further either degradation of value,
18 additional loans being put on top of it so that
19 there are multiple or additional claimants.
20       ARBITRATOR KORNREICH:  But you
21 already had a filing, you had a secured interest,
22 did you not?
23       MR. LADIG:  We did.
24       ARBITRATOR KORNREICH:  Wasn't the
25 collateral protected?

Page 39

1    MR. LADIG:  Well, it could have
2  been -- they could have been additional -- they
3  would have been junior presumably.
4    ARBITRATOR KORNREICH:  Absolutely,
5  right.
6    MR. LADIG:  They would, but it
7  doesn't mean that -- I think the more folks that
8  try to eat the pie makes it more difficult.  It
9  makes it less likely that you are going to
10  recover.  Even if it's a junior creditor, I think
11  just as a matter of practical interest there's
12  only one pie and you get more people there sitting
13  there with a fork at the end trying to eat out of
14  it you're not going to get as much as you thought.
15    But -- but after Frome Wye did
16  this, the claimants are the ones that initiated
17  this proceeding that we're here for today and they
18  did so by seeking equitable relief to stop the
19  very thing that Frome Wye was doing to protect its
20  collateral and that is commencing the foreclosure
21  proceeding and proceeding with that.
22    So the only way that Frome Wye
23  could continue that is by litigating this
24  arbitration.  I mean, so put another way the
25  claimants started this arbitration to stop Frome

Page 40

1  Wye from collecting --
2    ARBITRATOR KORNREICH:  I understand
3  that, but usually there's a very clear prevailing
4  party clause to fee shift.
5    MR. LADIG:  Right.  But this is --
6  the difference here, Justice Kornreich, is that
7  when you're talking about protecting the
8  collateral it doesn't require Frome Wye to, you
9  know, prevail in a litigation.
10    All it does is whatever you need
11  to do to protect it.  It's not a traditional fee
12  shifting provision like you might ordinarily see
13  because they don't talk about prevailing parties
14  and that's why it is -- it is, I think, secured
15  lender friendly in that regard and I'm not going
16  to deny that.
17    ARBITRATOR KORNREICH:  So any time
18  there is any kind of default any- -- anything done
19  would be protecting the collateral under your
20  interpretation?
21    MR. LADIG:  Correct.  Correct.  And
22  protecting collateral in this instance might also
23  mean foreclosing and getting paid out of it so
24  that we are actually, you know, made whole at the
25  end of it.

Page 41

1    But the bottom line is that, you
2  know, the claimants chose the field of play on
3  this.  They chose to commence this arbitration.
4  You know, it might be different analysis if Frome
5  Wye were the one who commenced it, but that's not
6  what happened.  The claimants did it.  Frome Wye
7  then, you know, was forced into litigating this
8  case and so that's why all of these expenses that
9  we incurred --
10    ARBITRATOR KORNREICH:  What would
11  the difference be if Frome Wye was the one that
12  instituted the litigation?
13    MR. LADIG:  I think we don't -- you
14  know, I haven't done that analysis, Justice
15  Kornreich.
16    ARBITRATOR KORNREICH:  No.  But you
17  just said it might have been different.  So I was
18  wondering.
19    MR. LADIG:  I don't think it would
20  be at the end of the day.  We don't need to
21  analyze that, but I don't think it would be
22  because if for some reason let's say, you know, we
23  tried to do the foreclosure and some -- the
24  California court said, oh, I'm not going to do
25  this without some order from your arbitrator

Page 42

1  saying that you actually have the right -- you
2  know, that there was a breach, you know, and then
3  we had to file the case in our own name, I think
4  that would be protecting the collateral as well.
5    I think it does have something
6  to do with context, but in this specific context,
7  which is the only one that we need to care about,
8  this was protecting the collateral.  So --
9    ARBITRATOR KRAMER:  All the
10  arguments that we've had, all the papers that have
11  been filed since the very beginning of the
12  constitution of this panel it has been
13  principally, almost a hundred percent, a case for
14  money damages concerning a breach of contract and
15  there is no fee shifting provision, but you said
16  the only -- the only time that the collateral has
17  been mentioned over the past many, many months is
18  when you've requested us to lift the preliminary
19  injunction.
20    MR. LADIG:  Right.
21    ARBITRATOR KRAMER:  Otherwise --
22  otherwise, the litigation has been a money claim
23  for breach of contract.
24    MR. LADIG:  Right.  But the
25  preliminary injunction was entered before this

Page 43

1 panel was constituted and the only way -- I mean,
2 we have requested that the preliminary injunction
3 be lifted, but the only way I think that we can
4 actually get this panel to lift it would be to
5 prevail on the merits to show there was a breach
6 and that -- and that there shouldn't be any bar,
7 any further, on us pursuing our remedy because we
8 would have done that.
9        We would have -- we would have
10 done that had the panel lifted it before and I'm
11 not rearguing that.  I'm just saying, again, we
12 were playing with the cards that we were dealt and
13 we can protect our collateral by winning this case
14 and then getting the injunction lifted and then
15 proceeding with the foreclosure.
16       So I just want to talk a little
17 bit, you know, for the record about what we think
18 should be in the order.  We think the order should
19 say that the claimants have to pay the amount
20 indicated on our Exhibit 1 as of the date of the
21 judgment because presumably this would get entered
22 as a judgment in a state court or some other court
23 for enforcement because we think it should
24 say that the Frome -- it should make provisions
25 for payment of Frome Wye costs, including

Page 44

1 attorneys fees.
2        It should vacate the preliminary
3 injunction.  It should be against all claimants
4 and to the extent that the panel issues a reasoned
5 order on this final dispute that at least the
6 reasoned opinion should be confidential, that you
7 can, I think, have a separate order that it's not
8 and that's what we think that the order should be
9 and let me just -- I think I just want to add one
10 more point.
11       You know, Mr. Hoise described --
12 said that he was a proponent of going forward on
13 just the strict legal issue because he thought it
14 would streamline things, but this is not -- what
15 he is proposing here is not streamline.
16       You know, he is proposing, you
17 know, document production and everything else
18 associated with -- with litigation and, you know,
19 that's not streamlining, that is, I think,
20 making -- trying to make things more complicated
21 as a last ditch effort to avoid the consequences
22 of the panel's well-reasoned ruling on the legal
23 interpretation of the LFA.
24       ARBITRATOR KORNREICH:  I have
25 another question.  I was just wondering how does

Page 45

1 $236,000 of prepaid interest fit into the
2 calculations?  I mean, how -- how is that applied?
3       MR. LADIG:  Well, I think if you
4 look at Exhibit 1 and let me bring that up, too,
5 so I can run through it with you.  Let me make
6 sure I have it here.
7        So it is -- so if you look at it
8 and you go to what I think is the fourth page
9 where the dates are beginning in December 12th,
10 2018, because that is where there was a repayment
11 at the time, you will see there that the $236,000
12 is listed as a credit and that gets carried really
13 as the minimum fee paid to date and that gets
14 carried through all of the calculations.
15       So the Exhibit 1 is a little
16 hard only because it was too big to fit on one
17 page and still be readable and I think if -- if --
18 if you go to the Exhibit 3, which is the actual
19 spreadsheet, you can see this sort of all-in-one
20 thing where, you know, especially these numbers
21 get added up pursuant to a formula that in each
22 and every instance gives credit for that $236,000.
23       ARBITRATOR KORNREICH:  How was it
24 credited?  That's what I wasn't clear about.  Is
25 it used to pay off the interest starting in the

Page 46

1 beginning of the year or is it just deducted at
2 the end?
3       MR. LADIG:  It is deducted at the
4 end, I believe.  Well, it's deducted, you know,
5 throughout because, remember, it's not just the
6 interest.  There is also this minimum -- there is
7 a minimum return that was required and that's what
8 this went towards and so it is -- it is going
9 towards the minimum return and then any future
10 interests.
11       ARBITRATOR KORNREICH:  So isn't it
12 different if you just deduct it from the end?  It
13 may not be different to the minimum return, but
14 wouldn't it make a difference in regards to the
15 interest?
16       MR. LADIG:  Well, I think -- now,
17 you're -- you know, I was not a math major.
18       ARBITRATOR KORNREICH:  I don't know.
19 I'm just -- I'm not a mathematician.  I'm not --
20       ARBITRATOR KRAMER:  I think the
21 question is if there were an interest charge for
22 the month of January, but the credit for the
23 prepaid interest wasn't made until the end of the
24 year in December, is that the way that your
25 calculation worked?

Page 47

1  MR. LADIG:  Right, and I don't think
2  that it works that way, but I'm trying to get to a
3  place where I can -- okay.
4  So, for instance, if you -- let
5  me see if this is actually also on Exhibit 1.  So
6  the damages liability calculation is -- they are
7  being given credit because if you look at it -- so
8  let's -- okay.  So what happens, you know, they
9  borrow -- they took some money originally and then
10  December 18th there was a paydown.
11  ARBITRATOR KORNREICH:  Right.  I
12  forget the year.  2018, you're saying?
13  MR. LADIG:  2018.
14  ARBITRATOR KORNREICH:  Right.
15  MR. LADIG:  So after that, there is
16  zero owed.  Okay.  And then because that total
17  liability outstanding is where everything gets
18  calculated and so in the -- when you get to
19  January 4, 2019, there's another --
20  ARBITRATOR KORNREICH:  You have a
21  credit, right, of $236,000?
22  MR. LADIG:  Yes, that's right
23  because you add everything up because the formula
24  is -- the formula is there because, remember, they
25  have to get -- you know, the minimum fee actually

Page 48

1  was $250,000, but that's where they -- you know,
2  if you add everything up that way, if you look at
3  the way that the formula is constructed, that's
4  where the credit is.
5  Your Honor, if you look at least
6  what is in Hoise Rice's brief I think they
7  actually do it the same way because they say in
8  there that what is owed is the amount borrowed
9  minus the -- minus -- minus the prepayment plus
10  interest and that interest is calculated not on
11  the $800,000 minus the prepayment, but on the
12  $800,000.
13  ARBITRATOR KORNREICH:  It's
14  compounded, though, right, as it goes along?
15  MR. LADIG:  Right.  Ours is
16  compounded monthly.  And that is -- if you look at
17  page 2 of their damages brief regarding prehearing
18  order number eight, that's where Hoise Rice states
19  what it is, how they calculated things.
20  ARBITRATOR KORNREICH:  So your
21  calculation would be the calculation at the very
22  end after all the interest is compounded and
23  everything else and you've -- you've already --
24  there's been, you know, the minimum return,
25  everything has happened, then you just subtract

Page 49

1  $236,000, is that what happens?
2  MR. LADIG:  No, let me see if I
3  can --
4  ARBITRATOR KORNREICH:  I just
5  don't -- yeah.
6  MR. LADIG:  I'm being told there's a
7  better way to look at it.  So if you go back to
8  our Exhibit 1.
9  ARBITRATOR KORNREICH:  Mm-hmm.
10  MR. LADIG:  If you go to, let's say,
11  August 2019.
12  ARBITRATOR KORNREICH:  Mm-hmm.
13  MR. LADIG:  You can see in here that
14  although interest has accrued -- the third column
15  is interest.
16  ARBITRATOR KORNREICH:  Mm-hmm.
17  MR. LADIG:  So just take August 1st.
18  There's $800,000 that's been forwarded to Hoise
19  Rice.  That's the drawdown.  The minimum fee is
20  $250,000.  The interest due to date is $100,000,
21  but because the minimum fee exceeds the interest
22  the amount owed is still only the $800,000.
23  So they only start owing more
24  than the amount that they actually drew down
25  beginning in April of 2020.

Page 50

1  Unless the panel has anything
2  else -- any further questions, I don't have
3  anything else.
4  ARBITRATOR KRAMER:  Mr. Hoise,
5  anything like -- anything that you would further
6  like to tell the panel?
7  MR. HOISE:  Yes, and I will -- I
8  will be -- I will be brief and pointed.
9  First, on protecting collateral,
10  the Judge is right.  Collateral was protected.
11  They had a deed on the property.  They weren't
12  protecting the collateral.  They were saying
13  "We're right on the merits.  We're taking our
14  money as though we won on the merits."
15  Second, they said, well, we --
16  we picked it.  We configured this as an emergency
17  motion about the notice of default.  On December
18  22nd, 2021, Woodsford filed an enormously detailed
19  amended complaint with affirmative counterclaims
20  and they put the entire liability issue squarely
21  at issue.
22  This, as you pointed out,
23  Mr. Kramer, has been from the outset a fight about
24  the merits and who owes how much under this
25  contract, if anything.  That's a merits fight and

Page 51

1  that if you don't have a fee shifting clause as
2  Judge Kornreich noted, that has to be clear and
3  straight forward, you don't get to write one in at
4  the end of the day.
5          Third, we -- we were borrowers.
6  We're not guarantors.  I'd ask the panel to look
7  at page 5 of the October 18th, 2021, order.  It
8  says, "Additionally, guarantors of a debt, here
9  Spencer Hoise and Diane Rice."
10         We're not guarantors.  We are
11  primarily liable co-borrowers and the statute says
12  that if a loan of more -- or use of money of more
13  than $100,000 is secured by the principal
14  residence of "any borrower" you have usury.  We
15  were a borrower.  One of many.
16         Finally, on the $236,000, I
17  frankly did not really understand the elaborate
18  computations they provided to us, but I do want to
19  note two things.  First, for the first time, I
20  believe the parties agree that we did start 2019
21  with a $236,000 prepaid interest credit.  That's
22  exactly right.
23         The question then becomes the
24  one of mechanics.  It is -- it matters how you
25  apply the interest.  If you did it at the end, and

Page 52

1  I don't think they did, they would have been
2  compounding money at a sum greater than what was
3  owed.
4          So, you know, I frankly am at a
5  loss at what to do.  We thought about asking for
6  leave to depose Mr. Lampier who I think probably
7  did these calculations, but thought that was
8  probably not something the panel would be
9  receptive to, but I want to underscore for the
10 first time they recognize that we did have a
11 $236,000 prepaid credit starting January 1st,
12 2019.
13         And in their prior presentations
14 and including the notice of default number, they
15 didn't give us that and that's -- that's alleged
16 in our proposed amended claimant.  Under
17 California law, the person who is trying to seize
18 the house has to get the amount right and they
19 were a quarter million dollars too high.  That is
20 actionable.  That is it.  I promised brevity and
21 that's brief.
22         ARBITRATOR KRAMER:  Thank you.
23 Thank you, Mr. Hosie.  Thank you, Mr. Ladig.
24 Judge Kornreich or Mr. Miller, anything further?
25         ARBITRATOR MILLER:  Nothing further.

Page 53

1          ARBITRATOR KRAMER:  Okay.  Well,
2  thank you.
3          ARBITRATOR KORNREICH:  Do any of my
4  co-panelists want to speak or do we want to wait
5  for some other time?
6          ARBITRATOR KRAMER:  Why don't we --
7  why don't we stay on the line and have everybody
8  else hang up and talk for a few minutes.
9          MR. HOISE:  Thank you.  This is
10 Spencer Hoise and Diane Rice.  We will sign off.
11 Thank you, again, panel.  Feelings are running
12 high, but we appreciate your grace and patience.
13 We're signing off now.
14         MR. LADIG:  Thank you, everyone.  I
15 appreciate it.
16         ARBITRATOR KORNREICH:  Thank you.
17            (Whereupon, the proceedings
18             concluded at 11:39 a.m.)
19
20
21
22
23
24
25

Case 1:22-mc-00249-CFC-SRF   Document 25-1   Filed 08/30/22   Page 105 of 122 PageID #:
324
Transcript of Arbitration 2.24.2022                    Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

1                    C E R T I F I C A T E

2

3

4        I, Steven Brickey, Certified Shorthand

5   Reporter, Registered Merit Reporter and Certified

6   Realtime Reporter, do hereby certify that I

7   reported in shorthand the proceedings had at the

8   trial aforesaid, and that the foregoing is a true,

9   complete and correct transcript of the proceedings

10  of said trial as appears from my stenographic

11  notes so taken and transcribed under my personal

12  direction.

13       Witness my official signature in and on this

14  8th day of March, A.D., 2022.

15

16

17

18

19                    _Steven Brickey_
                      _____
20                    STEVEN BRICKEY, CSR, RMR, CRR
                      CSR No. 084-004675

21

22

23

24

25

## WORD INDEX

< $ >
**$100,000**  4:7  49:20
51:13
**$126,000**  4:12
**$236,000**  45:1, 11, 22
47:21  49:1  51:16, 21
52:11
**$250,000**  48:1  49:20
**$800,000**  48:11, 12
49:18, 22

< 0 >
**0654**  21:9
**084-004675**  2:16
54:20

< 1 >
**1**  43:20  45:4, 15
47:5  49:8
**10**  12:20, 21  13:3, 7
16:18
**10:33**  1:15
**11:39**  53:18
**1100109661**  1:6
**12th**  21:10  45:9
**13.3**  3:20  33:10
**13.6**  37:20
**136**  30:24
**17**  32:22
**18**  34:21, 25
**18th**  47:10  51:7
**19899**  2:10
**1st**  49:17  52:11

< 2 >
**2**  48:17
**2018**  45:10  47:12, 13
**2019**  47:19  49:11
51:20  52:12
**2020**  21:9  49:25
**2021**  3:13  21:10
34:21, 25  50:18  51:7
**2022**  1:15  54:14
**21st**  3:13
**22nd**  50:18
**247-6000**  2:5
**24th**  1:14

**26**  24:4
**27**  15:23  28:1
**29**  9:16

< 3 >
**3**  45:18
**302**  2:11
**31.6**  30:24
**3400**  2:4

< 4 >
**4**  47:19
**400**  2:10
**415**  2:5

< 5 >
**5**  51:7
**56**  6:15

< 6 >
**600**  2:3, 9
**655-5000**  2:11

< 7 >
**7/21/2021**  5:5

< 9 >
**9**  7:7, 17  10:4  15:5
**94111**  2:4
**9B**  7:10, 12, 23

< A >
**A.D**  1:15  54:14
**a.m**  1:15  53:18
**ability**  16:17
**able**  26:3
**above-entitled**  1:14
**absolutely**  6:3  9:22
11:9  17:11  24:19
39:4
**abuse**  13:17
**accept**  16:13
**accepted**  10:12  17:9
35:21
**accrued**  49:14
**acknowledges**  7:11,
16  10:12
**action**  16:5  17:8
33:9

**actionable**  52:20
**actions**  19:25
**actual**  37:10  45:18
**add**  25:19  44:9
47:23  48:2
**added**  45:21
**additional**  38:18, 19
39:2
**Additionally**  51:8
**address**  3:14
**addressed**  33:14
**addresses**  33:13
**addressing**  20:2
**adopt**  16:14
**advanced**  33:3, 5
**advantage**  8:17  36:5
**advantages**  8:18
**affirmation**  3:16
**affirmative**  5:20
19:24  50:19
**aforesaid**  54:8
**afternoon**  3:1
**agree**  15:17  36:20
51:20
**agreed**  34:9  36:10
**agreement**  4:1  22:20
27:23  37:19
**ahead**  7:17
**allegation**  23:12  28:8
**allegations**  10:10, 11
**allege**  8:12  28:11, 13
**alleged**  17:2  18:12
24:7  52:15
**all-in-one**  45:19
**allow**  13:2  31:11
34:4  35:7
**allowed**  26:3  34:6, 8
**allows**  18:18
**alternatives**  30:15
**ambiguity**  23:13
**ambiguous**  22:16, 18
**amend**  5:13  7:21
11:6, 22, 25  12:3, 25
13:2, 16, 20  17:4, 23
19:20, 23  23:23
24:20  26:1  30:18
34:5, 8, 22
**amended**  4:18  6:14
7:5, 22  9:8, 22  10:7,
11  13:23  14:13  16:1,

**22**  18:6  19:3  27:2
34:12  50:19  52:16
**amendment**  34:14
**amount**  29:7, 23
43:19  48:8  49:22, 24
52:18
**amounts**  33:2  37:15
**amply**  25:18
**analysis**  41:4, 14
**analyze**  41:21
**analyzed**  7:21
**anticipated**  27:25
**anticipating**  32:9
**antithesis**  3:25
**anymore**  18:13
**apologize**  22:12
**appealed**  22:6
**Appeared**  2:7, 11
**appears**  32:8  54:10
**apple**  35:11
**application**  34:19
**applied**  35:1  45:2
**applies**  4:11  7:7, 17
13:9, 12
**apply**  8:16  10:2
14:8  18:19  36:17, 19
51:25
**appointment**  14:11,
12
**appreciate**  3:6  28:21,
22  29:4  53:12, 15
**appropriate**  7:13
30:2  33:8
**appropriateness**  7:4
**April**  49:25
**arbitrary**  14:23
**ARBITRATION**  1:1,
13  7:6  14:7  16:7
19:14  22:4, 5  32:22
39:24, 25  41:3
**arbitrations**  8:18, 19
**ARBITRATOR**  3:1
5:14, 22  6:8, 23  8:1,
4, 22  9:3  11:4, 17
12:11, 19, 23  13:1, 5
14:5, 19, 25  15:2, 21
16:19  17:11, 18
19:22  20:14  22:11
23:19  24:23  25:5, 8,
9  27:8, 21  28:7, 10,

17, 18, 20, 25   29:5, 10
30:19   32:4   36:22
37:5   38:7, 12, 20, 24
39:4   40:2, 17   41:10,
16, 25   42:9, 21   44:24
45:23   46:11, 18, 20
47:11, 14, 20   48:13,
20   49:4, 9, 12, 16
50:4   52:22, 25   53:1,
3, 6, 16
**arbitrators** 3:3
14:12, 13, 14
**argue** 37:17
**argues** 7:17
**arguing** 11:5, 22
**argument** 5:4, 11
14:6   24:24   28:22, 23
**arguments** 4:19   9:7
20:21   25:14   26:2
34:3, 13   35:12   42:10
**asked** 22:24   34:1
**asking** 11:24, 25
23:9   35:10   52:5
**asserted** 33:19
**assertion** 33:23
**assessing** 7:4
**associated** 44:18
**assume** 3:2   16:20, 21
**assumed** 10:23   24:21
**attack** 18:17
**attempt** 34:23   35:14
**attention** 3:7   25:2
**attorneys** 44:1
**August** 21:10   49:11,
17
**available** 35:20
**avoid** 23:15   34:18,
19   35:19   44:21

**< B >**
**back** 24:7   29:3
36:12   49:7
**ball** 19:17
**bank** 24:5
**bar** 43:6
**based** 10:24   23:22
**basic** 8:21
**basically** 12:24
**BAYARD** 2:7

**beginning** 19:4   24:8
42:11   45:9   46:1
49:25
**behalf** 2:7, 11   32:5
**belabor** 28:21
**believe** 3:10   10:15
16:10   22:9   27:16
30:11   46:4   51:20
**bench** 36:24
**Bertelsmann** 21:7
**best** 25:12
**better** 49:7
**beyond** 35:8
**big** 45:16
**bit** 9:5   29:1, 3   43:17
**bite** 35:11
**blunt** 10:19   13:15
**bluntness** 12:16
**boilerplate** 21:4
**bomb** 18:17
**borrow** 47:9
**borrowed** 48:8
**borrower** 4:10   35:21
36:17   37:1, 21   51:14,
15
**borrowers** 3:22   4:3,
4, 5   36:2, 3   51:5
**borrowing** 36:7, 13
**bottom** 41:1
**bound** 16:10
**branch** 19:15
**branching** 30:13
**breach** 38:3   42:2, 14,
23   43:5
**brevity** 52:20
**Brickey** 2:16   54:4, 19
**brief** 5:5   12:5   21:22
48:6, 17   50:8   52:21
**briefing** 3:8
**briefs** 11:20
**bring** 45:4
**broad** 15:7
**brought** 25:1
**business** 18:17   36:6,
14, 15, 23
**businesses** 36:3

**< C >**
**calculated** 47:18
48:10, 19

**calculation** 33:4
46:25   47:6   48:21
**calculations** 37:9, 10
45:2, 14   52:7
**California** 1:4   2:4
6:17, 20   38:5   41:24
52:17
**call** 7:8, 9   16:23
25:5, 6, 8, 10
**called** 22:24
**calls** 5:23   7:7
**candor** 12:16
**capacity** 4:2
**capricious** 14:23
**cards** 43:12
**care** 25:10   42:7
**carefully** 18:5
**carried** 45:12, 14
**case** 9:14   13:13
17:13   18:1, 3, 4, 7
19:9, 10, 16   21:5, 6
23:2   24:8, 15, 17
26:22   27:4   28:2
31:11   35:8   36:23
41:8   42:3, 13   43:13
**cases** 4:21   26:21
29:21
**cash** 18:2
**cause** 1:14
**causes** 16:4   17:7
**cavalier** 19:6
**centrally** 24:2
**certain** 23:15   26:14
**certainly** 7:9
**Certified** 54:4, 5
**certify** 54:6
**challenge** 35:10
**chancery** 21:8, 9
**change** 19:9   24:17
**changed** 26:12   27:2,
4
**changes** 30:16
**characterized** 24:11
30:5
**charge** 46:21
**chose** 41:2, 3
**cite** 20:12   21:6
**cited** 4:21
**Citibank** 18:15
**citing** 4:20   21:25

**claim** 8:24   9:1, 8, 13
12:25   13:2   14:16
15:4, 12   16:23   20:10,
11, 24   26:1   27:2, 10,
13   29:6, 7, 18   30:15,
23   33:18   34:5, 14
42:22
**claimant** 25:16   38:6
52:16
**Claimants** 1:7   2:7
33:22   34:6   35:10
37:16   38:19   39:16,
25   41:2, 6   43:19
44:3
**claimed** 29:11
**claims** 9:2, 5, 10
11:23, 25   13:23
14:10   15:8   16:25
19:1, 11   20:3, 7, 23
21:1, 2   24:1   25:2, 18,
19, 25   26:11
**clause** 20:17   31:3, 7,
13, 24   40:4   51:1
**clear** 20:5   36:4, 6
40:3   45:24   51:2
**clearly** 4:8   10:17
21:10   31:25
**close** 4:10
**co-borrowers** 3:16,
20   51:11
**collateral** 5:17   6:10
31:1, 10, 21   37:15, 23,
24   38:4, 9, 11, 16, 25
39:20   40:8, 19, 22
42:4, 8, 16   43:13
50:9, 10, 12
**collecting** 40:1
**column** 49:14
**come** 25:25
**comes** 4:12   18:24
**commence** 41:3
**commenced** 41:5
**commencing** 1:15
38:5   39:20
**commercial** 36:24
**company** 21:8
**competently** 17:6
**complaint** 4:18   6:14
7:5, 22   9:8, 22   10:8,
11, 18   16:1   18:7

19:*3, 8*  28:*3*  34:*12, 14*  50:*19*
**complete**  54:*9*
**complicated**  44:*20*
**compounded**  48:*14, 16, 22*
**compounding**  52:2
**computation**  4:*25*
**computational**  4:*24* 12:*6*  35:*9*
**computations**  51:*18*
**concerning**  42:*14*
**concluded**  22:*15, 16* 53:*18*
**conclusion**  18:*24*
**confidential**  32:*21* 44:*6*
**configured**  50:*16*
**conflicting**  10:*24*
**connection**  5:*16* 15:*13*
**consent**  12:*25*  14:*14*
**consequence**  18:*25* 30:*3, 4*
**consequences**  44:*21*
**consider**  22:*19*  23:*13*
**considered**  33:*10* 35:*13*
**constituted**  43:*1*
**constitution**  42:*12*
**constructed**  48:*3*
**construction**  18:*1, 25* 24:*3*
**construed**  9:*11*
**context**  37:*25*  42:*6*
**contingency**  24:*4* 26:*18*  27:*18*  29:*15* 30:*1*
**continue**  31:*20*  35:*7* 39:*23*
**contract**  13:22  15:*18* 19:*1*  20:*12*  21:*17* 22:*14, 16, 17*  23:*8, 11, 21*  26:*16*  29:*14*  30:*5* 31:*12*  42:*14, 23* 50:*25*
**contractual**  21:*12* 22:*25*  24:*13*  27:*11*
**contrary**  3:*18*

**contributions**  30:*25* 33:*10*
**co-panelists**  53:*4*
**core**  17:*25*  35:*8* 36:*12*
**correct**  17:*13*  23:*23* 31:*18*  40:*21*  54:*9*
**cost**  14:*22*
**costs**  43:*25*
**counterclaim**  33:*21*
**counter-claimant** 1:*12*  2:*13*
**counterclaims**  50:*19*
**counter-respondents** 1:*7*  2:*7*
**course**  8:*3*  9:*10* 14:*25*  30:*23*
**court**  12:*8*  13:*14* 14:*7*  21:*10*  25:*13, 14, 17, 20*  26:*4, 7*  30:*12* 41:*24*  43:*22*
**court's**  13:*21*
**cover**  29:*23*  32:*16*
**covered**  26:*20*  29:*20*
**Cravath**  18:*16*
**create**  16:*17*
**creative**  26:*12*  27:*3*
**credit**  45:*12, 22* 46:*22*  47:*7, 21*  48:*4* 51:*21*  52:*11*
**credited**  45:*24*
**creditor**  39:*10*
**CRR**  2:*16*  54:*19*
**CSR**  2:*16*  54:*19, 20*
**curious**  5:*24*
**cursory**  19:*5*

**< D >**
**damage**  12:*6*
**damages**  42:*14*  47:*6* 48:*17*
**Data**  33:*1*  38:*2*
**date**  35:*16*  43:*20* 45:*13*  49:*20*
**dates**  45:*9*
**day**  1:*14*  41:*20*  51:*4* 54:*14*
**dba**  1:*10*
**deal**  12:*19*  23:*10*

27:*1, 18*  29:*16*  30:*1*
**dealing**  31:*6*
**dealt**  43:*12*
**debacle**  23:*16*
**debt**  51:*8*
**debts**  29:*24*
**decades**  26:*7*
**December**  45:*9* 46:*24*  47:*10*  50:*17*
**decide**  11:*12*  14:*1* 17:*16*  23:*22*
**decided**  10:*24*  24:*11* 30:*6*  32:*25*  33:*15* 35:*2*
**deciding**  10:*16, 18*
**decision**  4:*16*  7:*20* 11:*11*  13:2, *21, 22* 14:*23*  17:*17*  18:*10* 19:*7, 9*  20:*8*  24:*9, 25* 25:*1, 3*  30:*10*
**decline**  16:*13*
**deduct**  46:*12*
**deducted**  46:*1, 3, 4*
**deed**  36:*1*  50:*11*
**default**  25:*6*  40:*18* 50:*17*  52:*14*
**defense**  29:*12*  30:*2* 33:*20*  34:*3, 20, 23* 35:*20*
**defenses**  19:*24*
**deference**  22:*5*
**definition**  35:*22*
**degradation**  38:*17*
**degree**  8:*6*
**Delaware**  2:*10*  3:*12* 4:*6*  7:*18*  10:*10*  13:*9, 10, 14*  20:*10*  21:*18* 31:*14*  36:*5*
**delicacy**  28:*22*
**demand**  23:*23, 24*
**denied**  22:*10*  34:*22*
**deny**  40:*16*
**denying**  4:*17*  7:*20* 17:*23*
**depose**  52:*6*
**deposition**  13:*18*
**deprivation**  10:*20* 11:*3*
**deprived**  21:*23*

**described**  44:*11*
**deserve**  12:*16*
**designated**  3:*21*
**despite**  34:*20*
**detail**  8:*12*  15:*25* 19:*4*  21:*22*  24:*7* 26:*25*
**detailed**  10:*7, 9* 50:*18*
**determination**  27:*11*
**development**  30:*13*
**DIANE**  1:*5*  2:*3* 51:*9*  53:*10*
**difference**  40:*6* 41:*11*  46:*14*
**different**  9:*20*  14:*8* 25:*23*  26:*9*  27:*22* 32:*9*  41:*4, 17*  46:*12, 13*
**difficult**  39:*8*
**digress**  9:*5*
**directed**  20:22, *24*
**direction**  54:*12*
**directly**  4:*16*
**disagree**  12:*10*
**disagreed**  23:*3*
**discovery**  13:*18* 19:*20*  23:*2*  30:*17*
**discreet**  33:*7*
**discretion**  13:*17* 14:*16*  16:*7*
**discretionary**  13:*1, 6*
**disguised**  4:*23*
**dispute**  10:*13*  31:*6, 10, 19*  44:*5*
**disputed**  10:*17*  14:*1* 17:*16*  18:*12*  21:*24* 30:*5*
**District**  13:*14*  14:*7* 25:*13, 14*
**ditch**  44:*21*
**document**  44:*17*
**documents**  11:*2* 13:*19*  37:*21*
**doing**  3:*24*  11:*6* 28:*23*  29:*2*  35:*4, 16* 39:*19*
**dollars**  52:*19*
**dozens**  30:*15*

drafting  34:*13*
draw  8:*9*
drawdown  49:*19*
drew  49:*24*
drice@hosielaw.com
2:*6*
due  10:*20*  11:*3*  12:*1*
14:*22*  16:*17*  17:*1*
21:*23*  22:8, *10*  49:*20*

< E >
e.g  26:*15*  27:6, *7*
earlier  27:*23*
early  30:*17*
eat  39:8, *13*
effort  44:*21*
eight  48:*18*
eight-page  17:*22*
either  38:*17*
elaborate  31:5  51:*17*
elect  6:*19*
elected  32:*1*
elements  8:*24*, *25*
e-mails  23:*15*
emergency  9:*15*  28:2
50:*16*
endlessly  19:*19*
enforcement  43:*23*
enormously  50:*18*
entered  42:*25*  43:*21*
entire  31:*10*  50:*20*
entitled  15:*15*
entitles  12:*2*
entity  36:*16*
equitable  39:*18*
equity  18:*23*
equivalent  7:*23*
error  3:*11*  4:*14*
6:*25*  7:*1*, *19*  10:*1*, *16*
21:*15*  22:*7*
errors  11:*10*  12:*6*
especially  19:*20*
30:*16*  45:*20*
essence  9:*21*  10:*25*
established  14:*9*
estate  6:*2*
events  9:*2*  33:*16*
35:*17*
everybody  3:*2*  30:*5*
53:*7*

evidence  10:*24*
11:*12*  23:*14*
evidentiary  11:*11*
exactly  51:*22*
example  9:6  11:*14*
12:*18*  17:*24*  25:*23*
exceeds  4:*7*  49:*21*
exchange  5:*10*
exchanged  13:*19*
Excuse  15:*1*
Exhibit  43:*20*  45:*4*,
*15*, *18*  47:*5*  49:*8*
expectation  15:*3*
expenses  33:*9*  36:*14*
37:*22*  41:*8*
explained  4:*15*
explicit  3:*16*, *19*
explicitly  9:*13*  31:*15*
extend  18:*15*
extent  44:*4*
extrinsic  23:*13*

< F >
facial  23:*13*
fact  3:*15*, *17*, *18*, *21*
18:*7*  20:*21*  28:*3*
29:*15*
facts  9:*2*, *12*, *17*
10:*14*, *22*  13:*17*  14:2
15:*24*  16:*3*, *12*, *15*, *21*
17:6, *7*, *9*, *16*  18:*19*
21:*25*  22:*19*  24:*20*
28:*14*  29:*22*  34:*18*
35:2, *6*
factual  7:9  10:*17*
11:*13*  14:*1*  16:*2*
17:*17*, *24*  18:*11*  19:2
21:*24*  22:*18*  26:*25*
28:*5*
fail  15:*9*
fairness  25:*11*
family  6:*21*
family's  6:*15*
far  8:*20*  29:*22*
February  1:*14*
Federal  13:*14*  25:*17*,
*20*  26:4, *7*  30:*12*
fee  18:2  24:4  26:*18*,
*20*  28:4  30:*1*, *22*
31:*3*, *7*, *13*, *24*  40:*4*,

*11*  42:*15*  45:*13*
47:*25*  49:*19*, *21*  51:*1*
feel  12:*12*
Feelings  53:*11*
fees  29:*20*, *22*  31:*11*,
*19*  33:8  38:*2*  44:*1*
field  41:2
fight  50:*23*, *25*
fights  26:*6*
file  4:*17*  15:4  23:*1*
34:6, *8*  42:*3*
filed  5:*12*  13:*20*
14:*11*  19:8  27:*13*
32:*13*  42:*11*  50:*18*
filing  9:*14*  26:*11*
28:2  38:*21*
filings  3:*3*  19:*6*
fill  32:*18*
final  44:*5*
Finally  5:*2*  51:*16*
financing  24:*4*
find  20:*21*  25:*23*
findings  17:*24*  20:*21*
first  3:*4*, *10*, *23*  9:*13*
15:*12*, *19*, *22*  18:*8*
26:*15*  27:*5*  28:*2*, *8*,
*11*  33:*12*, *21*  50:*9*
51:*19*  52:*10*
fit  45:*1*, *16*
flexibility  22:*3*
focusing  16:*20*
folks  39:*7*
footnote  7:*11*  10:*13*
23:*14*
forced  41:*7*
foreclosing  40:*23*
foreclosure  15:*13*
38:5, *8*  39:*20*  41:*23*
43:*15*
foregoing  54:*8*
foremost  3:*23*
forget  47:*12*
forgive  10:*19*  24:*12*
fork  39:*13*
form  6:*3*
formal  16:*4*
formula  45:*21*  47:*23*,
*24*  48:*3*
forth  9:*8*, *17*  10:*4*
15:8, *25*  16:*3*, *4*  17:*6*

20:*18*, *23*  26:*25*
31:*15*
forward  8:*21*  9:*14*
18:8  23:2  44:*12*
51:*3*
forwarded  35:*23*
49:*18*
found  32:*25*  38:*1*
four  4:*20*
fourth  45:*8*
Francisco  2:*4*
frankly  12:*7*, *13*
51:*17*  52:*4*
fraud  7:*12*, *18*  9:*7*,
*10*, *12*  19:*25*  20:*1*, *2*,
*10*, *11*, *22*  21:*1*, *12*, *16*
27:*7*, *9*, *12*  28:*11*, *13*
free  12:*12*
friendly  40:*15*
FROME  1:*9*  33:*9*,
*20*  34:*2*, *12*, *15*, *16*
35:*17*  38:4  39:*15*, *19*,
*22*, *25*  40:8  41:*4*, *6*,
*11*  43:*24*, *25*
front  25:*14*
fulcrum  17:*15*
fully  24:*5*
fundamentally  21:*22*
funds  33:*1*  35:*23*
further  30:*19*  38:*17*
43:*7*  50:*2*, *5*  52:*24*,
*25*
futile  21:*2*
future  46:*9*

< G >
gaps  32:*18*
general  15:*6*  31:*3*
German  21:*7*
germane  9:*2*, *10*
13:*23*  19:*3*  24:*1*, *10*
26:*15*  27:*5*  30:*10*
get-go  6:*18*
getting  40:*23*  43:*14*
give  5:*8*  8:*23*  9:*1*, *6*
11:*11*, *13*  12:*17*
13:*15*  14:*15*  16:*25*
17:*24*  24:*18*  52:*15*
Given  18:*12*  19:8
22:5  24:*16*  47:*7*

**gives** 3:22 14:*10* 45:22
**giving** 11:9 21:25
**go** 18:*17* 21:*1* 32:15 36:25 45:8, *18* 49:7, *10*
**goes** 7:17 10:*13* 48:*14*
**going** 12:*17* 13:25 14:*3* 15:4, *5* 16:*14* 23:2 24:7 25:6 32:5, *10, 22* 36:8 37:*1* 39:9, *14* 40:*15* 41:24 44:*12* 46:*8*
**Good** 3:*1* 8:8 28:23
**grace** 32:*3* 53:12
**grant** 14:*16*
**great** 7:*19* 22:4 24:7 27:*1*
**greater** 15:25 21:22 52:2
**guaranteed** 6:6 29:*20*
**guarantor** 3:25 37:*1*
**guarantors** 3:*15* 51:6, *8, 10*
**guess** 11:*18* 14:6
**guise** 35:9

**< H >**
**hand** 34:*13*
**hang** 53:8
**happen** 19:*16, 17* 24:22
**happened** 10:25 14:*4* 17:20 30:7 41:6 48:25
**happens** 23:17 26:*13* 37:6, *7* 47:8 49:*1*
**hard** 8:8 45:*16*
**head** 11:*15*
**HealthNow** 21:7
**hear** 12:*17* 28:*21*
**hearing** 10:*19* 11:*1, 2, 12* 17:20, *21* 22:*1* 24:*16* 30:8 31:*20* 34:*10*
**heightened** 7:*10, 22* 35:*1*
**held** 10:*3*
**hesitant** 12:*10*

**high** 3:*8* 21:*21* 52:*19* 53:*12*
**higher** 6:*20*
**high-risk** 26:*17* 29:*15*
**hit** 3:*8* 18:*16*
**Hoise** 3:*4, 5* 5:*15, 18, 25* 6:*12, 24* 8:*3, 7, 25* 9:*4* 11:*8, 24* 12:*13, 21* 13:*4, 7* 14:*18, 21* 15:*1, 19, 22* 17:*5, 14, 19* 20:*6, 25* 22:22 23:*24* 25:*4* 26:5 27:*15, 25* 28:*9, 13, 24* 29:*4, 9, 14* 30:*20, 21* 32:*11, 17* 33:*1, 4, 20* 34:*5, 8, 11* 35:*7, 21, 22* 36:*9, 13* 37:9 38:*3* 44:*11* 48:*6, 18* 49:*18* 50:*4, 7* 51:*9* 53:*9, 10*
**hold** 7:*12*
**home** 6:*15, 21* 26:23
**Honor** 8:*7* 11:*16* 12:*6* 14:*18* 17:*14* 18:*24* 20:*25* 25:*4, 5, 7, 9* 48:*5*
**hopefully** 31:*20*
**HOSIE** 1:*1, 5* 2:2 3:*6* 52:*23*
**hourly** 26:*20* 28:*4* 29:*20, 22*
**house** 4:*4* 6:*7* 52:*18*
**hundred** 42:*13*
**hybrid** 18:*2*

**< I >**
**idea** 15:*3*
**identified** 4:*5*
**ignore** 16:*8*
**immunize** 21:*11, 16*
**implied** 31:*14*
**important** 4:*25* 11:*13* 21:*19* 33:*15*
**importantly** 34:*7*
**improper** 22:*21* 23:*17* 35:*14*
**included** 18:*2*
**including** 4:*20* 24:*12* 43:*25* 52:*14*

**INCORPORATED** 1:*10*
**incurred** 33:9 41:9
**incurs** 37:22
**indicated** 43:*20*
**indicates** 34:25
**Individual** 1:*5, 6* 4:2
**individuals** 3:*20* 36:2, *20*
**inducement** 20:*1* 27:*7, 9, 12, 13* 28:*11, 14*
**initial** 9:*15* 14:*10* 15:*23* 26:*11* 27:*13* 29:*6, 13* 32:*19* 33:*18*
**initially** 23:*3* 32:*15*
**initiated** 39:*16*
**injunction** 42:*19, 25* 43:*2, 14* 44:*3*
**instance** 20:*8* 38:*15* 40:*22* 45:*22* 47:*4*
**instituted** 41:*12*
**intended** 28:*4, 15* 35:*5*
**interest** 4:*12* 5:*1* 6:*2* 29:*8, 10* 33:*8* 38:*21* 39:*11* 45:*1, 25* 46:*6, 15, 21, 23* 48:*10, 22* 49:*14, 15, 20, 21* 51:*21, 25*
**interested** 37:*11*
**interesting** 26:*2*
**interests** 46:*10*
**interpose** 34:*23*
**interpretation** 22:*14* 23:*22, 25* 24:*13* 30:*4* 40:*20* 44:*23*
**interpreted** 23:*21*
**investment** 18:*23* 26:*17*
**issue** 6:*8, 9* 8:*5* 18:*11* 22:*14, 25* 23:*6, 9, 20* 26:*8* 28:6 30:*6, 22* 32:25 33:*12* 35:8 37:*14* 44:*13* 50:*20, 21*
**issues** 10:*17* 11:*13* 14:*1* 17:*17, 25* 19:*7* 21:*24* 23:*25* 24:*1, 10*

26:*14* 27:*5* 30:9 33:*7* 44:*4*
**its** 3:*13* 11:*10, 11* 34:*5, 8, 13, 14* 36:*14, 15* 38:*4* 39:*19*

**< J >**
**JAMS** 1:*5* 7:6, *7, 14, 16, 24* 8:*10* 9:24 10:*4* 12:*20, 21* 13:*11* 14:*9, 20* 15:*3, 16* 16:*3, 18* 19:*14* 27:*14*
**January** 46:22 47:*19* 52:*11*
**job** 28:*23* 29:2
**jointly** 36:*11, 20*
**judge** 12:*10* 50:*10* 51:2 52:24
**judges** 25:*14*
**judgment** 43:*21, 22*
**JUDICIAL** 1:*1*
**July** 3:*13*
**junior** 39:*3, 10*
**jurisdictional** 22:*3*
**Justice** 37:*3* 40:6 41:*14*

**< K >**
**key** 32:25
**kind** 32:9 40:*18*
**King** 2:9
**knew** 34:*15*
**know** 8:*7* 12:9, *14, 24* 15:6, *9, 14* 16:*11, 24* 17:4 18:*17* 19:16 20:*16* 21:*18* 22:*19* 23:*7* 25:*16, 21* 26:*2, 5* 29:*19* 30:*16* 32:*12* 33:*13, 23* 40:*9, 24* 41:2, *4, 7, 14, 22* 42:2 43:*17* 44:*11, 16, 17, 18* 45:*20* 46:*4, 17, 18* 47:*8, 25* 48:*1, 24* 52:*4*
**known** 25:*2*
**KORNREICH** 8:*1, 4, 22* 9:*3* 11:*4, 17* 12:*11* 16:*19* 17:*11, 18* 19:22 20:*14* 36:22 37:*3, 5* 38:*7,*

12, 20, 24  39:4  40:2,
6, 17  41:10, 15, 16
44:24  45:23  46:11,
18  47:11, 14, 20
48:13, 20  49:4, 9, 12,
16  51:2  52:24  53:3,
16
**KRAMER**  3:1  5:14,
22  6:8, 12, 23  28:18
29:5, 10  30:19  32:4
42:9, 21  46:20  50:4,
23  52:22  53:1, 6

**< L >**
**LADIG**  2:9  32:5, 7
37:2, 7  38:10, 15, 23
39:1, 6  40:5, 21
41:13, 19  42:20, 24
45:3  46:3, 16  47:1,
13, 15, 22  48:15  49:2,
6, 10, 13, 17  52:23
53:14
**laid**  34:3
**Lampier**  52:6
**language**  3:19  20:12
21:12, 17  22:20
30:23  35:3  37:19, 20
**late**  35:16
**law**  3:12  4:14  7:3,
18, 24  8:15  10:10
12:2  13:9, 11, 24, 25
17:8  18:19  19:10
20:11  21:18  22:8
24:17  31:14  35:20
36:5, 19  52:17
**laws**  16:9  36:17
**learned**  24:25
**leave**  4:17  5:13
7:20  12:3  13:16
17:23  23:1  52:6
**led**  3:11  6:25  7:2
10:1, 16  21:15
**legal**  23:25  24:10, 18
27:5  30:3  32:25
35:8  44:13, 22
**legally**  30:9
**lender**  36:25  37:22
40:15
**lent**  6:1

**letter**  3:13  5:5  23:1
33:24  34:2
**letters**  34:1
**level**  8:12  21:21
**LFA**  3:19  4:15  9:11
20:10  26:14  30:24
31:18  33:3, 11  44:23
**Liability**  1:4  47:6,
17  50:20
**liable**  3:21  36:11, 21
51:11
**License**  2:16
**lien**  5:21
**lift**  42:18  43:4
**lifted**  43:3, 10, 14
**limitations**  34:20
**Limited**  1:4, 9
**line**  8:9  18:16  41:1
53:7
**listed**  45:12
**listening**  32:3
**litigant**  30:12
**litigated**  25:12
**litigating**  39:23  41:7
**litigation**  19:20
25:24  30:14  37:23
40:9  41:12  42:22
44:18
**little**  9:5  29:3  43:16
45:15
**live**  6:16, 19, 21
**LLP**  1:1  2:2
**loan**  4:7  18:18, 22
24:6  29:17  51:12
**loaning**  6:6
**loans**  36:23  38:18
**long**  10:9
**look**  13:10  16:18
17:22  20:9  37:25
45:4, 7  47:7  48:2, 5,
16  49:7  51:6
**looked**  22:19
**looks**  11:19  16:21
**loss**  52:5
**lost**  23:9  33:22
**lot**  22:3, 4  25:13
30:1  32:16  36:24
37:17
**lower**  6:19

**< M >**
**machine**  19:18
**major**  46:17
**making**  11:19  17:17
35:15  44:20
**marked**  32:20
**math**  46:17
**mathematician**  46:19
**matter**  14:17  17:10
32:19  35:20  39:11
**matters**  11:14  12:9
37:3  51:24
**maximum**  29:23
**mean**  5:20  12:12
18:15, 18  27:11
38:14, 16  39:7, 24
40:23  43:1  45:2
**meaning**  26:14
**means**  31:23
**meant**  22:17  23:11
**mechanics**  51:24
**MEDIATION**  1:1
**memory**  4:12  6:14
9:15  10:8  30:24
**mentioned**  33:17
42:17
**Merit**  54:5
**meritless**  34:4
**merits**  30:9  31:10,
19  33:22  43:5  50:13,
14, 24, 25
**metaphysical**  18:14
**midpoint**  25:19
**MILLER**  12:19, 23
13:5  14:5, 19, 25
15:2, 21  22:11  23:19
24:23  25:8  27:8, 21
28:7, 10, 17, 20, 25
32:24  52:24, 25
**million**  52:19
**minimum**  45:13
46:6, 7, 9, 13  47:25
48:24  49:19, 21
**minus**  48:9, 11
**minutes**  53:8
**mislead**  28:16
**missed**  26:11
**misstate**  22:12

**mix**  10:6
**Mm-hmm**  49:9, 12, 16
**money**  4:8  6:1, 6
33:5  35:24  36:7, 14
42:14, 22  47:9  50:14
51:12  52:2
**Montgomery**  2:3
**month**  46:22
**monthly**  48:16
**months**  25:24  32:22
42:17
**mortgage**  5:15, 19, 20,
23, 24  6:1, 5  36:1
**motion**  4:17, 23  5:13
10:22  11:6, 19  12:2
13:20  32:9, 12  33:13
34:6, 8, 22  35:15
50:17
**moved**  19:22  38:4
**multiple**  38:19

**< N >**
**name**  42:3
**nation**  16:9
**necessary**  34:18
**need**  25:17  40:10
41:20  42:7
**negotiate**  15:17  36:7
37:8
**negotiation**  37:4
**never**  25:4  26:3
**new**  21:6  24:18
25:25
**North**  2:9
**note**  23:14  51:19
**noted**  32:24  34:9
51:2
**notes**  54:11
**notice**  7:8  8:21, 23
9:1, 7, 22  14:10
15:23  16:2  17:1
18:9  19:2  27:22, 24
28:1  50:17  52:14
**noticed**  8:23
**number**  5:6, 7  21:9
33:25  48:18  52:14
**numbers**  18:12  45:20

**< O >**
**objection**  33:4

**obligation** 19:*14* 30:*12* 33:2 37:*20* 38:2
**obligations** 36:*21*
**obvious** 21:*13*
**obviously** 43:*23*
**o'clock** 1:*15*
**October** 34:*21, 25* 51:7
**offended** 29:*1*
**offenses** 19:*11*
**offhand** 33:*23*
**official** 54:*13*
**Oh** 6:5 8:*14* 41:*24*
**Okay** 6:*24* 17:*3, 18* 23:*20* 25:22 26:4 29:*3* 47:*3, 8, 16* 53:*1*
**once** 21:*4* 26:*13* 27:6, *20* 29:*19, 25*
**ones** 22:23 39:*16*
**Online** 21:7
**open** 4:*9*
**opinion** 44:6
**opportunity** 5:*12* 12:*4, 7* 15:*8, 11* 34:*17*
**opposite** 17:*12*
**order** 4:*19* 5:6, 7 17:*23* 23:*4* 33:6, 25 34:7, *18, 22, 25* 35:4 41:25 43:*18* 44:5, 7, 8 48:*18* 51:7
**ordinarily** 40:*12*
**oriented** 8:*14*
**originally** 47:*9*
**ourself** 21:*16*
**outset** 50:*23*
**outstanding** 47:*17*
**owed** 29:7 47:*16* 48:8 49:*22* 52:3
**owes** 50:*24*
**owing** 49:*23*

**< P >**
**pachinko** 19:*18*
**page** 4:*18* 45:*8, 17* 48:*17* 51:7
**pages** 10:*9*
**paid** 40:*23* 45:*13*

**panel** 3:*11, 13* 4:*15, 21* 5:6, 7 6:*25* 7:*3, 21* 9:*11* 10:*1, 16* 11:*10* 12:*10, 15* 13:25 14:22 16:7, *11, 16, 21* 17:*3, 15* 21:*2, 15, 23* 22:2 23:*3, 10, 11, 12* 24:*11, 12* 26:*13, 19* 27:6 29:*19, 25* 31:9 32:*24* 33:*16, 24* 34:*4, 5, 7* 35:*1, 12, 13* 37:*11* 38:*1* 42:*12* 43:*1, 4, 10* 44:*4* 50:*1, 6* 51:*6* 52:8 53:*11*
**panels** 22:*4, 5*
**panel's** 3:7 4:*16* 7:*20* 17:22 18:*1, 25* 19:7 20:8 24:*3* 30:4 33:6 34:*21* 35:4 44:22
**papers** 34:*10* 37:*12, 16* 42:*10*
**paragraph** 6:*15* 9:*16* 15:*23, 24* 28:*1*
**part** 15:*17* 36:*24*
**particularly** 37:*11*
**parties** 4:*1* 15:*17* 34:*1, 9* 37:*8* 40:*13* 51:*20*
**partners** 3:*15*
**Partnership** 1:*4*
**party** 21:*11* 31:7, *13, 24* 37:*18* 40:*4*
**patience** 32:*3* 53:*12*
**pay** 6:*20* 36:*14* 37:*21* 43:*19* 45:*25*
**paydown** 47:*10*
**payment** 43:*25*
**penny** 31:*18*
**People** 19:*19* 39:*12*
**perceived** 5:*9*
**percent** 42:*13*
**permitted** 11:*22*
**permutations** 19:*19*
**person** 52:*17*
**personal** 6:*11, 22* 54:*11*
**persuasive** 14:*3*
**PETER** 2:*9*

**petition** 9:*15*
**picked** 50:*16*
**pie** 39:*8, 12*
**place** 37:*18* 47:*3*
**placed** 5:*19, 20*
**placing** 5:*16*
**pladig@bayardlaw.com** 2:*11*
**plain** 35:*3, 6*
**plainly** 31:*15*
**plaintiff** 19:*14*
**planned** 32:*15*
**play** 41:*2*
**playing** 43:*12*
**plead** 7:*12, 23* 9:*4* 19:*18* 30:*14, 15* 34:*17*
**pleaded** 35:*6, 19*
**pleading** 7:*8, 9, 10, 18* 8:*15* 9:*16* 10:*22* 14:*10* 15:*7, 23* 17:*5* 28:*8, 12* 35:*1* 38:5
**pleadings** 6:*18* 8:*19* 16:*22* 18:8
**pleads** 17:*6*
**please** 5:*8* 15:*20*
**pled** 6:*13* 9:*13, 21* 10:*17* 16:*12* 18:6, *19* 20:*8* 21:*3, 24* 24:*21* 25:*18* 27:*1* 28:*14* 29:*12, 22*
**pledged** 6:*10*
**plus** 4:*11* 24:*4* 29:7 48:*9*
**point** 5:*3* 10:*1, 5* 12:*14* 14:*14* 17:*15, 19* 26:*1* 28:*21* 30:*21* 33:*14* 36:*12* 44:*10*
**pointed** 50:*8, 22*
**points** 3:*9*
**policy** 21:*13*
**position** 34:*16* 35:*18*
**possible** 19:*15* 30:*13*
**practical** 39:*11*
**prehearing** 33:*25* 48:*17*
**preliminary** 22:*25* 24:*12* 25:*1* 30:6 42:*18, 25* 43:*2* 44:*2*

**prepaid** 45:*1* 46:*23* 51:*21* 52:*11*
**preparing** 34:*11*
**prepayment** 48:*9, 11*
**presentations** 52:*13*
**presumably** 39:*3* 43:*21*
**pretty** 4:*19* 25:*15*
**prevail** 40:*9* 43:5
**prevailing** 31:7, *13, 24* 37:*17* 40:*3, 13*
**preview** 34:*21*
**previously** 23:*25* 24:*1*
**primarily** 3:*21* 51:*11*
**primary** 36:*3*
**principal** 4:*9* 6:*11, 15* 51:*13*
**principally** 42:*13*
**prior** 3:*24* 16:22 25:*3* 30:*10* 52:*13*
**probably** 52:*6, 8*
**problem** 22:*9*
**procedural** 3:*14* 7:*3, 16* 8:*5, 15* 10:*2* 13:*11, 24* 14:*8, 15* 16:*8* 22:*7* 24:*16, 20*
**procedurally** 7:*14*
**procedure** 8:*14* 15:*13*
**procedures** 8:*19* 14:*9*
**proceed** 3:*23*
**proceeding** 39:*17, 21* 43:*15*
**proceedings** 1:*13* 53:*17* 54:*7, 9*
**process** 8:*11, 13* 10:6, *21* 11:*3* 12:*1, 15* 14:22 15:*10* 16:*17* 17:*1* 21:*23* 22:*8, 10*
**production** 44:*17*
**profound** 10:*20*
**promised** 52:*20*
**promptly** 13:*21* 19:6
**proper** 5:*1* 16:*18*
**properly** 20:7 21:*24* 24:*20*
**property** 6:*10* 50:*11*
**proponent** 44:*12*

**proposed** 4:*17* 6:*14* 7:*4*, *21* 9:*8*, *21* 10:*7*, *11* 15:*25* 18:*6* 19:*3* 27:*1* 34:*11*, *14* 52:*16*
**proposing** 44:*15*, *16*
**proposition** 36:*18*
**prospective** 19:*15*
**protect** 30:*25* 37:*15* 38:*4*, *13*, *14* 39:*19* 40:*11* 43:*13*
**protected** 38:*25* 50:*10*
**protecting** 31:*10*, *21* 37:*23*, *24* 38:*9*, *16* 40:*7*, *19*, *22* 42:*4*, *8* 50:*9*, *12*
**protection** 32:*21*
**provide** 15:*22* 20:*12*
**provided** 51:*18*
**provision** 3:*22* 37:*18* 40:*12* 42:*15*
**provisions** 31:*6* 43:*24*
**publishing** 21:*8*
**pull** 12:*22*
**pursuant** 5:*6* 45:*21*
**pursuing** 43:*7*
**pushing** 29:*3*
**put** 20:*23* 26:*8* 27:*21*, *22* 31:*25* 38:*18* 39:*24* 50:*20*

**< Q >**
**quarter** 52:*19*
**question** 5:*15* 8:*8* 16:*20* 21:*1* 23:*17* 24:*13* 31:*8* 38:*8* 44:*25* 46:*21* 51:*23*
**questions** 50:*2*
**quote** 4:*10*

**< R >**
**raise** 5:*4* 35:*11*
**raised** 33:*21*
**raising** 28:*23*
**rate** 4:*11* 5:*1* 6:*20* 33:*8* 36:*8*
**read** 3:*3* 11:*21* 31:*12*

**readable** 45:*17*
**reading** 11:*20*
**real** 6:*2*
**really** 8:*5*, *17* 11:*14* 12:*3* 13:*1* 15:*9* 28:*15* 33:*5* 37:*19* 45:*12* 51:*17*
**Realtime** 54:*6*
**rearguing** 43:*11*
**reargument** 11:*5*, *19* 32:*12* 33:*14* 35:*14*, *15*
**reason** 14:*23* 20:*16* 41:*22*
**reasoned** 44:*4*, *6*
**reasons** 20:*18* 21:*13*
**recall** 19:*23*
**receipt** 33:*1* 38:*1*
**receive** 35:*23*
**receptive** 52:*9*
**recognize** 52:*10*
**reconsider** 23:*10*
**reconsideration** 4:*24* 12:*22*
**record** 3:*6*, *9* 10:*15* 12:*7* 13:*23* 21:*5* 27:*1*, *17* 43:*17*
**recorded** 5:*16*
**recover** 30:*25* 31:*11* 39:*10*
**recovery** 26:*18* 29:*15*, *20*
**Reference** 1:*5*
**refers** 5:*23*
**reflected** 4:*16* 7:*20*
**reflection** 23:*5*
**refusal** 13:*14*, *15*
**regard** 40:*15*
**regarding** 48:*17*
**regards** 46:*14*
**Registered** 54:*5*
**regular** 20:*2*
**reject** 35:*14*
**rejected** 34:*22* 35:*13*
**relationship** 3:*25* 36:*13*
**relevant** 19:*1*, *8* 24:*2*
**relief** 9:*15* 11:*8* 39:*18*

**rely** 15:*15*, *16*
**remedy** 43:*7*
**remember** 33:*15* 46:*5* 47:*24*
**repay** 33:*2* 38:*3*
**repayment** 24:*6* 45:*10*
**repeat** 3:*8* 21:*21*
**repetitively** 18:*6*
**REPORTED** 2:*15* 54:*7*
**reporter** 12:*8* 54:*5*, *6*
**representations** 27:*19*
**reprises** 4:*19* 15:*24*
**requested** 42:*18* 43:*2*
**requesting** 11:*9* 23:*1*
**require** 7:*25* 14:*9* 16:*4* 40:*8*
**required** 46:*7*
**requirements** 15:*7*
**requires** 17:*9*
**residence** 4:*9* 6:*11*, *22* 51:*14*
**resistance** 25:*20*
**resolution** 31:*6* 35:*8*
**resolved** 34:*10*
**resolving** 32:*10*
**respect** 28:*18* 29:*5*
**respectfully** 13:*8* 14:*21* 27:*15*
**respond** 5:*12*
**Respondent** 1:*11* 2:*11*
**respondents** 32:*6*
**response** 5:*4* 29:*13* 33:*20*
**rest** 17:*23*
**restricted** 12:*5*
**result** 24:*25* 35:*19*
**return** 24:*5* 46:*7*, *9*, *13* 48:*24*
**revenue** 18:*2* 26:*20* 28:*4*
**reversed** 13:*16*
**revisit** 11:*10*
**RICE** 1:*1*, *6* 2:*2*, *3* 33:*4* 34:*5*, *8*, *11* 35:*7*, *21*, *22* 36:*9*, *13* 38:*3* 48:*18* 49:*19* 51:*9*

53:*10*
**Rice's** 33:*2* 48:*6*
**right** 3:*23* 9:*3*, *20* 16:*11* 17:*14* 21:*11* 23:*5*, *8* 24:*20* 26:*6* 30:*18*, *20* 31:*9*, *22* 37:*18* 39:*5* 40:*5* 42:*1*, *20*, *24* 47:*1*, *11*, *14*, *21*, *22* 48:*14*, *15* 50:*10*, *13* 51:*22* 52:*18*
**rigorous** 9:*23*
**rise** 24:*18*
**risk** 18:*5*, *11*, *13*, *14*, *20*, *23* 24:*6* 26:*24* 30:*1*
**risky** 18:*18*
**RMR** 2:*16* 54:*19*
**routinely** 19:*19*
**Rule** 7:*7*, *16*, *17* 10:*4* 12:*20*, *21*, *22* 13:*3*, *7* 15:*4*, *5* 16:*18*
**ruled** 26:*13* 27:*6*
**rules** 7:*14* 8:*10* 14:*8*, *20* 15:*16* 16:*8*, *10*
**ruling** 22:*24* 44:*22*
**run** 21:*20* 25:*19* 45:*5*
**running** 53:*11*

**< S >**
**safely** 3:*2*
**San** 2:*4*
**santer** 20:*18*
**saved** 36:*8*
**saw** 36:*24*
**saying** 6:*5* 9:*19* 14:*6* 15:*15* 19:*8* 21:*15* 25:*16* 28:*14* 31:*18* 32:*16*, *17* 42:*1* 43:*11* 47:*12* 50:*12*
**says** 4:*3*, *7* 5:*3* 12:*24* 16:*24* 18:*10* 20:*11* 21:*10* 30:*24* 31:*4*, *14* 51:*8*, *11*
**scheduled** 18:*3* 26:*21*
**Second** 7:*2* 16:*6* 37:*14* 50:*15*
**Section** 3:*19*

**secured** 4:9  6:1
18:22  24:5  26:17, 22
28:4  29:17  35:25
37:20  38:21  40:14
51:13
**security** 6:7
**see** 11:15, 21  22:21
32:17  35:5  40:12
45:11, 19  47:5  49:2,
13
**seeking** 39:18
**seize** 52:17
**sense** 37:24
**sent** 5:5  23:15
**separate** 44:7
**sequence** 33:16
**series** 31:5
**SERVICES** 1:1
**set** 9:8, 17  10:4
15:8, 25  16:3, 4  17:6
20:18  26:25  31:15
37:12
**setting** 21:23
**severally** 36:11, 20
**shaking** 11:15
**sheet** 27:19
**shift** 40:4
**shifting** 31:3, 7, 13,
24  40:12  42:15  51:1
**short** 5:8  7:7  11:11
19:2  31:20
**Shorthand** 54:4, 7
**shosie@hosielaw.com**
2:5
**show** 25:17  43:5
**shows** 18:20  35:4
**side** 17:1  25:11
**side's** 14:2  16:15
**sign** 53:10
**signature** 54:13
**signed** 4:2  5:16
**significant** 22:7
**signing** 53:13
**simple** 5:8  7:7  8:20
**simply** 13:25  31:15
36:19  37:8
**simultaneous** 5:10
**single** 13:18
**sir** 3:5

**sitting** 39:12
**situation** 26:10
**six** 5:6, 7  25:24
33:25
**six-page** 5:11
**slightly** 26:9
**slow** 21:8
**sorry** 15:20
**sort** 7:10  11:5
21:20  24:16  33:23
45:19
**Space** 33:1  38:2
**speak** 3:4  32:5  53:4
**specific** 7:8  10:9
15:6  42:6
**specifically** 6:13
**specificity** 7:13, 19,
24  21:3
**speculative** 18:23
24:3  29:16
**SPENCER** 1:5  2:2
3:6  51:9  53:10
**spent** 30:25  31:19
37:15, 16
**spreadsheet** 45:19
**squarely** 50:20
**standard** 7:10, 13, 22
8:21  9:23  10:2, 3
35:2
**standards** 8:16
**start** 20:6  49:23
51:20
**started** 39:25
**starting** 45:25  52:11
**state** 6:19  8:15
43:22
**statement** 5:8  11:23,
25  16:23  26:8
**states** 48:18
**statute** 4:6, 7  5:22
36:4, 5, 9  51:11
**statutory** 34:19
**stay** 53:7
**stenographic** 54:10
**steps** 3:14  5:9
**Steven** 2:16  54:4, 19
**stop** 39:18, 25
**straight** 8:20  51:3
**streamline** 23:2, 6

24:15  30:6  44:14, 15
**streamlining** 44:19
**Street** 2:3, 9
**strict** 44:13
**strikes** 27:9
**stronger** 31:3
**stuff** 20:19
**subject** 26:19
**submit** 15:11  34:24
**submitted** 15:12
**subsequent** 18:4
**substance** 6:4  10:6
30:8
**Substantially** 5:25
**substantive** 3:12
4:14  5:11  6:25  7:18
8:6  10:10  11:1  12:1
13:11, 24  14:4  16:8
17:8  20:10  22:7
24:19  30:8
**subtract** 48:25
**suddenly** 19:11
**sufficient** 7:24  29:23
**suggesting** 36:9
**Suite** 2:4, 10
**sum** 52:2
**summarize** 9:25
**summation** 13:8
**support** 36:18
**supported** 27:17
**supposed** 4:18  8:20
16:12  24:14, 15  34:1
**sure** 5:19  6:9  8:9
25:5  45:6
**sustained** 17:7

**< T >**
**take** 4:4  15:4  27:8
36:4  49:17
**taken** 17:7  18:20
54:11
**talk** 40:13  43:16
53:8
**talking** 20:3, 4, 16, 17
40:7
**tax** 6:19, 20
**taxes** 6:17
**tell** 50:6
**term** 27:18

**terms** 3:11  4:14  7:3
9:12  10:2  11:8  13:9
28:1
**testimony** 11:1
**Thank** 3:5  6:23
12:13  20:25  28:24
32:2, 4, 7  52:22, 23
53:2, 9, 11, 14, 16
**themes** 21:21
**theories** 24:18  26:12
**theory** 27:4
**thing** 11:18  38:9
39:19  45:20
**things** 9:18, 20
36:15  44:14, 20
48:19  51:19
**think** 3:2  4:13  6:25
7:2  9:9, 25  10:20
11:3  12:2, 15  13:24
14:2  15:2  16:6, 16
17:8, 15, 21, 22  18:10
19:13, 15  20:7  21:3,
14  22:15  23:5, 19
24:19  29:2  30:13
31:17  32:14, 16
33:13, 15  35:14  36:3
37:10, 12  38:15  39:7,
10  40:14  41:13, 19,
21  42:3, 5  43:3, 17,
18, 23  44:7, 8, 9, 19
45:3, 8, 17  46:16, 20
47:1  48:6  52:1, 6
**Third** 10:5  23:4
49:14  51:5
**thorough** 4:11
**thought** 11:21  22:17
23:8, 11  39:14  44:13
52:5, 7
**three** 4:20  30:14
**threshold** 22:14
**time** 3:7  14:14  15:4
22:6  26:15  27:6, 13
32:23  33:21  37:17
40:17  42:16  45:11
51:19  52:10  53:5
**times** 37:6
**today** 6:13  12:17
32:10  37:16  39:17
**told** 3:12  28:5  49:6

top  38:*18*
total  47:*16*
**Totally**  13:*5*  16:2*1*
touch  37:*9*
tough  25:*15*
traditional  40:*11*
transcribed  54:*11*
transcript  32:*20*  54:*9*
transmogrified  31:*2*
transmuted  31:*1*
tremendous  25:*20*
trial  25:*19*  54:*8, 10*
trickling  19:*17*
tried  20:*23*  41:*23*
triggered  33:*1*  38:*2*
true  4:*8*  8:*16*  10:*12,*
*23*  16:*13, 14*  17:*7, 9*
*18*:*20*  24:*21*  54:*8*
trumps  6:*3*
trust  36:*1*
try  4:*4*  25:*18, 25*
*34*:*5, 17*  39:*8*
trying  20:*20*  23:*15*
*25*:*12, 22*  37:*17*
*39*:*13*  44:*20*  47:*2*
*52*:*17*
twice  23:*4*
two  19:*24, 25*  20:*3,*
*22*  30:*14*  33:*7*  51:*19*
**two-fifty**  24:*5*
**two-page**  19:*6*
typical  37:*20*

**< U >**
unbridled  16:*7*
uncertain  26:*18*
underlying  8:*15*  9:*1,*
*12*  11:*12*  15:*24*  16:*3*
underscore  52:*9*
understand  4:*22*
*11*:*18, 20*  14:*5*  15:*14*
*20*:*15*  22:*2, 3*  23:*9*
*40*:*2*  51:*17*
understanding  22:*13*
understood  33:*6*
unrelated  27:*10*
use  4:*8*  31:*2*  51:*12*
usually  40:*3*
usuary  4:*10*  51:*14*
usurious  29:*11, 16*

usury  3:*12*  6:*4*  7:*1*
*18*:*19*  19:*23*  20:*4, 6,*
*24*  24:*2*  26:*15, 19*
*27*:*6*  29:*6, 18*  30:*2*
*34*:*3, 20, 23*  35:*20*
*36*:*5, 17, 19*

**< V >**
vacate  44:*2*
valid  19:*12*  29:*18*
value  38:*17*
version  14:*2*  16:*15*
view  5:*24*  26:*16*
*27*:*23*
views  27:*3*
violated  22:*8*
violation  16:*17*
virtue  14:*8*
vitiate  8:*17*
vs  1:*8*

**< W >**
wait  53:*4*
waive  5:*3*  20:*11*
waived  20:*9*
waiver  20:*17*
walk  6:*4*
want  12:*12*  13:*10*
*16*:*23*  21:*21*  23:*23*
*25*:*9*  28:*20*  32:*14, 15*
*43*:*16*  44:*9*  51:*18*
*52*:*9*  53:*4*
warranting  24:*4*
way  9:*11*  39:*22, 24*
*43*:*1, 3*  46:*24*  47:*2*
*48*:*2, 3, 7*  49:*7*
weigh  17:*16*
**Well**  7:*24*  13:*8*
*15*:*19*  20:*14*  21:*17*
*23*:*22*  32:*18*  34:*17*
*37*:*12*  39:*1*  42:*4*
*45*:*3*  46:*4, 16*  50:*15*
*53*:*1*
**well-reasoned**  44:*22*
went  46:*8*
**we're**  3:*21*  4:*3, 5*
*6*:*6*  11:*9, 24, 25*
*13*:*25*  14:*3, 6, 7*  16:*9,*
*12, 14*  23:*9*  39:*17*

*50*:*13*  51:*6, 10*  53:*13*
**we've**  23:2*1*  42:*10*
**Wilmington**  2:*10*
winning  43:*13*
**Witness**  54:*13*
witnesses  11:*2*
won  50:*14*
wondering  15:*14*
*41*:*18*  44:*25*
**WOODSFORD**  1:*10*
*3*:*11, 12, 22*  4:*3, 14,*
*20, 21, 22*  5:*2, 3*  7:*11,*
*15*  10:*1, 12, 16*  18:*4*
*21*:*15*  26:*22*  29:*6*
*30*:*23*  31:*9, 23*  50:*18*
**Woodsford's**  9:*6*
word  21:*4*  31:*3*
work  8:*11*
worked  46:*25*
works  47:*2*
write  51:*3*
writing  31:*23*
wrong  7:*3, 24*  10:*2*
**WYE**  1:*9*  33:*9*
*34*:*15*  38:*4*  39:*15, 19,*
*22*  40:*1, 8*  41:*5, 6, 11*
*43*:*25*
**Wye's**  33:*20*  34:*2,*
*12, 16*  35:*18*

**< Y >**
**Yeah**  17:*18*  23:*19*
*49*:*5*
year  46:*1, 24*  47:*12*
years  30:*14*

**< Z >**
zero  26:*24*  47:*16*
**Zoom**  1:*13*

Transcript of Arbitration 2.24.2022     Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

## WORD LIST

**< $ >**
**$100,000** *(3)*
**$126,000** *(1)*
**$236,000** *(8)*
**$250,000** *(2)*
**$800,000** *(4)*

**< 0 >**
**0654** *(1)*
**084-004675** *(2)*

**< 1 >**
**1** *(5)*
**10** *(6)*
**10:33** *(1)*
**11:39** *(1)*
**1100109661** *(1)*
**12th** *(2)*
**13.3** *(2)*
**13.6** *(1)*
**136** *(1)*
**17** *(1)*
**18** *(2)*
**18th** *(2)*
**19899** *(1)*
**1st** *(2)*

**< 2 >**
**2** *(1)*
**2018** *(3)*
**2019** *(4)*
**2020** *(2)*
**2021** *(6)*
**2022** *(2)*
**21st** *(1)*
**22nd** *(1)*
**247-6000** *(1)*
**24th** *(1)*
**26** *(1)*
**27** *(2)*
**29** *(1)*

**< 3 >**
**3** *(1)*
**302** *(1)*
**31.6** *(1)*
**3400** *(1)*

**< 4 >**
**4** *(1)*
**400** *(1)*
**415** *(1)*

**< 5 >**
**5** *(1)*
**56** *(1)*

**< 6 >**
**600** *(2)*
**655-5000** *(1)*

**< 7 >**
**7/21/2021** *(1)*

**< 9 >**
**9** *(4)*
**94111** *(1)*
**9B** *(3)*

**< A >**
**A.D** *(2)*
**a.m** *(2)*
**ability** *(1)*
**able** *(1)*
**above-entitled** *(1)*
**absolutely** *(6)*
**abuse** *(1)*
**accept** *(1)*
**accepted** *(3)*
**accrued** *(1)*
**acknowledges** *(3)*
**action** *(3)*
**actionable** *(1)*
**actions** *(1)*
**actual** *(2)*
**add** *(4)*
**added** *(1)*
**additional** *(3)*
**Additionally** *(1)*
**address** *(1)*
**addressed** *(1)*
**addresses** *(1)*
**addressing** *(1)*
**adopt** *(1)*
**advanced** *(2)*
**advantage** *(2)*

**advantages** *(1)*
**affirmation** *(1)*
**affirmative** *(3)*
**aforesaid** *(1)*
**afternoon** *(1)*
**agree** *(3)*
**agreed** *(2)*
**agreement** *(4)*
**ahead** *(1)*
**allegation** *(2)*
**allegations** *(2)*
**allege** *(3)*
**alleged** *(4)*
**all-in-one** *(1)*
**allow** *(4)*
**allowed** *(3)*
**allows** *(1)*
**alternatives** *(1)*
**ambiguity** *(1)*
**ambiguous** *(2)*
**amend** *(21)*
**amended** *(18)*
**amendment** *(1)*
**amendment** *(1)*
**amount** *(7)*
**amounts** *(2)*
**amply** *(1)*
**analysis** *(2)*
**analyze** *(1)*
**analyzed** *(1)*
**anticipated** *(1)*
**anticipating** *(1)*
**antithesis** *(1)*
**anymore** *(1)*
**apologize** *(1)*
**appealed** *(1)*
**Appeared** *(2)*
**appears** *(2)*
**apple** *(1)*
**application** *(1)*
**applied** *(2)*
**applies** *(5)*
**apply** *(7)*
**appointment** *(2)*
**appreciate** *(6)*
**appropriate** *(3)*
**appropriateness** *(1)*
**April** *(1)*
**arbitrary** *(1)*
**ARBITRATION** *(12)*

**arbitrations** *(2)*
**ARBITRATOR** *(79)*
**arbitrators** *(4)*
**argue** *(1)*
**argues** *(1)*
**arguing** *(3)*
**argument** *(6)*
**arguments** *(9)*
**asked** *(2)*
**asking** *(5)*
**asserted** *(1)*
**assertion** *(1)*
**assessing** *(1)*
**associated** *(1)*
**assume** *(3)*
**assumed** *(2)*
**attack** *(1)*
**attempt** *(2)*
**attention** *(2)*
**attorneys** *(1)*
**August** *(3)*
**available** *(1)*
**avoid** *(5)*

**< B >**
**back** *(4)*
**ball** *(1)*
**bank** *(1)*
**bar** *(1)*
**based** *(2)*
**basic** *(1)*
**basically** *(1)*
**BAYARD** *(1)*
**beginning** *(6)*
**behalf** *(3)*
**belabor** *(1)*
**believe** *(9)*
**bench** *(1)*
**Bertelsmann** *(1)*
**best** *(1)*
**better** *(1)*
**beyond** *(1)*
**big** *(1)*
**bit** *(4)*
**bite** *(1)*
**blunt** *(2)*
**bluntness** *(1)*
**boilerplate** *(1)*
**bomb** *(1)*

Transcript of Arbitration 2.24.2022                                   Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

borrow *(1)*
borrowed *(1)*
borrower *(7)*
borrowers *(8)*
borrowing *(2)*
bottom *(1)*
bound *(1)*
branch *(1)*
branching *(1)*
breach *(5)*
brevity *(1)*
Brickey *(3)*
brief *(7)*
briefing *(1)*
briefs *(1)*
bring *(1)*
broad *(1)*
brought *(1)*
business *(5)*
businesses *(1)*

< C >
calculated *(3)*
calculation *(5)*
calculations *(5)*
California *(8)*
call *(7)*
called *(1)*
calls *(2)*
candor *(1)*
capacity *(1)*
capricious *(1)*
cards *(1)*
care *(2)*
carefully *(1)*
carried *(2)*
case *(26)*
cases *(4)*
cash *(1)*
cause *(1)*
causes *(2)*
cavalier *(1)*
centrally *(1)*
certain *(2)*
certainly *(1)*
Certified *(2)*
certify *(1)*
challenge *(1)*
chancery *(2)*

change *(3)*
changed *(3)*
changes *(1)*
characterized *(2)*
charge *(1)*
chose *(2)*
cite *(2)*
cited *(1)*
Citibank *(1)*
citing *(2)*
claim *(27)*
claimant *(3)*
Claimants *(13)*
claimed *(1)*
claims *(22)*
clause *(8)*
clear *(6)*
clearly *(4)*
close *(1)*
co-borrowers *(3)*
collateral *(24)*
collecting *(1)*
column *(1)*
come *(1)*
comes *(2)*
commence *(1)*
commenced *(1)*
commencing *(3)*
commercial *(1)*
company *(1)*
competently *(1)*
complaint *(17)*
complete *(1)*
complicated *(1)*
compounded *(3)*
compounding *(1)*
computation *(1)*
computational *(3)*
computations *(1)*
concerning *(1)*
concluded *(3)*
conclusion *(1)*
confidential *(2)*
configured *(1)*
conflicting *(1)*
connection *(2)*
consent *(2)*
consequence *(3)*
consequences *(1)*

consider *(2)*
considered *(2)*
constituted *(1)*
constitution *(1)*
constructed *(1)*
construction *(3)*
construed *(1)*
context *(3)*
contingency *(5)*
continue *(3)*
contract *(18)*
contractual *(4)*
contrary *(1)*
contributions *(2)*
co-panelists *(1)*
core *(3)*
correct *(6)*
cost *(1)*
costs *(1)*
counterclaim *(1)*
counter-claimant *(2)*
counterclaims *(1)*
counter-respondents *(2)*
course *(4)*
court *(14)*
court's *(1)*
cover *(2)*
covered *(2)*
Cravath *(2)*
create *(1)*
creative *(2)*
credit *(8)*
credited *(1)*
creditor *(1)*
CRR *(2)*
CSR *(4)*
curious *(1)*
cursory *(1)*

< D >
damage *(1)*
damages *(3)*
Data *(2)*
date *(4)*
dates *(1)*
day *(4)*
dba *(1)*
deal *(6)*

dealing *(1)*
dealt *(1)*
debacle *(1)*
debt *(1)*
debts *(1)*
decades *(1)*
December *(4)*
decide *(4)*
decided *(6)*
deciding *(2)*
decision *(17)*
decline *(1)*
deduct *(1)*
deducted *(3)*
deed *(2)*
default *(4)*
defense *(7)*
defenses *(1)*
deference *(1)*
definition *(1)*
degradation *(1)*
degree *(1)*
Delaware *(12)*
delicacy *(1)*
demand *(2)*
denied *(2)*
deny *(1)*
denying *(3)*
depose *(1)*
deposition *(1)*
deprivation *(2)*
deprived *(1)*
described *(1)*
deserve *(1)*
designated *(1)*
despite *(1)*
detail *(7)*
detailed *(3)*
determination *(1)*
development *(1)*
DIANE *(4)*
difference *(3)*
different *(10)*
difficult *(1)*
digress *(1)*
directed *(2)*
direction *(1)*
directly *(1)*
disagree *(1)*

Transcript of Arbitration 2.24.2022                                    Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

disagreed  (1)
discovery  (4)
discreet  (1)
discretion  (3)
discretionary  (2)
disguised  (1)
dispute  (5)
disputed  (6)
District  (4)
ditch  (1)
document  (1)
documents  (3)
doing  (7)
dollars  (1)
dozens  (1)
drafting  (1)
draw  (1)
drawdown  (1)
drew  (1)
drice@hosielaw.com  (1)
due  (10)

< E >
e.g  (3)
earlier  (1)
early  (1)
eat  (2)
effort  (1)
eight  (1)
eight-page  (1)
either  (1)
elaborate  (2)
elect  (1)
elected  (1)
elements  (2)
e-mails  (1)
emergency  (3)
endlessly  (1)
enforcement  (1)
enormously  (1)
entered  (2)
entire  (2)
entitled  (1)
entitles  (1)
entity  (1)
equitable  (1)
equity  (1)
equivalent  (1)

error  (9)
errors  (2)
especially  (3)
essence  (2)
established  (1)
estate  (1)
events  (3)
everybody  (3)
evidence  (3)
evidentiary  (1)
exactly  (1)
example  (5)
exceeds  (2)
exchange  (1)
exchanged  (1)
Excuse  (1)
Exhibit  (6)
expectation  (1)
expenses  (4)
explained  (1)
explicit  (2)
explicitly  (2)
extend  (1)
extent  (1)
extrinsic  (1)

< F >
facial  (1)
fact  (8)
facts  (25)
factual  (13)
fail  (1)
fairness  (1)
family  (1)
family's  (1)
far  (2)
February  (1)
Federal  (6)
fee  (20)
feel  (1)
Feelings  (1)
fees  (7)
field  (1)
fight  (2)
fights  (1)
file  (6)
filed  (8)
filing  (4)
filings  (2)

fill  (1)
final  (1)
Finally  (2)
financing  (1)
find  (2)
findings  (2)
first  (19)
fit  (2)
flexibility  (1)
focusing  (1)
folks  (1)
footnote  (3)
forced  (1)
foreclosing  (1)
foreclosure  (6)
foregoing  (1)
foremost  (1)
forget  (1)
forgive  (2)
fork  (1)
form  (1)
formal  (1)
formula  (4)
forth  (12)
forward  (6)
forwarded  (2)
found  (2)
four  (1)
fourth  (1)
Francisco  (1)
frankly  (4)
fraud  (20)
free  (1)
friendly  (1)
FROME  (19)
front  (1)
fulcrum  (1)
fully  (1)
fundamentally  (1)
funds  (2)
further  (7)
futile  (1)
future  (1)

< G >
gaps  (1)
general  (2)
German  (1)
germane  (10)

get-go  (1)
getting  (2)
give  (13)
Given  (5)
gives  (3)
giving  (2)
go  (8)
goes  (3)
going  (20)
Good  (3)
grace  (2)
grant  (1)
great  (4)
greater  (3)
guaranteed  (2)
guarantor  (2)
guarantors  (4)
guess  (2)
guise  (1)

< H >
hand  (1)
hang  (1)
happen  (4)
happened  (6)
happens  (6)
hard  (2)
head  (1)
HealthNow  (1)
hear  (2)
hearing  (11)
heightened  (3)
held  (1)
hesitant  (1)
high  (4)
higher  (1)
high-risk  (2)
hit  (2)
Hoise  (65)
hold  (1)
home  (3)
Honor  (12)
hopefully  (1)
HOSIE  (6)
hourly  (1)
house  (3)
hundred  (1)
hybrid  (1)

Transcript of Arbitration 2.24.2022                                      Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

**< I >**
**idea** *(1)*
**identified** *(1)*
**ignore** *(1)*
**immunize** *(2)*
**implied** *(1)*
**important** *(4)*
**importantly** *(1)*
**improper** *(3)*
**included** *(1)*
**including** *(4)*
**INCORPORATED** *(1)*
**incurred** *(2)*
**incurs** *(1)*
**indicated** *(1)*
**indicates** *(1)*
**Individual** *(3)*
**individuals** *(3)*
**inducement** *(7)*
**initial** *(9)*
**initially** *(2)*
**initiated** *(1)*
**injunction** *(5)*
**instance** *(5)*
**instituted** *(1)*
**intended** *(3)*
**interest** *(24)*
**interested** *(1)*
**interesting** *(1)*
**interests** *(1)*
**interpose** *(1)*
**interpretation** *(7)*
**interpreted** *(1)*
**investment** *(2)*
**issue** *(22)*
**issues** *(15)*
**its** *(12)*

**< J >**
**JAMS** *(20)*
**January** *(3)*
**job** *(2)*
**jointly** *(2)*
**judge** *(4)*
**judges** *(1)*
**judgment** *(2)*
**JUDICIAL** *(1)*
**July** *(1)*

**junior** *(2)*
**jurisdictional** *(1)*
**Justice** *(3)*

**< K >**
**key** *(1)*
**kind** *(2)*
**King** *(1)*
**knew** *(1)*
**know** *(50)*
**known** *(1)*
**KORNREICH** *(43)*
**KRAMER** *(19)*

**< L >**
**LADIG** *(31)*
**laid** *(1)*
**Lampier** *(1)*
**language** *(9)*
**late** *(1)*
**law** *(26)*
**laws** *(2)*
**learned** *(1)*
**leave** *(8)*
**led** *(6)*
**legal** *(9)*
**legally** *(1)*
**lender** *(3)*
**lent** *(1)*
**letter** *(5)*
**letters** *(1)*
**level** *(2)*
**LFA** *(10)*
**Liability** *(4)*
**liable** *(4)*
**License** *(1)*
**lien** *(1)*
**lift** *(2)*
**lifted** *(3)*
**limitations** *(1)*
**Limited** *(2)*
**line** *(4)*
**listed** *(1)*
**listening** *(1)*
**litigant** *(1)*
**litigated** *(1)*
**litigating** *(2)*
**litigation** *(8)*
**little** *(4)*

**live** *(4)*
**LLP** *(2)*
**loan** *(6)*
**loaning** *(1)*
**loans** *(2)*
**long** *(1)*
**look** *(13)*
**looked** *(1)*
**looks** *(2)*
**loss** *(1)*
**lost** *(2)*
**lot** *(8)*
**lower** *(1)*

**< M >**
**machine** *(1)*
**major** *(1)*
**making** *(4)*
**marked** *(1)*
**math** *(1)*
**mathematician** *(1)*
**matter** *(5)*
**matters** *(4)*
**maximum** *(1)*
**mean** *(12)*
**meaning** *(1)*
**means** *(1)*
**meant** *(2)*
**mechanics** *(1)*
**MEDIATION** *(1)*
**memory** *(5)*
**mentioned** *(2)*
**Merit** *(1)*
**meritless** *(1)*
**merits** *(9)*
**metaphysical** *(1)*
**midpoint** *(1)*
**MILLER** *(22)*
**million** *(1)*
**minimum** *(9)*
**minus** *(4)*
**minutes** *(1)*
**mislead** *(1)*
**missed** *(1)*
**misstate** *(1)*
**mix** *(1)*
**Mm-hmm** *(3)*
**money** *(13)*
**Montgomery** *(1)*

**month** *(1)*
**monthly** *(1)*
**months** *(3)*
**mortgage** *(8)*
**motion** *(16)*
**moved** *(2)*
**multiple** *(1)*

**< N >**
**name** *(1)*
**nation** *(1)*
**necessary** *(1)*
**need** *(4)*
**negotiate** *(3)*
**negotiation** *(1)*
**never** *(2)*
**new** *(3)*
**North** *(1)*
**note** *(2)*
**noted** *(3)*
**notes** *(1)*
**notice** *(18)*
**noticed** *(1)*
**number** *(6)*
**numbers** *(2)*

**< O >**
**objection** *(1)*
**obligation** *(5)*
**obligations** *(1)*
**obvious** *(1)*
**obviously** *(1)*
**o'clock** *(1)*
**October** *(3)*
**offended** *(2)*
**offenses** *(1)*
**offhand** *(1)*
**official** *(1)*
**Oh** *(3)*
**Okay** *(11)*
**once** *(6)*
**ones** *(2)*
**Online** *(1)*
**open** *(1)*
**opinion** *(1)*
**opportunity** *(6)*
**opposite** *(1)*
**order** *(20)*
**ordinarily** *(1)*

Transcript of Arbitration 2.24.2022                Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

oriented *(1)*
originally *(1)*
ourself *(1)*
outset *(1)*
outstanding *(1)*
owed *(5)*
owes *(1)*
owing *(1)*

**< P >**
pachinko *(1)*
page *(5)*
pages *(1)*
paid *(2)*
panel *(60)*
panels *(2)*
panel's *(14)*
papers *(4)*
paragraph *(5)*
part *(2)*
particularly *(1)*
parties *(7)*
partners *(1)*
Partnership *(1)*
party *(6)*
patience *(2)*
pay *(5)*
paydown *(1)*
payment *(1)*
penny *(1)*
People *(2)*
perceived *(1)*
percent *(1)*
permitted *(1)*
permutations *(1)*
person *(1)*
personal *(3)*
persuasive *(1)*
PETER *(1)*
petition *(1)*
picked *(1)*
pie *(2)*
place *(2)*
placed *(2)*
placing *(1)*
pladig@bayardlaw.com *(1)*
plain *(2)*
plainly *(1)*

plaintiff *(1)*
planned *(1)*
play *(1)*
playing *(1)*
plead *(8)*
pleaded *(2)*
pleading *(15)*
pleadings *(5)*
pleads *(1)*
please *(2)*
pled *(16)*
pledged *(1)*
plus *(4)*
point *(13)*
pointed *(2)*
points *(1)*
policy *(1)*
position *(2)*
possible *(2)*
practical *(1)*
prehearing *(2)*
preliminary *(8)*
prepaid *(4)*
preparing *(1)*
prepayment *(2)*
presentations *(1)*
presumably *(2)*
pretty *(2)*
prevail *(2)*
prevailing *(6)*
preview *(1)*
previously *(2)*
primarily *(2)*
primary *(1)*
principal *(4)*
principally *(1)*
prior *(5)*
probably *(2)*
problem *(1)*
procedural *(14)*
procedurally *(1)*
procedure *(2)*
procedures *(2)*
proceed *(1)*
proceeding *(4)*
proceedings *(4)*
process *(14)*
production *(1)*
profound *(1)*

promised *(1)*
promptly *(2)*
proper *(2)*
properly *(3)*
property *(2)*
proponent *(1)*
proposed *(16)*
proposing *(2)*
proposition *(1)*
prospective *(1)*
protect *(8)*
protected *(2)*
protecting *(14)*
protection *(1)*
provide *(2)*
provided *(1)*
provision *(4)*
provisions *(2)*
publishing *(1)*
pull *(1)*
pursuant *(2)*
pursuing *(1)*
pushing *(1)*
put *(8)*

**< Q >**
quarter *(1)*
question *(11)*
questions *(1)*
quote *(2)*

**< R >**
raise *(2)*
raised *(1)*
raising *(1)*
rate *(6)*
read *(3)*
readable *(1)*
reading *(1)*
real *(1)*
really *(11)*
Realtime *(1)*
rearguing *(1)*
reargument *(6)*
reason *(3)*
reasoned *(2)*
reasons *(2)*
recall *(1)*
receipt *(2)*

receive *(1)*
receptive *(1)*
recognize *(1)*
reconsider *(1)*
reconsideration *(2)*
record *(9)*
recorded *(2)*
recover *(3)*
recovery *(3)*
Reference *(1)*
refers *(1)*
reflected *(2)*
reflection *(1)*
refusal *(2)*
regard *(1)*
regarding *(1)*
regards *(1)*
Registered *(1)*
regular *(1)*
reject *(1)*
rejected *(2)*
relationship *(2)*
relevant *(3)*
relief *(3)*
rely *(2)*
remedy *(1)*
remember *(3)*
repay *(3)*
repayment *(2)*
repeat *(2)*
repetitively *(1)*
REPORTED *(2)*
reporter *(4)*
representations *(1)*
reprises *(2)*
requested *(2)*
requesting *(2)*
require *(4)*
required *(2)*
requirements *(1)*
requires *(1)*
residence *(5)*
resistance *(1)*
resolution *(2)*
resolved *(1)*
resolving *(1)*
respect *(2)*
respectfully *(3)*
respond *(1)*

Hosie Rice, LLP, et al. v. Frome Wye Limited, Incorporated

**Respondent** (2)
**respondents** (1)
**response** (3)
**rest** (1)
**restricted** (1)
**result** (2)
**return** (5)
**revenue** (4)
**reversed** (1)
**revisit** (1)
**RICE** (18)
**Rice's** (2)
**right** (31)
**rigorous** (1)
**rise** (1)
**risk** (9)
**risky** (1)
**RMR** (2)
**routinely** (1)
**Rule** (12)
**ruled** (2)
**rules** (7)
**ruling** (2)
**run** (3)
**running** (1)

**< S >**
**safely** (1)
**San** (1)
**santer** (1)
**saved** (1)
**saw** (1)
**saying** (15)
**says** (13)
**scheduled** (2)
**Second** (4)
**Section** (1)
**secured** (13)
**security** (1)
**see** (11)
**seeking** (1)
**seize** (1)
**sense** (1)
**sent** (2)
**separate** (1)
**sequence** (1)
**series** (1)
**SERVICES** (1)
**set** (12)

**setting** (1)
**severally** (2)
**shaking** (1)
**sheet** (1)
**shift** (1)
**shifting** (7)
**short** (5)
**Shorthand** (2)
**shosie@hosielaw.com** (1)
**show** (2)
**shows** (2)
**side** (2)
**side's** (2)
**sign** (1)
**signature** (1)
**signed** (2)
**significant** (1)
**signing** (1)
**simple** (3)
**simply** (4)
**simultaneous** (1)
**single** (1)
**sir** (1)
**sitting** (1)
**situation** (1)
**six** (4)
**six-page** (1)
**slightly** (1)
**slow** (1)
**sorry** (1)
**sort** (6)
**Space** (2)
**speak** (3)
**specific** (4)
**specifically** (1)
**specificity** (4)
**speculative** (3)
**SPENCER** (5)
**spent** (4)
**spreadsheet** (1)
**squarely** (1)
**standard** (8)
**standards** (1)
**start** (3)
**started** (1)
**starting** (2)
**state** (3)
**statement** (5)

**states** (1)
**statute** (7)
**statutory** (1)
**stay** (1)
**stenographic** (1)
**steps** (2)
**Steven** (3)
**stop** (2)
**straight** (2)
**streamline** (6)
**streamlining** (1)
**Street** (2)
**strict** (1)
**strikes** (1)
**stronger** (1)
**stuff** (1)
**subject** (1)
**submit** (2)
**submitted** (1)
**subsequent** (1)
**substance** (3)
**Substantially** (1)
**substantive** (18)
**subtract** (1)
**suddenly** (2)
**sufficient** (2)
**suggesting** (1)
**Suite** (2)
**sum** (1)
**summarize** (1)
**summation** (1)
**support** (1)
**supported** (1)
**supposed** (6)
**sure** (5)
**sustained** (1)

**< T >**
**take** (5)
**taken** (3)
**talk** (3)
**talking** (5)
**tax** (2)
**taxes** (1)
**tell** (1)
**term** (1)
**terms** (8)
**testimony** (1)
**Thank** (17)

**themes** (1)
**theories** (2)
**theory** (1)
**thing** (4)
**things** (7)
**think** (67)
**Third** (4)
**thorough** (1)
**thought** (8)
**three** (2)
**threshold** (1)
**time** (16)
**times** (1)
**today** (5)
**told** (3)
**top** (1)
**total** (1)
**Totally** (2)
**touch** (1)
**tough** (1)
**traditional** (1)
**transcribed** (1)
**transcript** (2)
**transmogrified** (1)
**transmuted** (1)
**tremendous** (1)
**trial** (3)
**trickling** (1)
**tried** (2)
**triggered** (2)
**true** (11)
**trumps** (1)
**trust** (1)
**try** (6)
**trying** (9)
**twice** (1)
**two** (7)
**two-fifty** (1)
**two-page** (1)
**typical** (1)

**< U >**
**unbridled** (1)
**uncertain** (1)
**underlying** (6)
**underscore** (1)
**understand** (11)
**understanding** (1)
**understood** (1)

**unrelated** *(1)*
**use** *(3)*
**usually** *(1)*
**usuary** *(2)*
**usurious** *(2)*
**usury** *(22)*

**< V >**
**vacate** *(1)*
**valid** *(2)*
**value** *(1)*
**version** *(2)*
**view** *(3)*
**views** *(1)*
**violated** *(1)*
**violation** *(1)*
**virtue** *(1)*
**vitiate** *(1)*
**vs** *(1)*

**< W >**
**wait** *(1)*
**waive** *(2)*
**waived** *(2)*
**waiver** *(1)*
**walk** *(1)*
**want** *(16)*
**warranting** *(1)*
**way** *(11)*
**weigh** *(1)*
**Well** *(16)*
**well-reasoned** *(1)*
**went** *(1)*
**we're** *(22)*
**we've** *(2)*
**Wilmington** *(1)*
**winning** *(1)*
**Witness** *(1)*
**witnesses** *(1)*
**won** *(1)*
**wondering** *(3)*
**WOODSFORD** *(24)*
**Woodsford's** *(1)*
**word** *(2)*
**work** *(1)*
**worked** *(1)*
**works** *(1)*
**write** *(1)*
**writing** *(1)*

**wrong** *(3)*
**WYE** *(13)*
**Wye's** *(5)*

**< Y >**
**Yeah** *(3)*
**year** *(3)*
**years** *(1)*

**< Z >**
**zero** *(2)*
**Zoom** *(1)*